UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MATTHEW BULL, Individually, and on
Behalf of All Others Similarly Situated,

                    Plaintiff,

    v.

22ND CENTURY GROUP, INC., HENRY
SICIGNANO, III AND JOHN T.
BRODFUEHRER,

                    Defendants.

Civil Action No. 19-cv-01285-EAW

Class Action

**AMENDED CLASS ACTION
COMPLAINT**

Jury Trial Demanded

**TABLE OF CONTENTS**

I.      NATURE AND SUMMARY OF THE ACTION ................................................ 1

II.     JURISDICTION AND VENUE ........................................................................ 9

III.    PARTIES ....................................................................................................... 10

        A.      Lead Plaintiffs ................................................................................... 10

        B.      Defendants ......................................................................................... 10

IV.     CONFIDENTIAL WITNESSES .................................................................... 12

V.      SUBSTANTIVE ALLEGATIONS ................................................................ 14

        A.      Background of 22nd Century .............................................................. 14

        B.      22nd Century's Precarious Financial Condition ....................................... 15

        C.      Defendants' Stock Promotion Scheme ..................................................... 18

        D.      The Authors ....................................................................................... 21

        E.      The Websites ..................................................................................... 24

        F.      The Articles ....................................................................................... 28

        G.      The October 2017 Offering ................................................................. 37

VI.     THE TRUTH SLOWLY EMERGES .............................................................. 39

        A.      The "Fuzzy Panda" Articles ................................................................. 39

        B.      The Undisclosed Letter to the Board ...................................................... 45

        C.      Sicignano Resigns as CEO .................................................................... 45

VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS ........................ 47

        A.      Defendants' SEC Filings ...................................................................... 48

        B.      The Promotional Articles ..................................................................... 52

        C.      October 26, 2018 Response and April 18, 2019 Response ......................... 59

        D.      Statements Concerning Material Weaknesses ........................................... 61

        E.      Defendants Sicignano and Brodfuehrer's Certifications Attached as
                Exhibits to 22nd Century's Quarterly and Annual Reports Were False and
                Misleading ........................................................................................ 64

VIII.   ADDITIONAL SCIENTER ALLEGATIONS .................................................. 65

IX.     CLASS ACTION ALLEGATIONS ................................................................ 68

X.      APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD-ON-THE-
        MARKET AND AFFILIATED UTE PRESUMPTIONS ................................... 70

XI.     LOSS CAUSATION ..................................................................................... 71

XII.    CAUSES OF ACTION .................................................................................. 73

COUNT I ............................................................................................................... 73

COUNT II .............................................................................................................. 76

COUNT III ............................................................................................................. 78

DEMAND FOR JURY TRIAL ............................................................................. 80

Lead Plaintiffs 22nd Century Investor Group ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants, allege the following based upon personal knowledge as to each Plaintiff and each Plaintiff's own acts, and information and belief as to all other matters, based upon the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding 22nd Century Group, Inc. ("22nd Century" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

Counsel for Plaintiffs has conducted extensive due diligence in preparation of this Amended Class Action Complaint ("Complaint"). Plaintiffs, among other things, retained the services of an independent investigation firm with extensive investigative experience, which made significant efforts to identify, locate, contact and interview former employees of Defendants potentially relevant information to the allegations in this Amended Complaint.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    This is a federal securities class action on behalf of all persons or entities who purchased or otherwise acquired 22nd Century securities between February 18, 2016 and July 31, 2019, both dates inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.      22nd Century is a small microcap-to-small cap[1] company claiming to have the technology and plant breeding expertise to regulate the level of nicotine (and other nicotinic alkaloids) in tobacco plants.  The Company has touted how it is able to grow tobacco with "up to 97% less nicotine than conventional tobacco."  The Company also purports to be developing cannabis plants and other cannabis-based products that contain little or no THC, the compound in cannabis responsible for the "high" experienced by users.

3.      This case involves a scheme to use undisclosed paid stock promotions to artificially inflate the price of 22nd Century's common stock.  The inflated stock was then used by Defendants to obtain a desperately needed cash infusion through a large stock offering.  The offering was highly successful, netting over $50 million from unsuspecting investors.  When the truth about the scheme emerged, 22nd Century's stock cratered, causing significant damages to investors.

4.      The articles prepared by the paid stock promoters were often released in coordination with the Company's press releases; attributed to "authors" with fake pseudonyms, some of whom had been involved in other stock manipulation schemes, and often repurposed information touted by the Company in its press releases and repeated talking points used by Defendant Sicignano at conferences, on earnings calls or at other public events.

5.      For example, a December 5, 2016 article posted to SmallCapExclusive.com and attributed to the pseudonymous "James Peters" largely parroted the contents of a 22nd Century Press Release issued by the Company on the same day, which announced that Sicignano and Dr. Paul Ruston, the Company's Vice President of Plant Biotechnology would speak at an upcoming "LD Micro Investor Conference."  The piece also asserted—with no shred of evidentiary

---

[1] A "microcap" company is a publicly traded company in the United States that has a market capitalization between approximately $50 million and $300 million.  A "small cap" is a publicly traded company in the United States that has a market capitalization between approximately $300 million and $2 billion

support—that "22nd Century Group appears uniquely positioned with enough biotechnology know-how in exploring revenue streams in the cannabis industry." 22nd Century's share price opened the day at a price of $0.92 per share, but closed the day up 19.6% to $1.10 per share on these news. The article did not disclose that it was a paid promotion.

6.     Similarly, a June 8, 2017 article posted to Born2Invest.com and attributed to the pseudonymous "Mark Collins" repurposed the contents of a 22nd Century Press Release two days earlier boasting the Company's "very low nicotine" tobacco varieties that contain "no foreign DNA" and "no trace of genetic modification. Collins's article also rephrased a quote from the press release and presented it as investment analysis: "the advantages are twofold. Not only can the company confidently approach large, global markets that would previously have been off-limits, it can bring a higher quality product to market domestically." On these news, 22nd Century's share price rose 2.7% from $1.84 per share to $1.89 per share. The article did not disclose that it was a paid promotion.

7.     An October 4, 2017 article posted to InvestingDaily.com and attributed to stock promoter John Persinos largely amalgamated and repeated content from 22nd Century press releases issued the day before, the prior week, and earlier that year. Within 2 days after the article was published, 22nd Century's stock price rose 11.8% from $3.05 to $3.41 per share. The article did not disclose that it was a paid promotion.

8.     Defendants' plan worked to perfection. When promotional articles began to appear in earnest in February 2017, the Company's stock price was only $1.08 per share. Articles touting 22nd Century, but concealing that they were paid stock promotions, appeared regularly over the next ten months. During that time, 22nd Century's stock price more than *tripled*, reaching a high of $3.41 per share on October 6, 2017.

9.      On October 11, 2017, Defendants issued over 20 million new shares at a price of $2.66 per share for a total cash infusion of over $50 million.  The price at which the shares were issued was nearly double the $1.3425 price that 22nd Century had obtained for its prior issuance of stock in October 2016, and represented an increase of over 146% from the Company's share price from February 2017.

10.      The stratospheric increase in the Company's stock price was plainly attributable to the paid promotions.  During the relevant time, the Company failed to develop any new cannabis or tobacco products.  Indeed, at a June 15, 2017 meeting with the FDA in Washington, D.C., the FDA was skeptical about approving such new products and questioned whether 22nd Century's "very low" nicotine cigarettes ("VLNC") in fact reduced smoking.  After the meeting, 22nd Century's then CEO told his executive assistant, who had attended the meeting as well, "[O]h shit, that didn't go well; this will take forever, we're f….d."

11.      Federal securities laws require companies and stock promoters to disclose any paid stock promotions.  In direct contravention to this requirement, the articles touting 22nd Century, which purported to be independent analyses of the appropriateness of investments in the Company, did *not* disclose that they were paid advertisements "written" by a network of writers—some of whom used aliases and pseudonyms—who made a living from this practice.

12.      Despite Defendants' best concealment efforts, the scheme was eventually exposed.  A key figure unmasking the ploy was 22nd Century's founder and former CEO.  On February 2, 2018, a user of the website Seeking Alpha[2] by the name of "Fuzzy Panda" published an article questioning whether 22nd Century's VLNC products were that revolutionary or close to FDA approval (the "February 2 Article").  The article also pointedly identified a series of

---

[2] Seeking Alpha is a financial news and analysis website. It publishes third party reports, analysis, and commentary as articles, and permits open discussion of the articles.

articles touting 22nd Century, some of which disclosed that they were stock promotions, and some of which did not.  On this news, shares of 22nd Century fell $0.35 per share or over 11% to close at $2.73 per share on February 2, 2018.

13.    Defendants knew, but never disclosed, that "Fuzzy Panda" was in fact 22nd Century's former CEO, Joseph Pandolfino ("Pandolfino"), who had been ousted in 2014. Indeed, Pandolfino had posted a photograph of himself to his account on the investing social networking site "StockTwits," where he also used the username "Fuzzy Panda."  The photograph showed him in a panda costume, standing in front of 22nd Century's headquarters.

14.    On March 7, 2018, a second article appeared on Seeking Alpha by a user called "ShareSleuth" (the "Stealth Promotion Article").   The Stealth Promotion Article was titled, "Pretenders and Ghosts: Stealth promotion network exploits financial sites to tout stocks," and laid out in painstaking detail how a network of writers, some of whom went by aliases and pseudonyms, had flooded the markets with articles promoting various stocks.   The article identified dozens of articles written by the network of writers, including 24 articles on 22nd Century between February 2017 and October 2017 alone.

15.    The article also described how the same network of writers had touted companies that were clients of the investor relations consulting firm IRTH Communications ("IRTH"). IRTH handled 22nd Century's investor relations in 2017, and continues to provide investors relations services to the Company today.

16.    The Stealth Promotion Article noted that the articles on 22nd Century appeared suspiciously timed to occur immediately before the Company had announced its October 2017 offering.

17.     Then, on October 25, 2018, "Fuzzy Panda" disclosed in another Seeking Alpha article that the SEC had received but denied a Freedom of Information Act ("FOIA") request for "all documents in the possession of SEC that pertain to investigations regarding 22nd Century Group (XXII) for the time period January 1, 2016 through July 16, 2018" because doing so could "reasonably be expected to interfere with on-going enforcement proceedings." The article also summarized the contents of the Stealth Promotion Article.  On this news, shares of 22nd Century fell $0.11 per share or over 4% to close at $2.45 per share on October 25, 2018.

18.     The next day, in response to the October 25 article,  Defendants issued a press release attacking the credibility of the article's author and the veracity of the article's contents (the "October 26 Response").  The October 26 Response characterized the October 25 Article as a "highly deceptive article published . . . by a self-professed short seller of the Company's stock who launched his smear campaign in an effort to dupe shareholders into selling their shares of 22nd Century Group stock," but did not disclose that they knew that the article was created by Joe Pandolfino.

19.     The October 26 Response also stated that "22nd Century has not received any notice of, and the Company has no knowledge of, any enforcement proceeding against 22nd Century by the SEC or any other regulator."  The October 26 Response also did not disclose the SEC had opened an investigation into the Company, including its accounting controls, in late 2015 or early 2016.

20.     Six months later, on April 17, 2019, Fuzzy Panda posted yet another article to Seeking Alpha concerning 22nd Century (the "April 17 Article").  The article was entitled, "22nd Century: Key Patents Behind MRTP and PMTA Applications Have Expired!"  The article alleged, among other things, that 22nd Century's key patents behind the tobacco used in its FDA

applications had begun to expire and that large tobacco manufacturers had the ability to create very low nicotine cigarettes.  On April 16, 2019, the Company's stock price closed at $1.92 per share.  The stock price fell to 1.6% to $1.89 per share on April 17, 2019, after the April 17 article was published, and fell 1.06% further the following day to $1.87 per share.

21.     On April 18, 2019, Defendants issued a response to the April 17 Article (the "April 18 Response").  The April 18 Response acknowledged that certain of the Company's low-nicotine patents had expired, but insisted that the Company still possessed patents that would enable it "to block any competitor from developing VLNC tobacco." The response also claimed that it would take "Big Tobacco" manufacturers several years before they could manufacture a low-nicotine plant.  The April 18 Response effectively denied that the Company had used undisclosed stock promotions or that the Company was the subject of an SEC investigation.  The April 18 Response did not disclose that the April 17 Article was written by former CEO Joe Pandolfino.

22.     On or about May 31, 2019, Sicignano's former executive assistant sent 22nd Century's Board of Directors (the "Board") a letter (the "Board Letter") stating, among other things, that Sicignano had disclosed on multiple occasions in 2017 that he was working "behind the scenes" to "get [22nd Century's] stock price up," by which he meant that he was working with IRTH to have undisclosed stock promotional articles published to artificially inflate the price of the Company's stock.  Sicignano had told his executive assistant that he needed to do whatever it took to get the stock price raised so that the Company would be listed on the "Russell Index," which would allow the Company to raise the cash it needed to survive, *i.e.*, at least $45 million.

23.     Defendants did not disclose the Board Letter or its content to investors.

24.     Within two weeks of the letter, the Company issued a press release stating that it had appointed Michael Zercher, the Company's Vice President of Business Development, to Chief Operating Officer.  The release also described Zercher responsibilities in that role, which included, among other things, working with the FDA to implement a rule requiring all cigarettes sold in the United States have minimally or non-addictive levels of nicotine, obtaining a Modified Risk Tobacco Product ("MRTP") marketing order from the FDA for the 22nd Century's VLNC cigarettes, and developing the Company's hemp/cannabis intellectual property portfolio, *i.e.*, all of the responsibilities assigned to Sicignano prior to the Board Letter.  In short, Sicignano was out, but the Company wanted the market to understand that his responsibilities were being handled *before* his departure was announced.

25.     On Friday, July 26, 2019, at the close of trading, the Company announced that Sicignano had resigned as CEO of 22nd Century for "personal reasons."  Sicignano's resignation was a materialization of the risk that he would have to step down if investors learned that he had participated in a scheme to artificially inflate 22nd Century's share price.  When trading closed after the next trading day, on July 29, 2019, the Company's stock price had fallen $0.05 per share to $1.81 per share, a decline of 2.7%.  As the market digested the news of Sicignano's resignation, the Company's share price continued to fall until it bottomed out at $1.36 per share on August 1, 2019, a decline of 26.9%.

26.     Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations and prospects. Specifically, Defendants failed to disclose that: (i) 22nd Century's stock was being manipulated through paid stock promotions; (ii) such conduct would subject 22nd Century to heightened regulatory scrutiny by the SEC; (iii) 22nd Century had been under

SEC investigation, including in connection with material weaknesses in the Company's internal accounting controls; and (iv) consequently, 22nd Century's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

27.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiffs and other members of the Class have suffered significant losses.

## II.     JURISDICTION AND VENUE

28.     The federal law claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

29.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, codified at 15 U.S.C. § 78aa.

30.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who continuously and systematically transacts business within this Judicial District or has sufficient minimum contacts with this Judicial District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.  The Company has operated and continues to operate dozens of retail stores in this Judicial District, and the Individual Defendants do, or did during the relevant time period, exercise authority over those retail stores.

31.     Venue is proper in this Judicial District pursuant to § 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts charged herein occurred in substantial part in this Judicial District.  The parties jointly stipulated to a transfer of this action to this Judicial District from the United States District Court for the Eastern District of New York on September 3, 2019 (the

"Eastern District").   The stipulation was so-ordered by the Eastern District on September 6, 2019.

32.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of a national securities exchange.

### III.     PARTIES

#### A.  Lead Plaintiffs

33.     Plaintiffs 22nd Century Investor Group, as set forth in their previously filed Certification (ECF No. 11, Ex. 2), acquired 22nd Century securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

#### B.  Defendants

34.     Defendant 22nd Century Group, Inc., purports to provide technology that increases or decreases the nicotine levels and other nicotinic alkaloids in tobacco plants and cannabinoids in hemp/cannabis plants through genetic engineering and plant breeding.   22nd Century is incorporated in Nevada.   Its principal place of business is in Williamsville, New York. 22nd. Century's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "XXII."

35.     Defendant Henry Sicignano III ("Sicignano") has served as the Company's Chief Executive Officer ("CEO") since March 3, 2015. He also served as the Company's Chief Operating Officer ("COO") from October 25, 2014 to March 3, 2015.

36.     Defendant John T. Brodfuehrer ("Brodfuehrer") has served as the Company's Chief Financial Officer ("CFO") since March 2013 and serves as the Company's Treasurer.

37.     Defendants Sicignano and Brodfuehrer are collectively referred to herein as the "Individual Defendants."

38.     The Individual Defendants, because of their positions as Executive Officers of 22nd Century, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market.   The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected.

39.     Because of their positions with the Company and access to material non-public information available to them but not to the public, all the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading.  Based on this knowledge, and based on the acts and omissions alleged below, each Individual Defendant was a culpable participant in the scheme to defraud the Class.  The Individual Defendants are liable for the false statements pleaded herein.

40.     22nd Century is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

41.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to 22nd Century under *respondeat superior* and agency principles.

42.     Defendants 22nd Century and the Individual Defendants are collectively referred to herein as "Defendants."

## IV.     <u>CONFIDENTIAL WITNESSES</u>

43.     In connection with their investigation of this matter, Plaintiffs interviewed several former 22nd Century employees identified herein as confidential witnesses ("CWs").   All confidential witnesses are referred to in the masculine to protect their identities.

44.     CW1 worked at 22nd Century from January 2016 until January 2019.   From January 2016 to February 2018, CW1 was the executive assistant to Sicignano and the Company's patent librarian.   In his role as patent librarian, CW1 monitored the Company's intellectual property portfolio and tracked annuity payments related to those patents.   CW1 worked directly outside of Sicignano's office in the executive suite and was responsible for, among other things, attending meetings with Sicignano and taking minutes at monthly management meetings and Board meetings.   The management meetings were attended by Sicignano, Brodfuehrer, and Thomas James ("James"), the Company's Vice President, General Counsel and Secretary, as well as other of the Company's vice presidents.   CW1 interacted with Sicignano throughout the day.   CW1 also interacted frequently with Brodfuehrer and James. CW1 traveled with Sicignano and other 22nd Century executives to industry events and conferences, and attended a meeting with the FDA on June 15, 2017.   In February 2018, CW1 became project manager of the 22nd Century's cannabis initiative.   CW1 terminated by 22nd Century in January 2019.

45.     CW2 was the Accounting Manager at 22nd Century from April 2016 to February 2019.   CW2 was based at the Company's corporate headquarters and reported directly to Brodfuehrer.   As Accounting Manager, CW2 was responsible for financial reporting, internal controls, day-to-day journal entries, general ledger reconciliations and bank reconciliations. He

also helped with Form 1099s, assisted human resources and the Company's controller, worked with the senior IT analyst and helped with the financial forecast and budgeting.  He also interfaced with the Company's auditors during annual audits.

46.     CW2 was hired after the Company and its auditors had identified a material weakness in its accounting controls.  On February 18, 2016, the Company filed its annual report on Form 10-K with the SEC.[3]  The 2015 10-K disclosed that "our management concluded that as of December 31, 2015, that our internal controls over financial reporting were not effective and that material weaknesses exist in our internal control over financial reporting."  The 2015 10-K went on to state that the material weakness consists of controls associated with segregation of duties whereby individuals have incompatable [SIC] duties within the financial reporting area."

47.     CW2 stated that he was told he was hired to remediate the weakness associated with "segregation of duties."  In its quarterly report on Form 10-Q for the Second Quarter of 2018, filed August 9, 2018, the Company disclosed that "[d]uring the second quarter of 2016, we hired an additional accounting employee to assist with remediating our material weakness associated with a lack of segregation of duties."  The Company claimed that it had "completed the implementation and testing of a remediation plan that was targeted at eliminating our previously reported material weakness in our internal controls over financial reporting primarily resulting from a lack of segregation of duties."

48.     Although the Company disclosed the material weakness in its accounting controls, it failed to disclose that it was being investigated by the SEC in connection with

---

[3] During the Class Period, the Company filed annual reports with the SEC on forms 10-K for: 2015 on February 18, 2016 (the "2015 10-K"); 2016 on March 8, 2017 (the "2016 10-K"); 2017 on March 7, 2018 (the "2017 10-K"); and a 10-K for 2018 on March 6, 2019 (the "2018 10-K"). Defendants Sicignano and Brodfuehrer signed each of the 2015 10-K, 2016 10-K, 2017 10-K and 2018 10-K.

material weaknesses at the Company.  The SEC investigation was already under way when he

was hired, and it continued throughout 2016.  CW2 stated that he never saw any statement from

the SEC formally closing the investigation.

49.     The SEC investigation was so serious that the Company retained counsel to

represent it and potentially Brodfuehrer in the investigation.  According to CW2, Brodfuehrer

traveled to Washington, D.C., in 2016 to meet with the SEC.  Brodfuehrer told CW2 that he

feared he could lose his CPA license or even be imprisoned.

50.     On February 26, 2019, after CW2's health had declined, Brodfuehrer abruptly

fired him.  For a period of several weeks after terminating CW2, 22nd Century operated without

an Accounting Manager and therefore its accounting controls suffered from material weaknesses.

Not only did the Company never disclose continued material weakness, but on March 6, 2019,

22nd Century filed its 2018 10-K and Sicignano and Brodfuehrer certified they had disclosed "to

the registrant's auditors and the audit committee of registrant's board of directors (or persons

performing equivalent functions) . . . . All significant deficiencies and material weaknesses in the

design or operation of internal control over financial reporting."

## V.     SUBSTANTIVE ALLEGATIONS

### A.  Background of 22nd Century

51.     22nd Century is a small company, with only approximately 82 employees as of

February 22, 2019.  These employees are split between the Company's corporate headquarters in

Williamsville, NY, and it manufacturing facility and warehouse in Mocksville, North Carolina.

52.     On March 3, 2015, the Company announced that the Board had elected Sicignano

to serve as CEO of 22nd Century.  The release also stated that Sicignano would continue to serve

as the Company's President and remain a member of the Board.

53.     One of Sicignano's first acts as CEO was to retain the California-based consulting firm IRTH Communications ("IRTH") to be responsible for the Company's investor relations. The Company's press releases before Sicignano's hiring on do not identify IRTH as an investor relations contact for 22nd Century.  Beginning with the first 22nd Century press release after Sicignano's hiring, dated March 25, 2015, however, IRTH is identified as the contact for investor relations information for 22nd Century.

54.     IRTH has been accused of involvement in improper undisclosed paid stock promotions.  For example, in June 2017, cannabis company MassRoots, Inc. ("MassRoots") announced that OTC Markets Group, Inc., an American financial market providing price and liquidity information for almost 10,000 over-the-counter (OTC) securities, had made MassRoots aware of improper undisclosed promotional activity.  MassRoots then disclosed that IRTH was one of the consultants it had disclosed to handle its investor relations.  In addition, a securities class action filed in July 2018 alleged that IRTH had "bragg[ed] to potential clients" about its role in a stock promotion scheme.  The class action was voluntarily dismissed without prejudice in December 2018.

**B.  22nd Century's Precarious Financial Condition**

55.     In 2013, 22nd Century entered into a partnership with BAT, an international tobacco company with over $32 billion in global revenue and the second largest cigarette maker in the United States.  Under the terms of the partnership, BAT made an upfront payment of $7 million to 22nd Century and agreed to pay 22nd Century up to an additional $7 million upon the completion of certain developmental milestones.  If BAT did not reach those milestones by October 2017, however, it could end the partnership without paying any of the additional $7 million.  Sicignano disclosed on a February 18, 2016 earnings call that the milestones were ones "that BAT *and BAT alone* can meet or not meet" (emphasis added).  In other words, BAT

controlled whether or not it would reach the milestones that would trigger the payment of some or all of the $7 million, and effectively could decide whether it wanted to continue the relationship or end the partnership.

56.     As time passed, and the Company's cash reserves continued to fall, the additional $7 million BAT had agreed to pay 22nd Century became an existential lifeline for the Company. At the time Sicignano took over the reigns as CEO, 22nd Century had only approximately $6.4 million cash on hand for the following 9 months.  The following February, the Company reported cash on hand of only $3,760,297, and that it could only continue operating for the next 9 months.

57.     Sicignano tried to replenish the Company's cash reserves through new stock issuances.  As time went by, however, the Company had to issue more and more stock at poor prices, diluting the holdings of its investors and struggling to obtain cash to stay afloat.  For example, on February 5, 2016, the Company closed a registered direct offering of common stock and warrants consisting of 5,000,000 shares of the Company's common stock and warrants to purchase 2,500,000 million shares at $1.21 per share. The stock and warrants were sold for $1.10 per unit, resulting in net proceeds to the Company in the amount of $5,091,791.  Just under six months later, on July 27, 2016, the Company closed another registered direct offering of common stock and warrants consisting of 6,172,840 shares of the Company's common stock and warrants to purchase 7,043,211 shares of the Company's common stock.  Less than three months later, on October 19, 2016, the Company again tapped the market again, this time selling 8,500,000 shares of the Company's common stock and warrants to purchase 4,250,000 shares of the Company's common stock at an exercise price of $1.45 per share. The common stock and

warrants were sold for $1.3425 per unit, resulting in net proceeds to the Company in the amount of $10,707,823.

58.      Even with the additional cash generated by the October 2016 offering, the Company disclosed in February 2017 that it only had enough cash to stay afloat until May 2018. Defendants knew that the Company could not keep going back to the market for small infusions of capital and expect to survive.

59.      To make matters worse, by early 2017, Defendants, including Sicignano, knew that BAT would not make the $7 million payment.  Sicignano made that clear to CW1 during their daily interactions.  Sicignano told CW1 that BAT's "expert researchers [had] looked at [the Company's low-nicotine patents] over two years and didn't see value."

60.      CW1 also could tell that BAT was not likely to continue the partnership based on his interactions with BAT.  One of CW1's responsibilities was to send quarterly patent update reports to BAT describing the state of 22nd Century's patents worldwide.  The patent updates included information about patents the company was in the process of applying for, obtaining, or that had been recently approved. These reports summarized whether an application had been submitted for a patent, approved, or if there were annuities due.  By the start of 2017, however, BAT had stopped asking for the reports, signaling that they were not going to continue the partnership.  CW1 stated that he knew that the Individual Defendants were aware that BAT was not going to pursue the relationship because "it was actually a big concern at the company — [the BAT agreement] was viewed as kind of a core deal."

61.      Strapped for cash, the Company took steps to raise money from investors.  On December 30, 2016, the Company had filed a Form S-3, universal shelf registration statement, with the U.S. Securities and Exchange Commission ("SEC") that was declared effective by the

SEC on January 17, 2017 (the "Registration").  The Registration allowed the Company to raise

up to $100 million of capital over a three-year period ending on January 17, 2020.   The

Defendants knew that they needed to raise an enormous amount of capital in the short term

pursuant to the Registration or the Company was likely to go under.

### C.  Defendants' Stock Promotion Scheme

62.     Section 17(b) of the Exchange Act imposes a duty to disclose that a stock

promoter received consideration for promoting a company's securities.   15 U.S.C. §77q(b).

Section 17(b) provides that:

> It shall be unlawful for any person, by the use any means or instruments of
> transportation or communication in interstate commerce or by the use of the
> mails, to publish, give publicly to, or circulate any notice, circular, advertisement,
> newspaper, article, letter, investment service, or communication, which, though
> not purporting to offer a security for sale, describes such security for a
> consideration received or to be received, directly or indirectly, from an issuer,
> underwriter, or dealer, without fully disclosing the receipt, whether past or
> prospective, of such consideration and the amount thereof.

63.     The SEC has also issued investor bulletins alerting investors to the use of stock

promoters that state that, to protect investors from being misled by such materials, the federal

securities laws require stock promoters to disclose the entity that retained them and the amount

and type of any payments that they received as compensation for their engagement.

64.     In February and March 2017, however, Sicignano told CW1 on multiple

occasions as part of their daily interactions that he was "working behind the scenes" to prop up

22nd Century's stock price.  These statements struck CW1 as odd, because the Company had not

achieved any new research or product development milestones, like securing new intellectual

property, did not have any new product ready to bring to market and did not have any low

nicotine cigarette under consideration by the FDA.  Sicignano told CW1 that Sicignano needed

to pump up the Company's stock price because 22nd Century did not have enough cash to

operate for much longer and needed an infusion of $45 to $50 million to keep operating. Sicignano further told CW1 that his plan was to pump up the Company's share price so that the Company would be added to the "Russell Index."  Sicignano said that once the Company was added to the Index and achieved a stock price of at least $2.00 per share, the Company could issue a stock offering that would raise the $45–$50 million it needed to keep operating.

65.     CW1 also explained that Defendants knew that they would not be able to bring a low-nicotine tobacco product to the market in time to save the Company because on June 15, 2017, the FDA had told Defendants at a meeting in Washington, D.C., that they did not necessarily believe that very low nicotine cigarettes could be an effective smoking cessation tool.

66.     CW1 recounted that he had personally attended the meeting, which lasted approximately an hour and was also attended by Sicignano, James and others from 22nd Century.  At that meeting, the FDA told Defendants that they did not believe that 22nd Century had proven that its product was any safer than regular cigarettes.  The FDA also made it clear that it did not want to approve new cigarettes.  CW1 recalls that the 20 or so attendees from the FDA grilled Sicignano, asking repeatedly how 22nd Century could know that its proposed very low nicotine cigarettes were any safer than a regular cigarettes.  After the meeting, Sicignano told CW1, "oh shit, that didn't go well; this will take forever, we're f…ed."  Nevertheless, Defendants issued a press release the following day optimistically characterizing the meeting as a "very encouraging and productive," with a "positive exchange" on the basis of which 22nd Century would "move forward with a significantly expanded Modified Risk Tobacco Product ("MRTP") application" for a very low nicotine cigarette.

67.     CW1 questioned Sicignano repeatedly about how he would get the stock price up under these circumstances.  Based on these conversations, CW1 came to understand that

Sicignano and the Company were paying for writers to write articles disguised as a legitimate articles that just promoted 22nd Century's stock.  These articles were not identified as stock promotion articles.  CW1 understood from these conversations that Sicignano was using IRTH, the Company's investor relations consultant as part of his scheme to pay and place articles touting the 22nd Century.  In addition, CW1 said that it was clear from the way Sicignano spoke to CW1 that he knew that paying third parties to write articles promoting 22nd Century's stock without disclosing that it had paid for the articles was not appropriate.

68.    CW1 said he was sure that Sicignano's efforts "behind the scenes" included reviewing, editing and/or approving the paid stock promotion articles because Sicignano was intensely focused on everything that was said publicly about the Company and "went over every Company press release with a fine-toothed comb."  CW1 also said that Sicignano told him that it was essential to tout 22nd Century to the market "even if nothing is happening."

69.    Brodfuehrer and Sicignano worked so closely together that it is thus not plausible that Brodfuehrer did not know about Sicignano's work with undisclosed stock promotions. Brodfuehrer suggested as much to CW1.  In addition, Brodfuehrer told CW1 on multiple occasions in 2017 that he was not comfortable signing the Company's SEC filings because he had concerns about Sicignano.  CW1 mentioned Brodfuehrer's concerns to the General Counsel, Thomas James, in early 2017.  James responded that "people need to save [Sicignano] from himself."

70.    From February 2017 through October 2017, Defendants, either directly or in conjunction with IRTH, retained multiple stock promoters to artificially prop up the price of 22nd Century's common stock.  Many of the articles published under the bylines of these authors were closely tied to press releases issued by Defendants and repeated statements that were

furnished by Defendants.  In all, in late 2016 and 2017 Defendants arranged for at least 24 promotional articles to be released that touted the Company's stock.  To protect investors from being misled by such materials and to ensure full and accurate disclosures, the federal securities laws require disclosure of the entity that retained stock promoters and the amount and type of payments that they received as compensation for their engagement.

71.     Defendants furnished information and language for, prepared, reviewed, approved, and/or ratified the articles that promoted 22nd Century's start as part of their scheme, and recklessly disregarded and/or tolerated that the articles were being published in violation of Section 17 of the Securities Act.  Many of these promotional articles largely parroted Defendants' language from 22 Century's press releases and copied or used other statements that had been prepared and issued by the Company.

72.     Moreover, Sicignano reviewed and approved statements in the Company's press releases as a matter of common practice, thus he reviewed and approved the articles before publication, either by closely reviewing the contents of press releases that he knew would be effectively cut and pasted into the articles "written" by the network of writers, and/or by reviewing and approving the articles themselves.  Brodfuehrer either knew from his interactions with Sicignano or recklessly turned a blind eye to Sicignano's activities in using the promotional network to prop up the Company's stock.

**D.  The Authors**

73.     Defendants' scheme was executed through a network of writers, many of whom were pseudonymous, who were paid by Defendants, directly or indirectly, to promote the Company's stock.

74.     For example, at least six articles promoting 22nd Century's stock were written during the Class Period by "John Persinos" ("Persinos").  As reported in the Stealth Promotion

Article, Persinos is one of a group of writers who have produced nearly 100 stories from 2016 to 2018 touting companies represented by IRTH.  Persinos purports to be an editor and writer at the financial website Investing Daily.  None of Persinos's pieces on 22nd Century disclosed that he was compensated by 22nd Century for writing the articles.

75.     At least another six articles promoting 22nd Century's stock were written by "Samuel Rae" ("Rae").  As reported in the Stealth Promotion Article, Rae purports to be a British citizen living in Spain.  The Stealth Promotion Article described in detail how Rae posted "roughly 180 articles at Seeking Alpha and a dozen similar sites" between 2013 and 2018 touting various stocks backed by financier Barry C. Honig, who had been linked to improper stock touting schemes, and IRTH Communications.  None of Rae's pieces on 22nd Century disclosed that he was compensated by 22nd Century for writing the articles.

76.     At least two more articles promoting 22nd Century's stock during the Class Period were written by "James Peters" ("Peters").  As reported in the Stealth Promotion Article "James Peters" is a pseudonym for a writer (or group of writers) that post articles on the websites SmallCapExclusive.com and SmallCapNetwork.com.[4]  None of Peters's pieces on 22nd Century disclosed that he was compensated by 22nd Century for writing the articles.

77.     At least two more articles promoting 22nd Century's stock during the Class Period were written by "Mark Holder" ("Holder"), who frequently posts articles to Seeking Alpha under the name "Stone Fox Capital."   Holder has also posted articles to the website TalkMarkets.com ("TalkMarkets").   As reported in the Stealth Promotion Article, of the 14 articles on specific companies Holder has posted to "TalkMarkets," five were about companies

---

[4] SmallCapNetwork was created by Lawrence Isen, who has been repeatedly charged with and/or found to have committed stock manipulation, including in 1993, 2001, 2007 and most recently on September 23, 2019 by the United States Attorney for the Eastern District of New York.

represented by IRTH, including 22nd Century.  As described in the Stealth Promotion Article, several pieces by Holder touting companies appeared within days of articles touting the same companies by other members of the group of writers who disseminated undisclosed promotional articles on 22nd Century, including Persinos, Rae and "George Ronan."  None of Holder's promotions of 22nd Century disclosed that he was compensated by 22nd Century for writing the articles.

78.     At least two more articles promoting 22nd Century's stock during the Class Period were written by "Luke Douglas" ("Douglas").  As reported in the Stealth Promotion Article, Douglas is a pseudonym for a person or persons engaged in undisclosed stock touting on various websites.  The byline "Luke Douglas" was listed on 13 articles covering IRTH Communications clients, including the two articles on 22nd Century.  Douglas also wrote articles on a company called Bingo Nation Inc., which was separately covered by Rae, Peters and "George Ronan."  The SEC stopped trading in Bingo Nation's shares in April 2017 because of potentially inaccurate public information and manipulative stock transactions.  Neither of Douglas's pieces on 22nd Century disclosed that he was compensated by 22nd Century or IRTH Communications for writing the articles.

79.     At least one article promoting 22nd Century's stock during the Class Period was written by "Reese Morgan" ("Morgan").  As reported in the Stealth Promotion Article, Morgan is a pseudonym for a person or persons engaged in undisclosed stock touting on various websites.  Morgan's piece on 22nd Century did not disclose that he was compensated by 22nd Century or IRTH Communications for writing the article.

80.     At least one article promoting 22nd Century's stock during the Class Period was written by "Edward Tarpin" ("Tarpin").  As reported in the Stealth Promotion Article, Tarpin is a

pseudonym for a person or persons engaged in undisclosed stock touting on various websites. The photo listed next to Tarpin's name on SmallCapExclusive is actually of a stockbroker in North Carolina named Brett Parkis.  Tarpin's piece on 22nd Century did not disclose that he was compensated by 22nd Century or IRTH Communications for writing the articles.

81.     At least one article promoting 22nd Century's stock during the Class Period was written by "Mark Collins" ("Collins").  As reported in the Stealth Promotion Article, Collins is a pseudonym for a person or persons engaged in undisclosed stock touting on various websites. Mark Collins's piece on 22nd Century did not disclose that he was compensated by 22nd Century or IRTH Communications for writing the articles.

82.     At least one article promoting 22nd Century's stock during the Class Period was written by "George Ronan" ("Ronan").  As reported in the Stealth Promotion Article, "George Ronan" is a pseudonym for a writer (or group of writers) that post articles on websites.  The Stealth Promotion Article described how, in surveying bylines for Ronan, the Stealth Promotion Article's author found *three* different photos associated with the name "George Ronan." Ronan's piece on 22nd Century did not disclose that he was compensated by 22nd Century or IRTH Communications for writing the articles.

83.     Finally, at least one article promoting 22nd Century's stock during the Class Period was written by "Adam Russell" ("Russell").  Russell is also a pseudonym for a writer (or group of writers) who post articles about companies online.   The website MuckRack.com attributes dozens of articles to Russell in the last three months alone, all containing speculation about stocks and commodities.

**E.  The Websites**

84.     Defendants' scheme was also executed by disseminating the articles on financial websites whose content was supplied by the sites' users.

24

85.     For example, Born2Invest.com purports to be a "digital news organization dedicated to writing about and publishing the business and financial affairs of the world." Born2Invest.com also purports to employ flesh-and-blood financial writers.  One of these authors was the pseudonymous "Mark Collins."  Although Born2Invest's website disclaimer references Section 17(b) of the Securities Act, it also claims that "[t]he information contained on our website and other publications are carefully compiled by Born2Invest from public sources that we believe to be reliable." Born2Invest states that it "does not endorse, independently verify, or assert the truthfulness or reliability of any statements or data obtained from third-party sources that are published by us about the profiled companies on our website or other publications," but claims that "we do not publish information that we know is incorrect."

86.     Buzzfeed.com publishes online articles by professional journalists as well as individuals and entities that submit "posts," which it claims are reviewed and approved for publication by BuzzFeed Community editors.

87.     According to its Wikipedia page, EconomicCalendar.com is "a financial news agency headquartered in New York City" that is "popular amongst financial communities and provides business news and market commentary, as well as original articles on finance, industry, investing, and marketing topics."  In addition, "[t]he website is also known for producing and monitoring market-moving events including indices, currencies, commodities, and stock market."

88.     Equities.com is a financial news and analysis website comprised of articles created by aspiring writers and/or financial analysts who become members of the website. Equities.com's disclaimer states in part that "[t]he companies mentioned on this website have not approved the content or timing of the information being published unless otherwise noted."  The

article on 22nd Century posted to Equities.com did not state that the content or timing of the information had been approved.

89.    GuruFocus.com is a website that purports to provide financial news, commentaries, research and other articles on investing and investment markets.

90.    Investing.com is an online data and news website that provides financial information, including news, analysis, streaming quotes and charts, technical data and financial tools about the global financial markets.  Much of Investing.com's content is submitted by its users.  Investing.com will publish any content submitted by users as long as that content is "well written, makes a clear point, requires no corrections or editing and is focused on markets relevant to United States traders and investors. Self-promotional material will automatically be denied, as will material that is no longer timely."  Investing.com does not purport to fact-check or otherwise confirm the accuracy of the articles it publishes.

91.    InvestingDaily.com ("InvestingDaily") is a website that purports to offer independent investment news and analysis, a message board where users can exchange ideas and subscription services where users can subscribe to receive investment recommendations.   In February 2019, InvestingDaily agreed to modify advertisements and testimonials for its subscription service after an independent regulatory body complained that those promotions and testimonials could be misleading.

92.    MarketExclusive.com is an online data and news website that purports to be "an investor driven research platform where new investment ideas from a[n] exclusively selected group of seasoned investment analysts and qualified members from various disciplines are able to deliver their investment thesis' across various industries and sectors."   Much of

MarketExclusive.com's content is submitted by "contributors," who are third parties that submit articles to the website.

93.    Minyanville.com is a website that publishes investment and business articles and licenses other financial content from financial websites that include Yahoo Finance, MSN Money, AOL Money & Finance and MarketWatch.

94.    MoneyShow.com is the website associated with a financial media company that sponsors workshops, conferences, cruises and other events that seek to education investors.  The site offers articles, videos, webcasts and other content "from the nation's leading financial newsletter advisors."

95.    Seeking Alpha is a financial news and analysis website that publishes third party reports, analysis, and commentary as articles, and lets users comment on these articles. As of July 2019, Seeking Alpha had 1.5 million daily unique visitors and 17 million monthly unique visitors.

96.    SmallCapExclusive.com is a website that claims that it is "the number one small cap stock market financial news resource."  A disclaimer on SmallCapExclusive.com states that "Small Cap Exclusive is owned and operated by JBN PARTNERS LLC, which is a US based corporation. We are paid advertisers, also known as stock touts or stock promoters, who disseminate favorable information (this "Article") about publicly traded companies (the "Profiled Issuers")."

97.    TalkMarkets.com is a social financial news and analysis platform that allows its users to read articles, track topics or companies and share investment ideas.  The article content on TalkMarkets.com is generated by "contributors" to TalkMarkets.com or by third parties who post material to TalkMarkets.com.

98.     Scutify.com is an online social network focused on the stock market. Users who create accounts can track stocks and use a message board and other functions to chat about the stock with other Scutify members.

99.     TheStreet.com is a website run by TheStreet, Inc., which provides news and financial analysis targeted to investors.   TheStreet.com has adopted a formal conflicts and disclosure policies. Editorial staff may not hold positions in individual stocks. While editorial staff may own mutual funds, the ownership must be disclosed in any article referencing the fund. Outside columnists may at times write about companies in which they hold shares, but must disclose such ownership.  TheStreet states that its outside columnists may not be paid promoters.

**F.  The Articles**

100.    The articles used by Defendants to disseminate undisclosed paid stock promotions were made from or using statements furnished by Defendants.  The articles were also reviewed and approved by Sicignano before publication, either by reviewing the statements before they were furnished to the writers, or by reviewing the articles themselves.  These articles included:

101.    On December 5, 2016, Defendants published, or caused to be published, an article by the pseudonymous James Peters titled "Why 22nd Century Group Inc (NYSEMKT:XXII) Shares Jumped This Week."  The article parroted the contents of a press release issued by the Company on the same day, which announced that Sicignano and Dr. Paul Ruston, the Company's Vice President of Plant Biotechnology would speak at an upcoming "LD Micro Investor Conference."  The article did not disclose that it was a paid stock promotion.

102.    On February 22, 2017, the Company issued a press release proclaiming that a former business partner, Crede CG III, Ltd. ("Crede") had dismissed certain claims Crede was asserting against the Company in litigation concerning a joint venture in China that the Company had terminated ("February 22 Release").  The same day, an article by the pseudonymous James

Peters appeared on SmallCapExclusive.com entitled, "22nd Century Group Inc (NYSEMKT:XXII) Shares React to Crede's Dismissal of Claims." The article simply repeated the statements in the press release and concluded by saying that if a planned summary judgment motion by 22nd Century was granted, the Company's "could be in for another wave higher on a successful resolution of the portion of the case in the SDNY court." The article did not disclose that it was a paid stock promotion.

103.   On March 30, 2017, Defendants published, or caused to be published, an article TheStreet.com purportedly by Persinos entitled, "Collect Smokin' Hot Profits From This Marijuana Biotech." The article described 22nd Century as a "small but well-financed biotech." The article was designed to disseminate statements from a 22nd Century press release the week before. The article also included a quote from the Company's vice president for plant biotechnology, Paul Rushton, which had been stated in the press release. It also repeated the Company's standard talking point that Sicignano had repeated countless times on earnings calls and at conferences, that the Company had "created genetically engineered tobacco plants to have . . . 97% less nicotine than conventional strains." The article did not disclose that it was a paid stock promotion.

104.   On April 6, 2017, Defendants published, or caused to be published, an article EconomicCalendar.com purportedly by Rae entitled, "Here's Why 22nd Century Group Inc (NYSEMKT:XXII) Could be the Only Play on the Back of a Global Shift in the Tobacco Industry." The website EconomicCalendar.com appears to no longer exist, and the article is no longer available. On April 6, after the article was posted, 22nd Century's stock price jumped 3.2% from $1.26 per share to $1.30 per share.

105.    On April 7, 2017, Defendants published, or caused to be published, an article on Investing.com purportedly by Rae entitled, "22nd Century Group Inc. is Quietly Preparing for a Changed Tobacco."   The article repeated talking points from 22nd Century press releases, including that 22nd Century is the only company in the world that is able to produce tobacco with less than 0.4 mg/g of nicotine without having to use a post-processing technique, that 22nd Century's patents prevent any other company from producing similar tobacco using 22nd Century's methods, and that 22nd Century intended to re-submit an application for approval of one of its very-low-nicotine cigarettes.  The article coupled its rehashing of 22nd Century's press releases and SEC filings with the claim that if the FDA were to approve low-nicotine cigarettes, it could provide 22nd Century with a "more than 10 times multiple."  On April 7, after the article was posted, 22nd Century's share price jumped 3.8% from $1.30 to $1.35 per share.  The article did not disclose that it was a paid stock promotion.

106.    On April 12, 2017, Defendants published, or caused to be published, an article on Seeking Alpha purportedly by Rae entitled, "Getting To The Details At 22nd Century Group, Inc."  The article repeated the same talking points from the above-mentioned April 7, 2017 article by Rae.  The article contained the following disclaimer, "I/we have no positions in any stocks mentioned, and no plans to initiate any positions within the next 72 hours. I wrote this article myself, and it expresses my own opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article."   After the article was published, 22nd Century's share price rose 1.52% from $1.31 per share to $1.33 per share.  The article did not disclose that it was a paid stock promotion.

107.    On April 13, 2017, Defendants published, or caused to be published, an article on TalkMarkets.com purportedly by the pseudonymous "Reese Morgan" entitled "A Big Opportunity—If Common Sense Can Prevail."  The article was posted on Talkmarkets.com, but appears to have been subsequently deleted.

108.    On May 3, 2017, Defendants published, or caused to be published, an article by Persinos titled "This Marijuana Stock Isn't Afraid of Jeff Sessions."  The article was posted on Investing.com and recommended investing in 22nd Century's stock.  The article was designed to further disseminate representations from a press release the Company issued on April 20, 2017. For example, the April 20 Press Release had that 22nd Century scientists and "sponsored researchers are now developing important 'enabling tools' that allow for the targeted manipulation of cannabinoid production in the cannabis plant" and "[o]ur expertise is in high demand by research universities, state agricultural programs, growers, and hemp processors." Persinos's article repeated these representations nearly verbatim.  The article did not disclose that it was a paid stock promotion.

109.    Two days later, on May 5, 2017, Defendants published, or caused to be published, an article by Persinos on InvestingDaily.com titled "This Pot Stock Isn't Afraid of America's Top Cop."  The article repeated the representations furnished by Defendants from Persinos's May 3 article, described above, and also parroted statements from a May 1 press release from the Company on FDA authorization of a clinical trial for a 22nd Century very low nicotine cigarette.

110.    On May 9, 2017, Defendants published, or caused to be published, an article by an individual using the alias "Edward Tarpin" titled "22nd Century Holdings Pushes Ahead With Revised Guidance and Impressive Financials" on SmallCapExclusive.com.  The article appears

to have been subsequently deleted from SmallCapExclusive.com.   After the article was published, 22nd Century's share price rose 6.9% from $1.31 per share to $1.40 per share.

111.   On May 30, 2017, Defendants published, or caused to be published, an article by Mark Holder of Stone Fox Capital titled "22nd Century: No Harm Owning This Stock" on Seeking Alpha.  The article parroted statements about the FDA approving a clinical trial from a recent 22nd Century press release and also made substantively similar statements about nicotine levels recommended by the World Health Organization and 22nd Century's ability to produce such very-low-nicotine cigarettes that had appeared in Rae's April 7, 2017 Investing.com article described above.  Holder's article did not disclose that it was a paid stock promotion.

112.   On June 8, 2017, Defendants published, or caused to be published, an article by the pseudonymous "Mark Collins" titled "This Company is Close to Producing a Tobacco Plant That Doesn't Cause Addiction."   The article was posted on Born2Invest.com, and copied the contents of a 22nd Century press release two days earlier about the purported results of a test of very low nicotine tobacco plants and North Carolina State University.  Since its publication, the article's byline has been changed to state that it was created by "Born2Invest Staff," even though it includes a "DISCLAIMER" at the bottom of the article stating that "This article was written by a third party contributor"—*i.e.*, not Born2Invest's staff, and "does *not* reflect the opinion of Born2Invest, its management, staff or its associates" (emphasis added).   After the article was published, 22nd Century's share price rose 2.7% from $1.84 per share to $1.89 per share.  The article did not disclose that it was a paid stock promotion.

113.   On July 31, 2017, Defendants published, or caused to be published, an article by an individual using the alias "Luke Douglas" titled "22nd Century Uniquely Positioned To Take Advantage Of New FDA Regulations."  The article was posted on Scutify and Minyanville.com.

The article has since been revised so that the byline on Minyanville.com lists "Scutify" as the author, but nevertheless states at the bottom of the article that "[t]his article was written by Luke Douglas for on .[SIC]"  Douglas's article is a rewrite of a press release issued the same day by 22nd Century concerning an FDA announcement that the regulator "plans to begin a public dialogue about lowering nicotine levels in combustible cigarettes to non-addictive levels through achievable product standards."  For example, the third paragraph of Douglas's article repurposes, with minor stylistic edits, the second paragraph of 22nd Century's press release.  The article is designed to suggest that independent analysts agree that FDA announcement was beneficial to the Company.  After the article was published, 22nd Century's share price rose 8.6% from $1.75 per share to $1.90 per share, and within four days had risen 41% to $2.47 per share. The article did not disclose that it was a paid stock promotion.

114.    On August 2, 2017, Defendants published, or caused to be published, an article by John Persinos titled "Betting on Cannabis as a Cure for Addiction (Yes, You Read That Right)." The article was posted on InvestingDaily.com and recommended investing in 22nd Century's stock.  The article suggested—with no evidence—that "[e]mpirical evidence shows that cannabis also can be used to ease additions, notably for tobacco."  It then falsely asserted that the FDA had "opened a large door to the moneymaking potential of marijuana as a cure for nicotine addiction" before awkwardly transitioning to a discussion of 22nd Century's purported very low nicotine tobacco cigarettes, which do not contain cannabis.  The article then repeated statements from the above-described articles by Persinos from May 3 and May 5, 2019.  These statements included paraphrases of 22nd Century press releases, such as "22nd Century also produces THC-free marijuana that's in demand among farmers, medical scientists, and agricultural programs across the U.S.," and "22nd Century is the only company in the world capable of producing

33

tobacco cigarettes at this extremely low level of nicotine, without having to use potentially harmful artificial extraction or chemical processes."   After the article was published, 22nd Century's share price rose 28% from $1.93 per share to $2.47 per share.   The article did not disclose that it was a paid stock promotion.

115.    On August 3, 2017, Defendants published, or caused to be published, an article by Mark Holder at Stone Fox Capital titled "22nd Century: FDA Catalyst."   The article was posted on TalkMarkets.com.   The article included several paragraphs essentially summarizing prior 22nd Century press releases.   It also included content taken directly from the Company's July 31, 2017 press release, which stated that "[b]y producing cigarettes that contain less than 0.6 mg of nicotine per cigarette, 22nd Century has already met Dr. Kessler's standard and has simultaneously demonstrated that the FDA's targets are both technically achievable and realistic."   Holder's article made the exact same claim, stating that "The good news for investors is that 22nd Century offers a Very Low Nicotine cigarette that meets the standards to reduce nicotine below the addictive levels. The cigarettes contain less than 0.6 mg nicotine per cigarette and less than 0.05 mg nicotine yield per cigarette."   After the article was published, 22nd Century's share price rose 28% from $1.93 per share to $2.47 per share.   The article did not disclose that it was a paid stock promotion.

116.    On August 7, 2017, Defendants published, or caused to be published, an article by the pseudonymous "Luke Douglas" titled "FDA Initiative to Reduce Nicotine Spells Potential for 22nd Century Group Inc."   The article was posted on Scutify and Minyanville.com and consists of an amalgamation of an FDA press release, several 22nd Century Press Releases, and talking points that Sicignano has made on earnings calls, in presentations and at conferences.   The article has since been revised so that the byline on Minyanville.com lists "Scutify" as the author, but

nevertheless states at the bottom of the article that "[t]his article was written by Luke Douglas for on .[SIC]"  The article did not disclose that it was a paid promotion.

117.    On August 9, 2017, Defendants published, or caused to be published, an article by Danielle Sabrina titled "5 of the Most Innovative Companies in Healthcare."  The article was posted on Buzzfeed.com and touted 22nd Century.  The article has since been deleted from Buzzfeed's site.  Within two days after the article was published, 22nd Century's share price rose 2.7% from $2.24 per share to $2.30 per share.

118.    On September 21, 2017, Defendants published, or caused to be published, an article by an individual using the alias "George Ronan" titled "An Opportunity in the Tobacco Industry: 22nd Century Group."  The article was posted on GuruFocus.com and recommended investing in 22nd Century's stock.  The article was posted on Scutify and Minyanville.com and consists of an amalgamation of an FDA press release, several 22nd Century Press Releases, and talking points that Sicignano has made on earnings calls, in presentations and at conferences, including that "22nd Century Group is the only company in the world with the technology (patented technology) to grow and produce tobacco that contains the levels of nicotine generally regarded as being low enough to have the desired effect on aggregate cigarette consumption in the U.S." and "the U.S. government is currently contracting 22nd Century Group to produce so-called 'research cigarettes' with which it can investigate the potential impact of a VLN product on the smoking population."  The article did not disclose that it was a paid promotion.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.  The article did not disclose that it was a paid stock promotion.

119.    On September 22, 2017, Defendants published, or caused to be published, an article by Samuel Rae titled "With Regulatory Support, 22nd Century Group Is Stronger Than

Ever."  The article was posted on Investing.com.  The article largely regurgitated statements

made in the September 21, 2017 article by "George Ronan," described above, which was derived

from an FDA press release, several 22nd Century Press Releases, and talking points that

Sicignano has made on earnings calls, in presentations and at conferences.  The article did not

disclose that it was a paid promotion.  The article was created, placed and paid for in connection

with Defendants' scheme to inflate 22nd Century's stock price.  The article did not disclose that

it was a paid stock promotion.

120.    On October 4, 2017, Defendants published, or caused to be published, an article

by an individual using the alias "Adam Russell" titled "22nd Century Group Inc

(NYSEMKT:XXII) American Opportunities Tobacco Hemp."  The article was posted on

MarketExclusive.com and touted 22nd Century's stock.  The article has since been removed

from MarketExclusive.com.  Within 2 days after the article was published, 22nd Century's stock

price rose 11.8% from $3.05 to $3.41 per share.

121.    On October 4, 2017, Defendants published, or caused to be published, an article

by Persinos titled "Cannabis Nation: From Woodstock to Wall Street" on InvestingDaily.com.

Like the above-described article by Persinos on August 2, although the article was purportedly

about trading stock in cannabis businesses, the article abruptly switched to coverage of 22nd

Century's announcement that its *tobacco* products would be the subject of an upcoming *tobacco*

conference.  The article then switched back to a generic discussion of cannabis business, and

then back to a discussion of 22nd Century's tobacco business, specifically repeating claims made

in a 22nd Century press release the week before regarding the termination of the BAT

partnership.  Within 2 days after the article was published, 22nd Century's stock price rose

11.8% from $3.05 to $3.41 per share. The article did not disclose that it was a paid stock promotion.

122.    On October 6, 2017, Defendants published, or caused to be published, an article by Samuel Rae titled "22nd Century Group Has Two Different But Rewarding Shots On Goal." The article was posted on Equities.com and recommended investing in 22nd Century's stock. The article did not disclose that it was a paid promotion.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.  The article did not disclose that it was a paid stock promotion.

123.    On October 10, 2017, Defendants published, or caused to be published, an article by Samuel Rae titled "22nd Century Group Is Down But Could Quickly Recover."  The article was posted on Seeking Alpha the same day that the company filed its Prospectus with the SEC for the October 2017 Offering.  The article stated that although 22nd Century's stock price had fallen 13%, from $3.41 per share to $2.99 per share, in the wake of the announcement of the October 2017 Offering, investors should "pick up some discounted shares of his or her own in anticipation of . . . long-term growth."  The article was designed to try artificially boost the stock by staving off further declines that could affect the October 2017 Offering.  The article worked, as 22nd Century's stock price stopped declining and rose 1.7% from $2.99 per share to $3.04 per share.  The article did not disclose that it was a paid promotion.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.  The article did not disclose that it was a paid stock promotion.

### G.  The October 2017 Offering

124.    Defendants' scheme to use undisclosed stock promotions to tout the Company's share price was a triumphant success.  For example, on June 26, 2019, the company officially joined the "Russell Microcap Index," *i.e.*, the Russell Index that Sicignano had emphasized to

CW1 was essential to 22nd Century's future and was part of the scheme to prop up the Company's stock price.

125.   The articles also massively boosted the Company's share price.   When the undisclosed promotions began appearing in earnest in 2017, the Company's stock price was at $1.08 per share.  On the day the October 2017 offering closed, October 11, 2017, the Company's stock price was at $2.94 per share, an increase of approximately 172%.   The increase in the Company's share price was the result of the stock promotions because during this time the Company did not announce any new products or file any modified risk tobacco product applications with the FDA for approval.

126.   On October 10, 2017, the Company closed a registered direct common stock offering with institutional investors for approximately $54 million in gross proceeds through the sale of 20.57 million shares of common stock at a price of $2.625 per share, securing net proceeds of approximately $50.7 million.  When the Company filed its 2017 10-K on March 7, 2018, it disclosed that it now had "cash and cash equivalents and short-term investment securities" on hand totaling $62,635,047.  Whereas the Company had previously not been able to assure investors that it had enough cash to operate for much longer than a year, the Company represented that it "believe[d] this amount of cash and cash equivalents and short-term investment securities will be adequate to sustain normal operations and meet all current obligations as they come due for a number of years."

127.   Defendants' scheme to pump up 22nd Century's stock price had been a smashing success.  After the October 2017 Offering closed, Sicignano bragged to CW1 that, as a result of the offering, he received such a large bonus that it had to be broken down "in two sections."

128.    Sicignano's compensation windfall is reflected in the Company's SEC filings. After failing to receive a bonus in 2015 or 2016, the Board gave Sicignano a bonus of $94,800 for his work in 2017.  Sicignano had not received a bonus in 2016 or 2015.  In addition, after receiving a 5% salary increase from 224,231 to 235,808 in from 2015 to 2016, and a 3% salary increase from 235,808 to 242,690 for 2016 to 2017, the Board awarded Sicignano a 23.4% raise over his 2017 salary from 242,690 to 300,000.  By working "behind the scenes" with paid stock promoters to boost 22nd Century's share price, Sicignano reaped a personal windfall of over $150,000 in additional compensation.

## VI.    THE TRUTH SLOWLY EMERGES

129.    The truth began to emerge through a series of corrective disclosures and materializations of risks.

### A.  The "Fuzzy Panda" Articles

130.    On February 2, 2018, an individual going by the online user ID "Fuzzy Panda" posted an article to Seeking Alpha entitled "22nd Century — Cutting Through the Smoke and Hype — 75% Downside."  The article claimed, among other things, that 22nd Century had exaggerated the value of its patent portfolio and the uniqueness of its tobacco products, operated with "negative gross margins," i.e., sold its tobacco products at a loss and did not have the ability to produce a low-nicotine cigarette (at least in the near term).  The article also stated that 22nd Century used a years' long "[r]ampant paid stock promotion" scheme to inflate 22nd Century's share price.  According to the article, the sponsors of some of the articles from 2014 through 2017 were undisclosed.  The article included the following partial list identifying paid stock promotions that had and had not been disclosed.

131.   On February 1, 2018, the Company's stock price closed at $3.08 per share.  After the February 2 Article was released, the Company's share price fell $0.35 per share, or over 11.4%, to $2.73 per share on February 2, 2018.  By February 5, 2018, the Company's share price had fallen to $2.56, a total decline of 16.9%.

132.   CW1 stated that the author of the February 2, 2018 article was 22nd Century's co-founder, Joseph Pandolfino, who served as the Company's CEO from January 1998 to November 2014.

133.   CW1 stated that General Counsel James showed him Pandolfino's "StockTwits"[5] user page and the photo of Pandolfino in the panda costume in February or March 2018, after the

---

[5] StockTwits is a social media platform or "social network" designed specifically for traders and investors to share ideas in real time.  The platform, which can be accessed via an application, or "app" on a computer, tablet or smartphone, allows traders to share charts, links, and short messages about different stocks. These pieces of information are then aggregated into streams for each individual stock.

February 2, 2018 Seeking Alpha article was published.  Pandolfino had at least one StockTwits account in 2018.  According to CW1, the username or "handle" associated with a StockTwits account belonging to Pandolfino was "Fuzzy Panda."  The Fuzzy Panda StockTwits account also featured a photo of Pandolfino himself wearing a panda costume and pointing at the Company's sign at its prior corporate headquarters in Clarence, New York.

134.    General Counsel James told CW1 that Pandolfino had authored the February 2 article.  Sicignano and Brodfuehrer knew that Pandolfino was the author of the February 2 article as well.  Indeed, CW1 stated that it was known throughout the office that Pandolfino was "Fuzzy Panda" and had written the February 2 Seeking Alpha article.

135.    On March 7, 2018, an individual or entity named "ShareSleuth" published the Stealth Promotion Article, an expose on Seeking Alpha entitled "Pretenders and Ghosts: Stealth Promotion Network Exploits Financial Sites to Tout Stocks."  The article described in detail how a group of writers, many of whom wrote stories covering the same companies, and some who appeared to be pseudonyms, had produced hundreds of articles touting companies owned by a specific financier, as well as almost 100 promotional pieces about clients of IRTH, including 22nd Century.

136.    On July 16, 2018, a nonpublic Freedom of Information Act ("FOIA") request was submitted seeking "all documents in the possession of the SEC pertaining to investigations regarding 22nd Century Group (XXII) for the time period January 1, 2016 through July 16, 2018."  On August 13, 2018, a FOIA Officer denied the request pursuant to FOIA Exemption (b)(7)(A) ("Exemption 7(A)").  Exemption (b)(7)(A) authorizes the withholding of "records or information compiled for law enforcement purposes, but only to the extent that production of such law enforcement records or information . . . could reasonably be expected to interfere with

enforcement proceedings." On September 14, the denial was appealed to the SEC's Office of the General Counsel.  On September 21 The SEC Office of the General Counsel denied the appeal, stating that it had confirmed that "releasing the withheld information could reasonably be expected to interfere with on-going enforcement proceedings."

137.    On October 25, 2018, Fuzzy Panda disclosed the FOIA request and denials in a second article on Seeking Alpha, which suggested that the SEC had open investigations into 22nd Century, including for its involvement in a potential pump and dump scheme.  The article described how that the SEC had refused to provide documents in response to a FOIA request because it would interfere with an ongoing SEC investigation.  The article included the following screen capture, with highlighting, of a letter from the SEC's Office of the General Counsel:

138.    The October 25 Article also summarized the findings of the Stealth Promotion Article, which had suggested that Defendants had used a network of undisclosed paid stock promoters to pump up 22nd Century's stock price in advance of the October 2017 stock offering.

139.    On October 24, 2018, 22nd Century's stock price closed at $2.56 per share.  The following day, after the release of the October 25 Article, the Company's stock price fell $0.11 per share to $2.45 per share, a decline of 4.3%.

140.    The October 25 Article was also written by Joe Pandolfino.  On October 26, 2018, the Company issued a press release entitled, "22nd Century Group Comments on Grossly Misleading 'Short and Distort' Article" in response to the October 25 Article ("October 26 Response").   The October 26 Response characterized the October 25 Article as a "highly deceptive article published . . . by a self-professed short seller of the Company's stock who launched his smear campaign in an effort to dupe shareholders into selling their shares of 22nd Century Group stock."  The October 26 Response did not disclose that the Company and the Individual Defendants had known for months that former 22nd Century CEO Joe Pandolfino had written the October 25 Article.  Instead, Sicignano stated in the press release that, "[t]hough the author of the 'short and distort' article on 22nd Century failed to disclose his own name, the Company plans to notify the SEC of the article, of all persons associated with it, and of their intent to deceive 22nd Century's shareholders."   Defendants did not disclose that the author of the article was former CEO Pandolfino.

141.    The October 26 Response also misleadingly stated that "22nd Century has not received any notice of, and the Company has no knowledge of, any enforcement proceeding against 22nd Century by the SEC or any other regulator."   This statement was false and

misleading, because Defendants knew that the Company had been, and might still be, under SEC investigation, including for material weaknesses in its internal accounting controls.

142.    The October 26 Response concluded with Sicignano stating that "[b]y persuading unsophisticated shareholders that something is amiss, unscrupulous short sellers are essentially stealing from ordinary investors. We hope that the SEC will punish such wrongful behavior. In the meantime, we have a business to run and a mission to execute. We will not respond to any further short seller articles."

143.    Six months later, on April 17, 2019, Fuzzy Panda posted another article to Seeking Alpha concerning 22nd Century.  The article was entitled, "22nd Century: Key Patents Behind MRTP and PMTA Applications Have Expired!"  The article alleged, among other things, that 22nd Century's key patents behind the tobacco used in its FDA applications had begun expiring in 2018.  The article also alleged that so-called "Big Tobacco" manufacturers now had the ability to manufacture low-nicotine tobacco patents that could adhere to FDA low nicotine standards.  The article also repeated the allegations in the February 2 and October 25 articles that the Company had used undisclosed paid stock promoters to write articles to pump up 22nd Century's stock price and that 22nd Century was the subject of an SEC investigation.  On April 16, 2019, the Company's stock price closed at $1.92 per share.  The stock price fell to 1.6% to $1.89 per share on April 17, 2019, after the April 17 article was published, and fell 1.06% further the following day to $1.87 per share.

144.    Although the Company had stated in its October 26 Response that "[w]e will not respond to any further short seller articles," the Company issued a response to the April 17 Article on April 18 (the "April 18 Response").  The April 18 Response proclaimed Defendants' innocence:  "The 'short and distort' article also states that 22nd Century has paid authors to write

stock promotion articles; subsequently, this allegation has been used to file class action and derivative lawsuits.  22nd Century has previously publicly stated and continues to assert that the claims made in the on-going class action and shareholder derivative cases related to such matters are frivolous [and] meritless."  Nevertheless, the April 18 Response did not disclose that Defendants had directly or indirectly paid undisclosed stock promoters to write numerous articles designed to pump up 22nd Century's stock, including 24 in 2017 alone.

145.    The April 18 Response also misleadingly stated that "the self-serving 'hit piece' article falsely alleges that 22nd Century is supposedly under SEC investigation."  The response went on to say that "[a]s 22nd Century has publicly stated on several occasions, 22nd Century has not received any notice of, and the Company has no knowledge of, any enforcement proceeding against 22nd Century by the SEC or any other regulator."  The April 18 Response did not, however, disclose that 22nd Century had been, and may still be, subject to at least one SEC investigation in connection with the material weakness disclosed in its accounting protocols.

**B.  The Undisclosed Letter to the Board**

146.    CW1 was fired by 22nd Century in January 2019.  On May 31, 2019, CW1 sent a whistleblower letter to the Board notifying them of, among other things, the stock promotion scheme and exaggerations CW1 believed that Sicignano and James had been making at industry conferences about the progress of the Company's cannabis initiative.

147.    The Board did not respond to CW1's letter.

148.    Defendants did not disclose the Board Letter or its contents to the market.

**C.  Sicignano Resigns as CEO**

149.    On June 14, 2019, within two weeks of CW1's letter to the Board, 22nd Century announced that it had appointed Michael Zercher ("Zercher") as Chief Operating Officer of the Company.  Zercher had been the Company's Vice President of Business Development since

October 2016. The Company's announcement stated that Zercher would "oversee and direct 22nd Century's efforts across marketing, sales, business development, research and development, regulatory affairs and operations as the Company works to: 1) Support the efforts of the U.S. Food and Drug Administration (FDA) and others to implement a new Agency rule requiring that all cigarettes sold in the U.S. contain only minimally or non-addictive levels of nicotine; 2) Obtain a Modified Risk Tobacco Product (MRTP) marketing order from the FDA for the Company's VLNC cigarettes; 3) Commercialize 22nd Century's proprietary VLNC cigarettes through strategic partnerships in the U.S. and internationally; 4) Develop the Company's hemp/cannabis intellectual property portfolio; and 5) Expand 22nd Century's presence in the hemp/cannabis value chain."

150.    When CW1 saw the press release, he recognized that the Board had actually fired Sicignano, likely in response to his letter. The responsibilities described in the letter as now belonging to Zercher had been Sicignano's. By stripping Sicignano of his responsibilities and giving those responsibilities to Zercher, the Board was effectively firing Sicignano.

151.    Six weeks later it was official. On July 26, 2019, 22nd Century announced that Sicignano had resigned as CEO for "personal reasons," although he would act as a consultant to the Company "for the next several years." The Press Release did not disclose, however, that Sicignano had been fired by the Board in response to CW1's letter, which disclosed to the Board that people outside the Company knew that, among other things, Defendants had engaged in an illegal stock promotion scheme designed to artificially pump up the Company's stock price through paid promotional articles that were not identified as such.

152.    On Friday, July 26, 2019, the Company's share price had closed at $1.86 per share. The share price plummeted in response to the news. First, on July 29, 2019, the

Company's share price closed at $1.81 per share, a decline of 2.7%. On July 30, as the market began to digest the implications of Sicignano's departure, the Company's share price fell to $1.71, a decline of an additional 5.5%. On July 31, 2019, the Company's share price fell to $1.59 per share, before bottoming out on August 1, 2019 at $1.36 per share. In all 22nd Century's share price fell from $1.86 to $1.36 in response to the news of Sicignano's "resignation," a decline of 27%. Sicignano's departure was the direct and foreseeable consequence of his participation in the scheme to pump up 22nd Century's share price using undisclosed paid stock promotions, and the declines in the Company's share price were the result of the materialization of the risk presented by that scheme.

153.    Throughout the Class Period, 22nd Century and the Individual Defendants made false and misleading statements concerning Defendants' scheme to artificially inflate the Company's stock and the existence of an SEC investigation and, as a result, 22nd Century's public statements were materially false and misleading at all relevant times.

## VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

154.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations and prospects. Specifically, Defendants failed to disclose that: (i) 22nd Century's stock was being manipulated through paid stock promotions; (ii) such conduct would subject 22nd Century to heightened regulatory scrutiny by the SEC; (iii) 22nd Century had indeed been under SEC investigation, including for material weaknesses in its internal accounting controls; and (iv) consequently, 22nd Century's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### A. Defendants' SEC Filings

155.    On February 18, 2016, the Company filed a Form 10-K with the SEC, which provided its financial results and position for the fiscal year ended December 31, 2015 (the "2015 10-K"). The 2015 10-K was signed by Defendants Sicignano and Brodfuehrer. The 2015 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Sicignano and Brodfuehrer attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

156.    The 2015 10-K stated that the Company's stock price was subject to volatility, but failed to disclose its stock could experience volatility due to manipulation and that Defendants were using paid promoters to artificially inflate the Company's stock price:

> ***Our stock price may be highly volatile and could decline in value.***
>
> Our common stock is currently traded on the NYSE MKT and the market prices for our common stock have been volatile. Further, the market prices for securities in general have been highly volatile and may continue to be highly volatile in the future. The following factors, in addition to other risk factors described in this section, may have a significant impact on the market price of our common stock:
>
> - results from and any delays in any clinical programs
> - failure or delays in entering potential products into clinical trials;
> - failure or discontinuation of any of our research programs;
> - delays in establishing new strategic relationships;
> - delays in the development of our potential products and commercialization of our potential products;
> - market conditions in our sector and issuance of new or changed securities
> - analysts' reports or recommendations;
> - general economic conditions, including recent adverse changes in the global financial markets;
> - actual and anticipated fluctuations in our quarterly financial and operating results;
> - developments or disputes concerning our intellectual property or other proprietary rights;

48

- introduction of technological innovations or new commercial products by us or our competitors;
- issues in manufacturing or distributing our products or potential products;
- market acceptance of our products or potential products;
- third-party healthcare reimbursement policies;
- FDA or other United States or foreign regulatory actions affecting us or our industry;
- litigation or public concern about the safety of our products or potential products;
- additions or departures of key personnel;
- third-party sales of large blocks of our common stock;
- sales of our common stock by our executive officers, directors, or significant stockholders; and equity sales by us of our common stock or securities convertible into common stock to fund our operations.

157.    On March 8, 2017, the Company filed a Form 10-K with the SEC, which provided its financial results and position for the fiscal year ended December 31, 2016 (the "2016 10-K"). The 2016 10-K was signed by Defendants Sicignano and Brodfuehrer. The 2016 10-K contained signed SOX certifications by Defendants Sicignano and Brodfuehrer attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The Company's 2016 10-K stated that "management concluded that our internal control over financial reporting was effective as of December 31, 2016."

158.    The Company's 2016 10-K stated that its stock price was subject to volatility but failed to disclose its stock could experience volatility due to manipulation and that Defendants were using paid promoters to artificially inflate the Company's stock price:

> ***Our stock price may be highly volatile and could decline in value.***
>
> Our common stock is currently traded on the NYSE MKT and the market prices for our common stock have been volatile. Further, the market prices for securities in general have been highly volatile and may continue to be highly volatile in the future. The following factors, in addition to other risk factors described in this section, may have a significant impact on the market price of our common stock:

- results from and any delays in any clinical programs
- failure or delays in entering potential products into clinical trials;
- failure or discontinuation of any of our research programs;
- delays in establishing new strategic relationships;
- delays in the development of our potential products and commercialization of our potential products;
- market conditions in our sector and issuance of new or changed securities
- analysts' reports or recommendations;
- general economic conditions, including recent adverse changes in the global financial markets;
- actual and anticipated fluctuations in our quarterly financial and operating results;
- developments or disputes concerning our intellectual property or other proprietary rights;
- introduction of technological innovations or new commercial products by us or our competitors;
- issues in manufacturing or distributing our products or potential products;
- market acceptance of our products or potential products;
- third-party healthcare reimbursement policies;
- FDA or other United States or foreign regulatory actions affecting us or our industry;
- litigation or public concern about the safety of our products or potential products;
- additions or departures of key personnel;
- third-party sales of large blocks of our common stock;
- sales of our common stock by our executive officers, directors, or significant stockholders; and equity sales by us of our common stock or securities convertible into common stock to fund our operations.

159.   On March 7, 2018, the Company filed a Form 10-K with the SEC, which provided its financial results and position for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Sicignano and Brodfuehrer. The 2017 10-K contained signed SOX certifications by Defendants Sicignano and Brodfuehrer attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud. The Company's 2017 10-K stated that "management concluded that our internal control over financial reporting was effective as of December 31, 2017."

160.    The Company's 2017 10-K stated that its stock price was subject to volatility but failed to disclose its stock could experience volatility due to manipulation and that Defendants were using paid promoters to artificially inflate the Company's stock price:

**Our stock price may be highly volatile and could decline in value.**

Our common stock is currently traded on the NYSE MKT and the market prices for our common stock have been volatile. Further, the market prices for securities in general have been highly volatile and may continue to be highly volatile in the future. The following factors, in addition to other risk factors described in this section, may have a significant impact on the market price of our common stock:

- results from and any delays in any clinical programs
- failure or delays in entering potential products into clinical trials;
- failure or discontinuation of any of our research programs;
- delays in establishing new strategic relationships;
- delays in the development of our potential products and commercialization of our potential products;
- market conditions in our sector and issuance of new or changed securities
- analysts' reports or recommendations;
- general economic conditions, including recent adverse changes in the global financial markets;
- actual and anticipated fluctuations in our quarterly financial and operating results;
- developments or disputes concerning our intellectual property or other proprietary rights;
- introduction of technological innovations or new commercial products by us or our competitors;
- issues in manufacturing or distributing our products or potential products;
- market acceptance of our products or potential products;
- third-party healthcare reimbursement policies;
- FDA or other United States or foreign regulatory actions affecting us or our industry;
- litigation or public concern about the safety of our products or potential products;
- additions or departures of key personnel;
- third-party sales of large blocks of our common stock;
- sales of our common stock by our executive officers, directors, or significant stockholders; and equity sales by us of our common stock or securities convertible into common stock to fund our operations.

161.    By making the statements discussed in paragraphs 155–161 above, Defendants were required to disclose all material facts necessary to make those statements not misleading. Defendants breached this duty by failing to disclose that (i) 22nd Century's stock was being manipulated through paid stock promotions; (ii) such conduct would subject 22nd Century to heightened regulatory scrutiny by the SEC; and (iii) consequently, 22nd Century's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**B. The Promotional Articles**

162.    On December 5, 2016, Defendants published, or caused to be published, an article by an individual using the alias "James Peters" titled "Why 22nd Century Group Inc (NYSEMKT:XXII) Shares Jumped This Week."   Peters's article was posted on SmallCapExclusive.com and recommended investing in 22nd Century's stock.  The article did not disclose that it was a paid promotion by 22nd Century.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

163.    On February 22, 2017, Defendants published, or caused to be published, an article by an individual using the alias "James Peters" titled "22nd Century Group Inc (NYSEMKT:XXII) Shares React to Crede's Dismissal of Claims."  The article was posted on SmallCapExclusive.com and recommended investing in 22nd Century's stock.  The article did not disclose that it was a paid promotion by 22nd Century.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

164.    On March 30, 2017, Defendants published, or caused to be published, an article by John Persinos titled "Collect Smokin' Hot Profits From This Marijuana Biotech."  The article was posted on TheStreet.com and recommended investing in 22nd Century's stock.  The article

did not disclose that it was a paid promotion.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

165.    On April 6, 2017, Defendants published, or caused to be published, an article by Samuel Rae entitled "Here's Why 22nd Century Group Inc (NYSEMKT:XXII) Could be the Only Play on the Back of a Global Shift in the Tobacco Industry."  The article was posted on EconomicCalendar.com and recommended investing in 22nd Century's stock.  On April 6, after the article was posted, 22nd Century's stock price jumped 3.2% from $1.26 per share to $1.30 per share.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

166.    On April 7, 2017, Defendants published, or caused to be published, an article by Samuel Rae titled "22nd Century Group Inc. is Quietly Preparing for a Changed Tobacco."  The article was posted on SmallCapExclusive.com and recommended investing in 22nd Century's stock.  On April 7, after the article was posted, 22nd Century's share price jumped 3.8% from $1.30 to $1.35 per share.  The article did not disclose that it was a paid promotion.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

167.    On April 12, 2017, Defendants published, or caused to be published, an article by by Samuel Rae titled, "Getting To The Details At 22nd Century Group, Inc."  The article was posted on Seeking Alpha and recommended investing in 22nd Century's stock.  After the article was published, 22nd Century's share price rose 1.52% from $1.31 per share to $1.33 per share.  The article did not disclose that it was a paid promotion.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

168.    On April 13, 2017, Defendants published, or caused to be published, an article by an individual using the alias "Reese Morgan" titled "A Big Opportunity – If Common Sense Can Prevail."  The article was posted on Talkmarkets.com, but appears to have been subsequently deleted from Talkmarkets.com.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

169.    On May 3, 2017, Defendants published, or caused to be published, an article by John Persinos titled "This Marijuana Stock Isn't Afraid of Jeff Sessions."  The article was posted on Investing.com and recommended investing in 22nd Century's stock.  The article did not disclose that it was a paid promotion.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

170.    On May 5, 2017, Defendants published, or caused to be published, an article by John Persinos titled "This Pot Stock Isn't Afraid of America's Top Cop."  The article was posted on InvestingDaily.com and recommended investing in 22nd Century's stock.  The article did not disclose that it was a paid promotion.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

171.    On May 9, 2017, Defendants published, or caused to be published, an article by an individual using the alias "Edward Tarpin" titled "22nd Century Holdings Pushes Ahead With Revised   Guidance   and   Impressive   Financials."     The   article   was   posted   on SmallCapExclusive.com,   but   appears   to   have   been   subsequently   deleted   from SmallCapExclusive.com.  After the article was published, 22nd Century's share price rose 6.9% from $1.31 per share to $1.40 per share.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

172.    On May 30, 2017, Defendants published, or caused to be published, an article Mark Holder of Stone Fox Capital titled "22nd Century: No Harm Owning This Stock."  The article was posted on Seeking Alpha and recommended investing in 22nd Century's stock.  The article did not disclose that it was a paid promotion.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

173.    On June 8, 2017, Defendants published, or caused to be published, an article by an individual using the alias "Mark Collins" titled "This Company is Close to Producing a Tobacco Plant That Doesn't Cause Addiction."  The article was posted on Born2Invest.com and recommended investing in 22nd Century's stock.  Since its publication, the article's byline has been changed to state that it was created by "Born2Invest Staff," even though it includes a "DISCLAIMER" at the bottom of the article stating that "This article was written by a third party contributor" — *i.e.*, not Born2Invest's staff, and, better yet, "does *not* reflect the opinion of Born2Invest, its management, staff or its associates" (emphasis added).  After the article was published, 22nd Century's share price rose 2.7% from $1.84 per share to $1.89 per share.  The article did not disclose that it was a paid promotion.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

174.    On July 31, 2017, Defendants published, or caused to be published, an article by an individual using the alias "Luke Douglas" titled "22nd Century Uniquely Positioned To Take Advantage Of New FDA Regulations."  The article was posted on Scutify and Minyanville.com and recommended investing in 22nd Century's stock.  The article has since been revised so that the byline on Minyanville.com lists "Scutify" as the author, but nevertheless states at the bottom of the article that "[t]his article was written by Luke Douglas for on .[SIC]."  After the article was published, 22nd Century's share price rose 8.6% from $1.75 per share to $1.90 per share,

and within four days had risen 41% to $2.47 per share. The article did not disclose that it was a paid promotion.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

175.     On August 2, 2017, Defendants published, or caused to be published, an article by John Persinos titled "Betting on Cannabis as a Cure for Addiction (Yes, You Read That Right)." The article was posted on InvestingDaily.com and recommended investing in 22nd Century's stock.  After the article was published, 22nd Century's share price rose 28% from $1.93 per share to $2.47 per share.  The article did not disclose that it was a paid promotion.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

176.     On August 3, 2017, Defendants published, or caused to be published, an article by Mark Holder at Stone Fox Capital titled "22nd Century: FDA Catalyst."  The article was posted on TalkMarkets.com and recommended investing in 22nd Century's stock.  After the article was published, 22nd Century's share price rose 28% from $1.93 per share to $2.47 per share.  The article did not disclose that it was a paid promotion.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

177.     On August 7, 2017, Defendants published, or caused to be published, an article by an individual using the alias "Luke Douglas" titled "FDA Initiative to Reduce Nicotine Spells Potential for 22nd Century Group Inc."  The article was posted on Scutify and Minyanville.com and recommended investing in 22nd Century's stock.  The article has since been revised so that the byline on Minyanville.com lists "Scutify" as the author, but nevertheless states at the bottom of the article that "[t]his article was written by Luke Douglas for on .[SIC]"  The article did not

disclose that it was a paid promotion.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

178.    On August 9, 2017, Defendants published, or caused to be published, an article by Danielle Sabrina titled "5 of the Most Innovative Companies in Healthcare."  The article was posted on Buzzfeed.com, but appears to have been deleted from that site.  Within two days after the article was published, 22nd Century's share price rose 2.7% from $2.24 per share to $2.30 per share.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

179.    On September 21, 2017, Defendants published, or caused to be published, an article by an individual using the alias "George Ronan" titled "An Opportunity in the Tobacco Industry: 22nd Century Group."  The article was posted on GuruFocus.com and recommended investing in 22nd Century's stock.  The article did not disclose that it was a paid promotion.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

180.    On September 22, 2017, Defendants published, or caused to be published, an article by Samuel Rae titled "With Regulatory Support, 22nd Century Group Is Stronger Than Ever."  The article was posted on Investing.com and recommended investing in 22nd Century's stock.  The article did not disclose that it was a paid promotion.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

181.    On October 4, 2017, Defendants published, or caused to be published, an article by an individual using the alias "Adam Russell" titled "22nd Century Group Inc (NYSEMKT:XXII) American Opportunities Tobacco Hemp."  The article was posted on MarketExclusive.com and touted 22nd Century's stock.  The article has since been removed

from MarketExclusive.com.  Within 2 days after the article was published, 22nd Century's stock price rose 11.8% from $3.05 to $3.41 per share.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

182.    On October 4, 2017, Defendants published, or caused to be published, an article by John Persinos titled "Cannabis Nation: From Woodstock to Wall Street."  The article was posted on InvestingDaily.com and recommended investing in 22nd Century's stock.  Within 2 days after the article was published, 22nd Century's stock price rose 11.8% from $3.05 to $3.41 per share. The article did not disclose that it was a paid promotion.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

183.    On October 6, 2017, Defendants published, or caused to be published, an article by Samuel Rae titled "22nd Century Group Has Two Different But Rewarding Shots On Goal." The article was posted on Equities.com and recommended investing in 22nd Century's stock. The article did not disclose that it was a paid promotion.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

184.    On October 10, 2017, Defendants published, or caused to be published, an article by Samuel Rae titled "22nd Century Group Is Down But Could Quickly Recover."  The article was posted on Seeking Alpha the same day that the company filed its Prospectus with the SEC for the October 2017 Offering.  The article stated that although 22nd Century's stock price had fallen 13%, from $3.41 per share to $2.99 per share, in the wake of the announcement of the October 2017 Offering, investors should "pick up some discounted shares of his or her own in anticipation of . . . long-term growth."  The article was designed to try artificially boost the stock by staving off further declines that could affect the October 2017 Offering.  The article worked, as 22nd Century's stock price stopped declining and rose 1.7% from $2.99 per share to $3.04 per

share.  The article did not disclose that it was a paid promotion.  The article was created, placed and paid for in connection with Defendants' scheme to inflate 22nd Century's stock price.

185.    Since the articles described in ¶¶163–185 above were paid promotions, Defendants were required to disclose the amount of compensation and who paid that compensation.  The above articles were thus materially false and/or misleading because they failed to disclose that they were promotions paid for and disseminated by 22nd Century, and that Defendants furnished information and language for, prepared, reviewed, approved, and/or ratified the articles and recklessly disregarded and/or tolerated that the articles were being published in violation of Section 17 of the Securities Act.

### C.  October 26, 2018 Response and April 18, 2019 Response

186.    Defendants' statements in their press releases responding to the October 25, 2018 and April 17, 2019 articles by Fuzzy Pandas about 22nd Century's alleged scheme to artificially inflate 22nd Century's stock through the use of undisclosed third-party stock promotions and SEC investigations in 22nd Century created a duty for 22nd Century to disclose all material facts necessary to make the statements in those releases not misleading.  Defendants, however, did not disclose their use of undisclosed third-party stock promotions and that the Company had been, and might still be, under SEC investigation, including for material weaknesses in its internal accounting controls.

187.    In the October 26 Response, Defendants stated that the October 25 Article "attempt[ed] to link 22nd Century to stock promoters who have absolutely nothing to do with the Company."  In addition, the October 26 Response stated that "the 'short and distort' article suggests that complimentary articles about 22nd Century have been the result of Company promotions, the Company's website and a cursory Google search will show that there have been numerous independent scientific publications that accurately praise 22nd Century's proprietary

technology."   Once Defendants chose to make these statements, Defendants had a duty to disclose their direct or indirect use of undisclosed third-party stock promoters.  Failing to make this disclosure rendered these statements actionably misleading.

188.    In the April 18 Response, Defendants stated that the April 17 Article:

> states that 22nd Century has paid authors to write stock promotion articles; subsequently, this allegation has been used to file class action and derivative lawsuits. 22nd Century has previously publicly stated and continues to assert that the claims made in the on-going class action and shareholder derivative cases related to such matters are frivolous, meritless and that 22nd Century and the individual defendants have substantial legal and factual defenses to such claims.

Once Defendants chose to make these statements, Defendants had a duty to disclose their direct or indirect use of undisclosed third-party stock promoters.  Failing to make this disclosure rendered these statements actionably misleading.

189.    In the October 26 Response, Defendants accused Fuzzy Panda of "disparaging 22nd Century with misleading suppositions about an alleged Securities and Exchange Commission (SEC) enforcement proceeding against the Company" and stated bluntly that "22nd Century has not received any notice of, and the Company has no knowledge of, any enforcement proceeding against 22nd Century by the SEC or any other regulator."  The October 25 Article had stated that the SEC's refusal to produce documents suggested that there is "an ongoing SEC investigation regarding the company."   By making these statements, which disputed the statements in the October 25 Article, Defendants had an obligation to disclose all facts necessary to make their statements not misleading.  Defendants failed to do this, however, because they failed to disclose that the Company had been, and might still be under an SEC investigation, including in connection with its material accounting weaknesses.

190.    In the April 17 Response, Defendants stated that the April 16 Article "*falsely alleges that 22nd Century is supposedly under SEC investigation. As 22nd Century has publicly*

stated on several occasions, 22nd Century has not received any notice of, and the Company has

no knowledge of, any enforcement proceeding against 22nd Century by the SEC or any other

regulator" (emphasis added).  This statement created a duty in Defendants to disclose that they in

fact been the subject of an SEC investigation, including for material weaknesses in their internal

accounting controls.   Failing to make this disclosure made these statements actionably

misleading.

191.    By making the statements discussed in paragraphs 187–191 above, Defendants

were required to disclose all material facts necessary to make those statements not misleading.

Defendants breached this duty by failing to disclose that (i) 22nd Century's stock was being

manipulated through paid stock promotions; (ii) such conduct would subject 22nd Century to

heightened regulatory scrutiny by the SEC; (iii) 22nd Century was being investigated by the

SEC, including for material weaknesses in its internal accounting controls; and (iv)

consequently, 22nd Century's public statements were materially false and misleading and/or

lacked a reasonable basis at all relevant times.

### D.  Statements Concerning Material Weaknesses

192.    Defendant's statements about the Company's material accounting weaknesses in

its 2015 10-K, quarterly reports filed on Form 10-Q in 2016, and its 2016 10-K created a duty for

the Company to disclose that it was under SEC investigation in connection with those material

weaknesses.   Since Defendants failed to disclose the SEC investigation, its statements were

materially false and misleading.

193.    The Company filed its 2015 10-K on February 18, 2016, which was signed by the

Individual Defendants.  The 2015 10-K disclosed that:

> [O]ur management concluded that as of December 31, 2015, that our internal
> controls over financial reporting were not effective and that material weaknesses
> exist in our internal control over financial reporting.   The material weakness

consists of controls associated with segregation of duties whereby individuals have incompatable duties within the financial reporting area. To address the material weakness we performed additional analyses and other post-closing procedures to ensure that our consolidated financial statements were prepared in accordance with accounting principles generally accepted in the United States of America (U.S. GAAP).

Defendants did not disclose that the SEC was investigating material weaknesses at 22nd Century.

194.    The Company filed its quarterly report for the first quarter of 2016 on Form 10-Q on May 10, 2016 (the Q1 2016 10-Q), which was signed by the Individual Defendants.  The Q1 2016 10-Q disclosed that:

[O]ur chief executive officer and chief financial officer, after evaluating the effectiveness of the Company's "disclosure controls and procedures" (as defined in the Exchange Act Rules 13a-15(e) or 15d-15(e)) as of the end of the period covered by this quarterly report, have concluded that our disclosure controls and procedures were not effective and that material weaknesses described in our Form 10-K for the year ended December 31, 2015 exist in our internal control over financial reporting based on their evaluation of these controls and procedures as required by paragraph (b) of Exchange Act Rules 13a-15 or 15d-15.

Defendants did not disclose that the SEC was investigating material weaknesses at 22nd Century.

195.    The Company filed its quarterly report for the second quarter of 2016 on Form 10-Q on August 9, 2016 (the Q2 2016 10-Q), which was signed by the Individual Defendants. The Q2 2016 10-Q disclosed that:

During the second quarter of 2016, we hired an additional accounting employee to assist with remediating our material weakness associated with a lack of segregation of duties. In addition, subsequent to the end of the second quarter of 2016, we engaged a third-party consultant to assist with material weakness remediation and to assist with our controls and procedures over our financial reporting. Except as set forth herein, there were no changes in the Company's internal control over financial reporting during the second quarter of 2016 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

Defendants did not disclose that the SEC was investigating material weaknesses at 22nd Century.

196.     The Company filed its quarterly report for the third quarter of 2016 on Form 10-Q on May 10, 2016 (the Q3 2016 10-Q), which was signed by the Individual Defendants.  The Q3 2016 10-Q disclosed that:

> During the third quarter of 2016, an additional accounting employee hired during the second quarter of 2016 was fully deployed and with the assistance of a third-party consultant, we developed and commenced the implementation of a remediation plan targeted at eliminating our previously reported material weakness in our internal controls over financial reporting primarily resulting from a lack of segregation of duties. Except as set forth herein, there were no changes in the Company's internal controls over financial reporting during the third quarter of 2016 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

Defendants did not disclose that the SEC was investigating material weaknesses at 22nd Century.

197.     The Company filed its 2016 10-K on March 8, 2017, which was signed by the Individual Defendants.  The 2016 10-K disclosed that:

> During the fourth quarter of 2016, we completed the implementation and testing of a remediation plan that was targeted at eliminating our previously reported material weakness in our internal controls over financial reporting primarily resulting from a lack of segregation of duties. Except as set forth herein, there were no changes in the Company's internal controls over financial reporting during the fourth quarter of 2016 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

Defendants did not disclose that the SEC was investigating material weaknesses at 22nd Century.

198.     By making the statements discussed in paragraphs 193–198 above, Defendants were required to disclose all material facts necessary to make those statements not misleading. Defendants breached this duty by failing to disclose that 22nd Century was under investigation by the SEC, including in connection with material weaknesses in the Company's internal accounting controls and consequently, 22nd Century's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### E. Defendants Sicignano and Brodfuehrer's Certifications Attached as Exhibits to 22nd Century's Quarterly and Annual Reports Were False and Misleading

199.     Appended as exhibits to each of the Company's 2016, 2017 and 2018 10-Ks were signed certifications pursuant to the Section 302 of the Sarbanes-Oxley Act of 2002, in which Defendants Sicignano and Brodfuehrer certified that they had "reviewed the annual report on Form 10-K of the 22nd Century Group, Inc. [and] . . . [b]ased on my knowledge [the] report contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report," and "[b]ased on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."

200.     Also appended to each of the 2016, 2017 and 2018 10-Ks were signed certifications pursuant to 18 U.S.C. § 1350 in which Defendants Sicignano and Brodfuehrer certified that "to the best of [their] knowledge:  (1) [Each of the 2016, 2017 and 2018 10-Ks] fully complies with the requirements of Section 13(a) or 15(d) of the Exchange Act; and (2) The information contained in [each of the 2016, 2017 and 2018 10-Ks] fairly presents, in all material respects, the financial condition and result of operations of the Company."

201.     Each of the statements excerpted from the exhibits to the 2016, 2017 and 2018 10-Ks was materially false and misleading because each of the 2016, 2017 and 2018 10-Ks "omitted to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading," did not "fully comply with the requirements of Section 13(a) or 15(d) of the Exchange Act" and did not "fairly present[], in all material respects, the financial condition and result of operations of the

Company" because each of the 2016, 2017 and 2018 10-Ks failed to disclose that:  (i) 22nd Century's stock was being manipulated through paid stock promotions; (ii) such conduct would subject 22nd Century to heightened regulatory scrutiny by the SEC; (iii) 22nd Century was being investigated by the SEC, including for material weaknesses in its internal accounting controls; and (iv) consequently, 22nd Century's public statements were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

202.    In addition to the facts pled above, more facts show that Defendants acted with scienter when they failed to disclose their scheme to artificially inflate the price of the 22nd Century's common stock and that the Company had been, and might still be, under SEC investigation, including for material weaknesses in its internal accounting controls.

203.    Defendants repeatedly concealed that they knew that "Fuzzy Panda" was former 22nd Century CEO Joseph Pandolfino.  Both the October 26 and the April 19 Responses assailed Fuzzy Panda as an anonymous short seller.   However Defendants Sicignano and Brodfuehrer knew that Pandolfino was "Fuzzy Panda."  Had Defendants disclosed Fuzzy Panda's identity, it would have lent credence to his allegations, including the allegations about Defendants' scheme to inflate 22nd Century's stock price.  Defendants' decision to conceal the identity of Fuzzy Panda is thus additional evidence of scienter.

204.    Defendants also repeatedly lied to conceal both their scheme to inflate 22nd Century's share price and their role in it, and Defendants repeatedly lied to conceal the existence of the SEC investigation.

205.    The October 26 Response, for example, which was reviewed and/or approved by Defendants, accused the October 25 Article of "attempting to link 22nd Century to stock promoters who have absolutely nothing to do with the Company."  It also affirmatively stated

that "Though the 'short and distort' article suggests that complimentary articles about 22nd Century have been the result of Company promotions, the Company's website and a cursory Google search will show that there have been numerous independent scientific publications that accurately praise 22nd Century's proprietary technology."  Defendants made similar statements in the April 19 Response as well.  Defendants published these statements even though they knew that they had used paid stock promoters to plant undisclosed, paid stock promotional articles to artificially inflate the price of the 22nd Century's common stock.  Defendants' statements were designed to refute and deny the allegations in the Fuzzy Panda articles concerning Defendants' stock promotion scheme, even though Defendants knew that their statements were false, and thus provide further evidence of Defendants' scienter.

206.    Similarly, the October 26 response stated that "22nd Century has not received any notice of, and the Company has no knowledge of, any enforcement proceeding against 22nd Century by the SEC or any other regulator."  The April 18 Response also stated that "Finally the self-serving "hit piece" article falsely alleges that 22nd Century is supposedly under SEC investigation. As 22nd Century has publicly stated on several occasions, 22nd Century has not received any notice of, and the Company has no knowledge of, any enforcement proceeding against 22nd Century by the SEC or any other regulator."  Defendants published these statements even though they knew that 22nd Century had been, and might still be, the subject of an SEC investigation, including for material weaknesses in the Company's internal accounting controls, which were serious enough that the Company obtained counsel for Defendant Brodfuehrer and met with the SEC.  Defendants' statements were designed to refute and deny the allegations in the Fuzzy Panda articles concerning SEC investigation(s) of 22nd Century, even though

Defendants knew that their statements were at the very least materially misleading, and thus provide further evidence of Defendants' scienter.

207.    Moreover, Defendant Sicignano's scienter is revealed by steps he took to ensure that his Company computer was not searchable.  CW1 recalled that, as part of the FDA MRTP review process, 22nd Century needed to have all employees' computers connected to the Company's servers so that their documents could be searchable.  CW1 stated that he heard Sicignano instruct another 22nd Century employee named "Nathan" that his computer was not to be connected to the network.  CW1 stated that as far as he knew, Sicignano's computer was never fully connected to the Network.  This allowed Sicignano to ensure that he could conceal his work, including the stock promotion scheme, from the regulators.

208.    Defendant Brodfuehrer's scienter is also revealed by statements he made to CW1.  Brodfuehrer told CW1 on multiple occasions in the first half of 2017 that he was not comfortable signing the Company's SEC filings because of Defendant Sicignano.  When CW1 asked General Counsel James about Brodfuehrer's comments, James responded, "people need to save Henry [Sicignano] from himself."  Brodfuehrer and James's comments showed that they knew that Sicignano was engaged in wrongful conduct and were electing not to stop him.

209.    Finally, Defendants' scienter is shown by their placement of promotional articles on the websites Seeking Alpha and TheStreet.  Seeking Alpha does not permit paid promotional articles, and mandates that all articles must disclose that they are not paid promotions. Thus, Defendants' placement of paid promotional articles that were not identified as such on Seeking Alpha demonstrates that they were intentionally engaging in a scheme to artificially inflate the price of 22nd Century's common stock.  Similarly, TheStreet states that its outside columnists may not be paid promoters.  Thus, Defendants' placement of paid promotional articles that were

not identified as such on TheStreet demonstrates that they were intentionally engaging in a scheme to artificially inflate the price of 22nd Century's common stock.

## IX.    CLASS ACTION ALLEGATIONS

210.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased or otherwise acquired 22nd Century securities during the Class Period who were damaged thereby, seeking to pursue remedies under the Exchange Act (the "Exchange Act Class").  Excluded from the Class are Defendants herein, the officers and directors of 22nd Century, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

211.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, 22nd Century securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by 22nd Century or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

212.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

213.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

214.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the business, operations and management of 22nd Century;

(c)    Whether the Individual Defendants caused 22nd Century to issue false and misleading financial statements during the Class Period;

(d)    Whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    Whether the prices of 22nd Century securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(f)    Whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

215.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.     APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET AND AFFILIATED UTE PRESUMPTIONS

216.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    22nd Century's securities traded in efficient markets;

(d)    22nd Century's shares were liquid and traded with moderate to heavy volume during the Class Period;

(e)    22nd Century traded on the NYSE and was covered by multiple analysts;

(f)    The misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of the 22nd Century's securities; and

(g)    Plaintiffs and members of the class purchased, acquired and/or sold 22nd Century's securities between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

217.    At all relevant times, the markets for the Company's securities were efficient for the following reasons, among others:  (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market

communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiffs and the Class relied on the price of the Company's securities, which reflected all information in the market, including the misstatements by Defendants.

218.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

219.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## XI.    LOSS CAUSATION

220.    On February, 1, 2018, 22nd Century's stock price closed trading at $3.08 per share.  On February 2, 2018, the day the February 2 Article was released partially disclosing Defendants' scheme to inflate the Company's share price, 22nd Century's stock price closed at $2.73 per share, a decline of roughly 11.4%.  Then, as the market digested the revelation in the February 2 Article, 22nd Century's share price plummeted before hitting bottom at $2.56 on February 5, 2018, a decline of over 16.9%.  These declines were attributable to the disclosure to investors of the Company's scheme to artificially inflate its share price.

221.    On October 24, 2018, 22nd Century's stock price closed trading at $2.56 per share.  On October 25, 2018, after the release of the October 25 Article, which further disclosed Defendants' scheme to inflate the Company's stock price as well as that the Company had been, and might still be, under SEC investigation, the Company's stock price fell $0.11 per share to

$2.45 per share, a decline of 4.3%.  These declines were attributable to the disclosure to investors of the Company's scheme to artificially inflate its share price and that the Company had been, and might still be, under SEC investigation.

222.    On April 16, 2019, 22nd Century's stock price closed trading at $1.92 per share. On April 17, 2019, after the release of the April 17 Article, which further disclosed Defendants' scheme to inflate the Company's stock price as well as that the Company was subject to at least one SEC Investigation, the Company's stock price fell $0.03 per share to $1.89 per share, a decline of 1.6%.  The following day, the Company's share price fell 1.06% further to $1.87 per share.  These declines were attributable to the disclosure to investors of the Company's scheme to artificially inflate its share price and that the Company had been, and might still be, under SEC investigation.

223.    On July 26, 2019, 22nd Century's stock price closed at $1.86 per share.  After trading, the Company announced that Defendant Sicignano was stepping down as 22nd Century's CEO for "personal reasons."  When trading closed after the next trading day, on July 29, 2019, the Company's stock price had fallen $0.05 per share to $1.81 per share, a decline of 2.7%.  In addition, as the market digested the news of Sicignano's resignation, the Company's share price continued to fall until it bottomed out at $1.36 per share on August 1, 2019, a decline of 26.9%.  These declines were attributable to the disclosure that Sicignano was stepping down. Sicignano's resignation was a materialization of the risk to investors caused by Defendants' scheme to artificially inflate the Company's stock price.  It was a foreseeable risk that if Sicignano's involvement in the scheme was learned by individuals outside the Company, Sicignano would have to resign.  The risk materialized when Sicignano resigned, and the stock price fell, harming investors.

## XII.   CAUSES OF ACTION

### COUNT I

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

224.    Plaintiffs repeat and reallege each and every allegation contained above as if fully
set forth herein.

225.    This Count is asserted against Defendants and is based upon Section 10(b) of the
Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

226.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and
course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions,
practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the
other members of the Class; made various untrue statements of material facts and omitted to state
material facts necessary in order to make the statements made, in light of the circumstances
under which they were made, not misleading; and employed devices, schemes and artifices to
defraud in connection with the purchase and sale of securities. Such scheme was intended to,
and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and
other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of
22nd Century securities; and (iii) cause Plaintiffs and other members of the Class to purchase or
otherwise acquire 22nd Century securities at artificially inflated prices. In furtherance of this
unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set
forth herein.

227.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of
Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly
and annual reports, SEC filings, press releases and other statements and documents described

above, including statements made to securities analysts and the media that were designed to influence the market for 22nd Century securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the financial health and business prospects of the Omnicare LTC business.

228.   By virtue of their positions at 22nd Century, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

229.   Additional information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of 22nd Century, the Individual Defendants had knowledge of the details of 22nd Century's internal affairs.

230.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of 22nd Century. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to

22nd Century's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of 22nd Century's securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning 22nd Century's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired 22nd Century securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

231.    During the Class Period, 22nd Century securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of 22nd Century securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of 22nd Century securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of 22nd Century securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

232.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

233.     Plaintiffs and members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for 22nd Century's securities. Plaintiffs and the Class would not have purchased the Company's securities at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had written off the entire value of the goodwill associated with the Omnicare acquisition.

## COUNT II

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b5(a) and (c) Promulgated Thereunder
### (Against the Individual Defendants)

234.     This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c).  Accordingly, Plaintiffs need not allege in this Count nor prove in this case that each of the Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.  Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

235.     During the Class Period, the Scheme Defendants carried out a common plan, 429.scheme, and unlawful course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class; (ii) artificially inflate the market price of 22nd Century securities; and (iii) cause Plaintiff to purchase 22nd Century securities at artificially inflated prices.

236.     In furtherance of this unlawful plan, scheme and course of conduct, the Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly

engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the Class in connection with their purchases of 22nd Century stock, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

237.   The Defendants' fraudulent devices, schemes, artifices and deceptive acts, practices, and course of business included furnishing statements to a network of writers for use in creating illegal undisclosed stock promotions, reviewing and approving the articles created by those writers, and failing to disclose that the Company was paying stock promoters to create stock promotions.

238.   Plaintiffs and the Class reasonably relied upon the integrity of the market in which 22nd Century securities traded.

239.   During the Class Period, Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct. Had Plaintiffs and the Class known of the Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased 22nd Century securities, or if they had, would not have done so at the artificially inflated prices paid for such securities.

240.   As a direct and proximate result of the Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs and the Class suffered damages in connection with their purchases of 22nd Century securities during the Class Period.

241.   By reason of the foregoing, the Scheme Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Plaintiffs and the Class for damages suffered in connection with their purchases of 22nd Century securities during the Class Period.

## COUNT III

### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

242.    Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

243.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew and culpably participated in the scheme to artificially inflate 22nd Century's stock price through the use of undisclosed paid third-party promotional articles and to conceal that the Company had been, and might still be, under SEC investigation.  The Individual Defendants also knew that the Company's failure to disclose these omissions made its statements during the Class Period.

244.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's stock promotion activities, and to correct promptly any public statements issued by the Company and its officers or directors which had become materially false or misleading.

245.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which were disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of 22nd Century within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of 22nd Century's securities.

246.    Each of the Individual Defendants, therefore, acted as a controlling person of 22nd Century. By reason of their senior management positions and/or being directors of 22nd Century, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, 22nd Century to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of 22nd Century and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

247.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by 22nd Century.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiffs as class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory and punitive damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

C.      Awarding Plaintiffs and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

D.      Awarding Plaintiffs and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated:  November 19, 2019                    Respectfully submitted,

                                                                POMERANTZ LLP

                                                                */s/ Brian Calandra*
                                                                Jeremy A. Lieberman
                                                                Brian Calandra
                                                                600 Third Avenue, 20th Floor
                                                                New York, New York 10016
                                                                Telephone: (212) 661-1100
                                                                Facsimile: (212) 661-8665
                                                                Email: jalieberman@pomlaw.com
                                                                         bcalandra@pomlaw.com

                                                                POMERANTZ LLP
                                                                Patrick V. Dahlstrom
                                                                10 South La Salle Street, Suite 3505
                                                                Chicago, Illinois 60603
                                                                Telephone: (312) 377-1181
                                                                Facsimile: (312) 377-1184
                                                                Email: pdahlstrom@pomlaw.com