UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK


MATTHEW BULL, Individually           Docket No.
and on Behalf of All Others     1:19-cv-01285-JLS
Similarly Situated,         *
                            *
Plaintiffs,                 *
                            *
                            *        Buffalo, New York
            v.              *        July 31, 2020
                            *        10:07 a.m.
                            *
22ND CENTURY GROUP, INC.,            Oral Argument
HENRY SICIGNANO, III and
JOHN T. BRODFUEHRER,        *
                            *
Defendants.                 *
                            *
* * * * * * * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiffs:         POMERANTZ, LLP,
                            By BRIAN CALANDRA, ESQ.,
                            600 Third Avenue,
                            20th Floor,
                            New York, New York  10016,
                            Appearing via Zoom.



For the Defendants:         FOLEY & LARDNER, LLP,
                            By JONATHAN H. FRIEDMAN, ESQ.,
                            and HEATHER A. LEE, ESQ.,
                            90 Park Avenue,
                            New York, New York  10016

                            FOLEY & LARDNER, LLP,
                            JOHN A. TUCKER, ESQ.,
                            1 Independent Drive,
                            Jacksonville, Florida  32202

```
                                DUKE, HOLZMAN, PHOTIADIS
                                   & GRESENS, LLP,
                                By CHARLES C. RITTER, JR., ESQ.,
                                700 Seneca Street,
                                Suite 750,
                                Buffalo, New York  14210,

                                All appearing via Zoom.

    The Courtroom Deputy:       KIRSTIE L. HENRY

    Court Reporter:             BONNIE S. WEBER,
                                Notary Public
                                Robert H. Jackson Courthouse
                                2 Niagara Square
                                Buffalo, New York  14202,
                                Bonnie_Weber@nywd.uscourts.gov.


            Proceedings recorded by mechanical stenography,
                   transcript produced by computer.
```

(Proceedings commenced at 10:07 a.m.)


**THE CLERK:**  All rise.

The United States District Court for the Western District of New York is now in session.  The Honorable John Sinatra presiding.

Court calls case number 19-CV-1285, Bull versus 22nd Century Group, Inc., et al.  This is the date set for oral argument on defendants' motion to dismiss.

Counsel, please state your name and the party you represent for the record.

**MR. CALANDRA:**  Brian Calandra, Pomerantz, LLP, on behalf of the plaintiffs, 22nd Century Investor Group.

**MR. TUCKER:** Your Honor, this is John Tucker, with Foley & Lardner. Along with my partner, John Friedman and local counsel, Chuck Ritter. We represent the defendants in the case, 22nd Century, Henry Sicignano and John Brodfuehrer.

**THE COURT:** It looks like we have one more person. Can we --

**MS. LEE:** Your Honor, it's Heather Lee, also with Foley & Lardner, LLP. I'm an associate with Mr. Tucker and Mr. Friedman.

**THE COURT:** Can you say your name again? Our court reporter didn't get it.

**MR. TUCKER:** It's Heather Lee --

**MS. LEE:** Heather Lee.

**MR. TUCKER:** -- Judge. And I apologize to the Court and to Ms. Lee for leaving her out.

**THE COURT:** Okay. You know, you can divide it up if you like, but who is taking the lead for the argument for defendants?

**MR. TUCKER:** Your Honor, this is John Tucker. I will be arguing the Count One, the alleged 10b-5 claim, with regard to misrepresentations and omissions. And I will also touch on materiality and scienter arguments.

And my partner, John Friedman, will address the Count Two, which is the manipulative -- market manipulation claim and the loss causation issue.

Count Three is a control person claim, and that largely falls on one or two -- depending on how you rule on one and two, so that's how we will be splitting it up.

THE COURT:  Okay.  Well, since you've got the microphone right now, why don't you start with telling me why the motion to dismiss ought to be granted, as to Count One, at least.

MR. TUCKER:  Okay.  Your Honor, first, I would start a -- maybe from like a 20,000 foot view.  This is a -- since this is a claim under the PSLRA and involving a fraud claim under 9(a), the motion to dismiss and the plaintiff's pleading requirement is a heightened pleading requirement.

Meaning, that they have to allege not just conclusions, but they have to allege particularized facts to support it.  They can't just, you know, touch the buzz words that are considered the elements of these claims.

And that's why -- because you have this heightened pleading requirement, that is why when you're reading the various cases that all the parties have cited, you will see that a lot of them are dismissed, unlike a lot of the other cases you probably have presided over.

So this is one where there is a high bar and the courts regularly are dismissing the cases, if the plaintiff doesn't come forward with particularized facts that plead the wrongdoing.

The other thing that I would point out at the start, Your Honor, is the plaintiff must prevail on all the arguments that we've raised in the motion to dismiss.

They are all requirements to state a cause of action. And to say that a little bit differently, there are multiple independent grounds for you to dismiss.

Let's look now at what the claims are and what they are alleging. All of these climbs allege basically two wrongs. And all, Your Honor, are based on their reading of Internet articles and literally trying to make a federal class action case out of some Internet articles that they have read.

I'm not discounting that they have now two confidential informants, but these people don't add anything that gets them over the bar from what's in the articles.

The two alleged wrongdoings, Judge, are in certain promotional articles that the company is alleged to have paid for, that the authors of those articles did not disclose that they were paid. So in other words, if there is an article that's written, at the end, there's not a statement that I was paid to write these articles.

The second alleged wrongdoing is the company did not disclose that there was an alleged SEC investigation in 2016. Those are the two wrongdoings that the company is alleged to have affirmatively tried to conceal or omit disclosure. I want to look at those and then look at the allegations that would

support or not support this.

And first, I want to look at the promotional articles. And, Judge, I note in paragraphs 53 and 54 of the complaint, the plaintiffs recognize that the deals with authors were through a third party, Earth Communications.

Earth Communications is an investor relations company that is hired to help companies, such as 22nd Century and others.

And while it alleges that Earth has been involved in issues before, it doesn't allege that 22nd Century has been involved in any of those issues.

A couple of other points that I think are very important for the Court in considering the promotional articles issue, one, there is nothing about these articles -- nothing in the articles themselves that they allege is false or misleading in any way.

In fact, if you read their page after page about the articles, what they say is that these articles largely parroted or repurposed what the company itself disclosed in the -- in these press releases.

So, fundamentally, the articles themselves -- we don't have a situation were there's something that's being said in these articles that is false or misleading.

Second, Judge, that there is nothing wrong -- and the case law establishes that there is nothing wrong with a company

having paid promotions.  I mean, that's simply not an actionable action.

And the only alleged wrong with regard to these promotional articles is that the authors of the articles failed to disclose that they were paid.

And it's clear, under section 17 of the Exchange Act and under the case law, that everybody has cited -- everybody has cited, that the responsibility and duty to disclose whether you were paid or not is with the author and not with the company.

And, in fact, when you look at section 17, that suggests that this is a duty on the author.  It -- it contemplates by it's very nature that there would be paid promotional articles, otherwise you wouldn't have a statute that says you've got to do that.

Now, if you consider that that is the background, and then you need to look at the allegations with regard to these articles, as it relates to the defendants.  When you look at the allegation or the claim against the company, all of those allegations relate to respondiac superiority.

If you look at paragraphs 40 and 41, basically it says, we're riding on the activities of Mr. Sicignano and Mr. Brodfuehrer.  So then you have to turn and your analysis has to go, so what did they allege with regard to these two gentlemen?  And Mr. Sicignano was a CEO of the company.

Mr. Brodfuehrer was the CFO of the company.

And it's critical, when you look at this -- when you are looking at these allegations, again, you have to remember the heightened pleading standard. In other words, particularized facts about what these individuals allegedly did. Not a conclusion, okay?

And it's also critical at the outset, Judge, that there is not a single allegation in this complaint that alleges that Mr. Sicignano or Mr. Brodfuehrer knew that the authors were not disclosing that they were paid or that they directed such.

And if you look at the cases that we cited versus the cases that the defendant -- the plaintiffs have cited, in the plaintiff's case such as the Galeni -- Galena case and the Rabkin case, in those cases, the claims were sustained because there, the defendants were involved in not only writing the articles, approving them, editing them, but they were -- and telling the authors that they couldn't disclose it, but they also -- in those cases -- and in most of those cases, they were affirmatively telling the authors, you need to include a disclosure that you, in fact, were not paid. Just the opposite.

So those are very different cases from the Cortina case that we have cited to the Court, which I recommend is pretty much on all fours, where you have an end, where there was not a payment.

And the Court looked at it and said, there is nothing

where the company is involved in that aspect of it, and therefore the claim should be dismissed.

So looking at the allegations with regard to Mr. Sicignano, those are in paragraphs 22, 25, 64 through 72 and 100.  And let's look at what they say.

In one -- and these are all from the confidential informant.  It says, the -- this confidential witness says that Mr. Sicignano told him that he, quote, worked behind the scenes to get the stock price up.

He also allegedly said Mr. Sicignano would do whatever it took to get on the Russell Index.  And, also, that he had a meeting with the FDA that didn't go well.

So what, I guess is what I would say.  None of those have to do with the allegations of wrongdoing about the whether or not the authors were omitting their disclosures or with regard to the SEC investigations.

And the next thing they all are -- that they say is the confidential informant, quote, came to understand -- and they use that term a couple of times -- came to understand that -- that language in itself is suggesting a conclusion that that confidential witness is making based on facts that are not pled, okay?  And it is not sufficient.

And what does he come to understand?  That the company was paying authors to write articles disguised as legitimate articles.  Okay.  That the company is paying for a promotion.

Again, nothing wrong with that.

The other thing he says that the witness came to understand is that -- that the -- that Henry -- that Mr. Sicignano knew that paying third parties to write articles, without disclosing they were paid, was not appropriate.

Again, no particularized facts.  And even more importantly, in this, that's just a correct statement of the law.  The law would be that an author does have to identify it and it would be appropriate, so that there is nothing about that that establishes it.

The last thing, which is probably where they try to make their biggest run at it, Judge, is where they allege this, that it is common practice -- common practice for Mr. Sicignano to review and approve the language in the press releases.  It is suggested that he was somewhat anal about that.

And that then from there, they make the leap or the inference -- they say:  Thus, because these -- the language in the press releases were parroted or used or repurposed in these articles, that he must have approved them or -- and they use the term "and/or" -- that he approved them, and/or he reviewed and made them himself.

Well, that is not -- Judge, if we say I -- when we have this hearing, I was either in Florida or I was in Buffalo, the or -- it's important when I use the or.

And he has to have said, like in the Galena cases and

the cases that the plaintiff cites, he has to show that Mr. Sicignano is doing more.  That he is, in fact, writing those articles.  Approving those articles.

And not only that, but specifically that he is saying the author should not disclose that they are paid or making an affirmative misrepresentation that they weren't paid.  None of that is in there and I suggest, again, that you look at the cases.

If you look at John Brodfuehrer's -- the allegations against him, they don't even suggest that he knew.  At best, the allegations as to him are that he traveled to DC for a meeting with the SEC, and he was -- he wasn't -- he was uncomfortable about that.  In fear, that it might have an impact on his license.

He also says that he worked closely with Mr. Sicignano, and therefore, he should know.  Again, no particularized facts.  Not sufficient.

The other is that he expressed concerns about signing the certifications that go with the financial statements, because of Mr. Sicignano's conduct.

It doesn't explain about what the conduct is.  It doesn't explain anything about it.  So, again, those simply are not the high -- don't meet the high standard of particularized facts.

There are other reasons to dismiss the claim as to the

articles themselves, Judge, and that is scienter.  Scienter, as you know, is there has to be particularized facts to demonstrate or evidence and intent to deceive or defraud, a bad motive.

And there are two ways that the cases have said that people can establish that or plead it.  The first way is to demonstrate motive and opportunity.  That's personal analysis.  That looks at the individual and suggests what is it that he's doing that's going to benefit him personally.

And the courts have said that it's not enough if you are an executive or manager and you're trying to get your stock price up or you're trying to get -- you know, because of what you're doing, the company will do well and you will get paid -- you know, your compensation will increase.

The cases -- and I will refer you to the Second Circuit cases of ECA and the Kalnit cases.  Those both stated that that is not enough.

That that doesn't -- and what they suggest is what is enough?  They say, the typical type of case that meets that standard is a CEO is out there doing things about his stock that he shouldn't and then he dumps a bunch of his own personal stock, that he sells.

That -- and there is no allegation that that exists here.  In fact, the allegations we've already talked about with regard to Mr. Sicignano, they don't get anywhere near that.  Nor to Mr. Brodfuehrer.

And they -- they do allege, as to Mr. Sicignano, that he got a raise that year, after getting raises prior years.  And that it was a little bit more and that he got a bonus.

But the case law that we have cited, Judge, says that there has to be a direct link between the actions and what happened.  And there has to be a -- something of magnitude.

And like the VEON -- Vivendi case that was cited, there the -- the defendant got a 3 million dollar bonus, which they said was two and a half times his normal compensation.

It's that type of thing, that here we have Mr. Sicignano's salary, I think, went from 250 something to around 300 and he got a, I think, $94,000 bonus.  That's not the type of acts that would support the motive and opportunity requirement.

The other method that you can establish scienter, Judge, is you have to show a strong, a strong circumstantial evidence of conscious misbehavior.

And the courts have said, well, what does that mean?  I mean, it sounds like it's a big standard a high standard and it is.

And the courts have said what you have to plead is particularized facts that show highly unreasonable conduct.  Highly unreasonable conduct that demonstrates a -- quote, an extreme departure from standard of ordinary care.

On its face, that's a high standard.  And what do they

allege to be that?  They allege all the things we talked about before, which certainly don't.

And the only other thing they have alleged, as to Mr. Sicignano, and they said, he wouldn't network his computer. He kept his laptop up and he kept it separate.  And they say that that is some sort of badge of suspicion that would allow this court to say that he is intending to deceive.

The other thing that they allege is that he -- that they didn't disclose that they -- that Mr. Pandolfino -- meaning Mr. Pandolfino, who years ago had been the CEO and chairman of 22nd Century, that he was the anonymous author.

Well, there is two problems with that, Judge.  There is two problems with that argument.  One is that they don't plead any particularized facts to say -- to establish that Mr. Brodfuehrer or Mr. Sicignano knew.  They just say they knew.

And, second, the inference doesn't make any sense, because if you read the articles that they are talking about that, quote, blew the whistle, that they would say were written by Mr. Pandolfino, and that they should be -- you know, the company should have disclosed that.

Well, if you read one of the articles, one of the red flags that they suggest is -- shows that the company is a bad company and doing bad things is Mr. Pandolfino and his association with the company.  They say that he had previously been involved in issues that would be a problem.

And so to suggest that the inference that he was the author of articles that were self critical is simply not credible.

On to the scienter.  I will raise one other issue, Judge, and that is the court operations theory.  They raise that in their response.  It's not pled.

And it's clear that the second DCA -- I mean the Second Circuit -- it's not even clear that it is applicable any more, but it has to do with if -- if this is something that is intragel to the operation of business, it's, quote, core operations, then someone -- a manager would be presumed to know.

The stuff about whether the authors were omitting it, certainly is not core to the operation of a company, which at its core is -- it has -- what -- what 22nd Century has, Judge, is it has the patents to dial up or down, genetically design tobacco, so that you can take the nicotine down.

And it also has similar patents for Cannibis, marijuana, so that you can dial the bad -- I mean, the good medical qualities up and the bad -- you know, the get high qualities down.  That's what these patents are.  That's what this company's -- that's its core operations.  None of these things relate to that.

One other requirement that has to do with this -- with the articles and that is the materiality requirement that these matters have to be material.

And the courts have defined what is meant by the materiality, saying that there has to be a substantial likelihood that a reasonable person would find the information important when making an investment decision.

And it doesn't say that it might find it important. It says that there is a substantial likelihood. And they have also explained that as saying, whether the information that was not disclosed would significant -- significantly alter the total mix of information available to the investors.

And, here, when you consider that standard, as applied to the articles, which the plaintiff has plead simply parrots and repurposes what's in the press releases, one can't say that there is anything about these, if the company is out there saying -- and if someone else is out there saying the same thing, it can't alter the total mix and be something that would substantially likely impact an investment decision.

Let me turn now briefly, Judge, to the failure to disclose the SEC investigation. And I think it's important again to look at the allegation in the complaint and what do they plead with regard to the SEC investigation.

Again, this allegation is all based upon an Internet article that reports that a FOIA request was made in 2019 to the SEC, and the SEC responded saying we're not going to produce. This public record is under our investigation exemption, okay?

From that, they then allege that there is a duty to

disclose that.  And let's talk about what the SEC investigation, they plead had to with.  It had to do with accounting concerns with regard to segregation of duties.

And, Judge, I don't know your experience with regard to accounting, but accounting has these concepts of segregation of duties, so kind of like the check and balance of the government.

And examples would be, if somebody is writing the check, they don't get the check -- the check -- they don't get the bank statement at the end of the month, so somebody else is looking at the bank statement at the end of the month to make sure that checks are written that are proper.  And, basically, what the segregation concern is they needed more people to be doing more different -- separate things.

And there is no allegation with regard to this SEC investigation and this accounting concern, Judge, that there was anything wrong with the financial statements, anything that was fraudulent about it.  There is no amended financial statements. It just has to do with should they have disclosed that.

And what they also admit, Judge, in the 2016 filings by the company, they expressly identified these accounting concerns and the steps that they were taking to deal with it, so this is not anything that was new news.

They also allege, Judge, that there is no allegation that the investigation continued after 2016.  The allegation of

confidential witness number two says that she never saw anything after 2016 to say it was over.

Well, as a practical matter, the SEC -- it's a rare day when the SEC sends something and says, we're closing our file on it.  It just did doesn't happen.

And if you look at the case law, Judge -- and we cited the Lions Gate, out of the Second Circuit.  That's on point. And in that case, it says:  The general rule -- the general rule is government investigations don't need to be reported.  They only have to report it when they are substantially certain that there is going to be a charge.

And in the Lions Gate case, there were Wells notices that were issued.  And the company was later charged with matters relating to the investigation.

Here we are, Judge, this is a 2016 investigation, we're four years later.  There are no charges.  There has been no suggestion of anything, any penalties or whatever, so it is simply not a requirement that this be disclosed in 2019, 2020.

And the case that they cite, the Kasner case, which is out of Tennessee, is very different.  The Kasner case -- in that case, Judge, the prosecutor was on record saying that our investigation is coming to a close soon and I intend to file charges.  That would get you over the bar of is this substantially certainly going to happen.  That's not the case here.

The other basis to dismiss the claim as to the bearer to disclose has to begin with scienter.  There is nothing -- there is no allegations about the scienter that relate to this, other than what we talked about.  There is certainly no extreme departure or mode of opportunity.

Also, the materiality, Judge.  It's hard for them to suggest with a straight face that it's material that we didn't disclose this, when the whole underlying basis was actually disclosed to -- in the company's filings.  It can't have altered the total mix of information available to the investor.

Judge, I would recommend -- when I -- with -- with Federal cases, I used to be a law clerk many, many years ago.  Some of the problems with Federal cases is that there are so many of them and they are so long, I would recommend to you, Judge, that maybe what you would need to do is -- what I would suggest you do is read the Cortina case, the Galectin case and the Lions Gate case.  All of which are very similar to the circumstances here.  And in all those instances, dismissed.

And then I would look at the cases that the defendants cite, the Galeni -- Galena case, the Rabkin case, the CytRx case, and look at the allegations pled in those cases, which are different.

There, you had people affirmatively involved, affirmatively saying, we can't disclose this.  And in fact, in a lot of instances saying, disclose to the opposite.  And then

they were selling personal stock, as a result of it.

That's what the 10b-5 claims are supposed to be about, Judge. And so with that, I will turn it over to my partner, John Friedman, to discuss with you Count Two, and the loss causation issue.

Thank you, Judge.

**THE COURT:** Sure. Hang on a second, Mr. Friedman. I'm going to ask a question or two of you, Mr. Tucker. Last things first, I suppose.

**MR. TUCKER:** Sure.

**THE COURT:** If we're talking about the requirement of disclosure of the SEC investigation, does the issuer need to make a judgment about where on the spectrum the investigation is?

Is it at -- one that is clearly something that needs to be disclosed or something that is really a bogus investigation?

And then maybe there are some in the middle, where there is a judgment call that the issuer needs to make?

**MR. TUCKER:** Well, I think there is -- there certainly, probably could be a spectrum, you know, right?

I mean, I think, had in 2016, I think there was one case that was cited -- that the parties cited where someone said that we are subject to subpoenas from time to time. And they were, in fact, under a subpoena at the time.

And the Court said, yes.  You would have to go ahead and disclose that.  So I think it would be a different situation if in 2016, the company had come out with an affirmative statement saying that we're not involved in any investigations.  In this instance, the disclosure was not in enforcement -- was not an enforcement action.

You're going three to four years later.  And, certainly, given the disclosure that we -- that the company had made in 2016, to think there is not a requirement to do that, but there could be circumstances where there would.

But in this case, I think these are factual.  You have to look at what's pled and you have to make a case by case determination.

And we think this one clearly falls -- if in the Lions Gate case, where there were Wells notices issued after subpoenas, and there was later a charge, I think that gets you over the hurtle.

We don't have that here.  The most we have is an allegation that the -- there was an SEC investigation back in 2016, with regard to the matters that were disclosed.

**THE COURT:**  On the promotional materials issue, if I determine that there is no duty to disclose payment, then I don't need to address heightened pleading or scienter or any of the other pleading issues; is that right?

**MR. TUCKER:**  I think that that's right, Judge.  But I

would suggest to you that most of the decisions have -- have gone past that.  And you -- you know, in other words, boots and suspenders to support the decision.

And here, those boots and suspenders are obvious and easy, because here you have -- there is no allegations that any of the defendants were involved in the types of activities that are in the Galena case, for example.

So I think that -- I think that your court is correct, but we think that there is multiple basis and we would -- you know, the more basis to sustain the dismissal, obviously, the better for us, and for supporting your decision on appeal, if there is an appeal.

**THE COURT:**  Okay.  Mr. Friedman, what do you have to say about Count Two?

**MR. FRIEDMAN:**  Good morning, Your Honor.  On Count Two -- so first of all, it is pled against only the individual defendants.

And it is also worth noting that there is no claim that the nondisclosure -- the alleged nondisclosure of an SEC investigation was market manipulation.

The market manipulation claim, Count Two, is focused only on the articles part of -- of the claim.  And to confirm that, I point you to paragraph 237 of the amended complaint and plaintiff's opposition brief at pages 17 to 18.

So I'll start with the bottom line and then I will

unpack it a bit.  The bottom line is simple.  The Second Circuit requires market activity for market manipulation claims under Rule 10b-5, subsections (a) and (c).

And the precedent is quite clear, that misstatements or omissions alone do not satisfy that requirement.  I will add, that legal principal is not disputed by plaintiffs here.

Here, the only alleged misconduct is not an act, but an alleged omission.  It's the Internet authors' alleged failure to disclose payment, so that's the bottom line.

It's dispositive and I will unpack it just a bit.  So the difference between market manipulation claims under 10b-5, (a) and (c) versus claims of fraudulent statements or omissions, under 10b-5, subsection (b), is essentially as follows: Subsection B is for claims based on statements or omissions.

Essentially, those take -- those claims take the form of the defendants told the plaintiffs something that wasn't true or didn't tell the plaintiffs something that they should have told them.

That's how plaintiffs structure their claim.  Their claim is about 22nd Century not telling the plaintiffs that the authors of the Internet articles received payments.

But plaintiff's omission claim, under subsection B, doesn't work, for the reasons Mr. Tucker discussed, and we discussed in our briefs.  Including, that the foundational omission is the omission of payment disclosures from Internet

articles that the defendants didn't publish.

And there's a section 17 issues, as Mr. Tucker discussed, because those -- those articles were not from 22nd Century, but from Internet authors.  The Janus case bars liability, as we discussed in the briefs, because the defendants weren't the speaker.

So with all of those issues, they pivot to market manipulation and try to plead a claim under A and C.  But the problem that they have is this market activity requirement that the Second Circuit is quite clear about.

And the -- the key case that is always looked to in this area is the ATSI case, that we quote extensively in our brief.

And I would look, in particular, at page 101 of that decision, which quotes the Supreme Court -- the U.S. Supreme Court on market manipulation in the Sante Fe Industries case where -- where the Second Circuit and Supreme Court explained that, quote, a market manipulation claim cannot be based solely upon misrepresentations or omissions.

They add, there must be some market activity, such as wash sales, matched orders or rigged prices.  Those are the examples they give and all of them involve actual market activity, buying something, selling something.

And I would also direct the Court to the Cannavest case, that we cite in our brief.  It's 307 F.Supp. 222.  In

particular, pages 248 through 252, which is a helpful summary of the Second Circuit's requirements for claims under subsections A and C.

So plaintiffs don't dispute this requirement.  In fact, not only do they not dispute our account of the law, but the opposition brief admits on page 17, that to state a claim for market manipulation, the plaintiffs are required to plead that the individual defendants performed, quote, an inherently deceptive act that is distinct from an alleged misstatement. That's the plaintiff's characterization of the law.

And I would add, this is an important requirement as the Cannavest court explained, without a market activity requirement, any misrepresentation or omission would be market manipulation, because all misstatements and omissions that constitute securities fraud under subsection B are designed to have an impact on the company's share prices -- the share price of the security.

And if any such misstatements or omissions could be pled as market manipulation under subsections A and C, subsection B would be entirely subsumed.

And all of the requirements attendant to pleading an omission claim, pleading what it was with specificity, pleading the duty to disclose, et cetera, would be is superseded.  And that's evidently what plaintiffs may hope for, but that is not the law.

And here, there is no market activity.  The only alleged misconduct is the omission -- the alleged omission of these payment disclosures from the Internet articles.

And they acknowledge that an omission is not enough. Moreover, Cortina and Galectin expressly hold that such allegations in very similar circumstances of undisclosed stock promotion are not market manipulation, and I direct you to page 17 of our motion for that discussion.

So that lack of market activity is -- in addition to all of the deficiencies that Mr. Tucker discussed, is dispositive of the market manipulation claim.

**THE COURT:**  Okay.

**MR. FRIEDMAN:**  Moving on to loss causation -- well, loss causation is an element of all of the claims at issue.  The absence of loss causation is dispositive of Counts One, Two and Three in the complaint.

So for loss causation, I would start with -- with the foundational case cited -- cited from the Second Circuit, the Lentell case, which is a good articulation of the Second Circuit standard for loss causation in 10b-5 cases.

And among other requirements, it requires that the loss must be caused by the materialization of -- of a concealed foreseeable risk.

So in any of these loss causation cases, we ask the question, what is the concealed risk -- the alleged concealed

risk, whose materialization has caused the loss.

And the plaintiffs tried to plead that by asserting that, they have pled corrective disclosures. But as an initial matter, it's worth noting that it's not enough to allege that there was an announcement and the stock went down on the -- on the day of the announcement.

Just -- it's worth noting, that if they pick a random day, there is a 50 percent chance that the stock market was down. So that would make the loss causation threshold much easier to overcome than the courts intended.

And to give you an example, I would point you to the Plumbers, Pipefitters case, that we discuss in our motion on page 23. In particular, pages 337 through 338 of that case. It's a recent SDNY case from 2012.

And the plaintiffs in that case alleged that the stock dropped after each of multiple disclosures, including the -- an announcement that there was an SEC investigation that precipitated an alleged drop in stock price.

And the Court held that there was no loss causation and granted a motion to dismiss, because the Court found there was no materialization of this required undisclosed risk.

So looking first at the SEC investigation, part of the claim. To illustrate the concept of how a -- an undisclosed -- the disclosure of an undisclosed SEC investigation might be a materialization of risk, you can imagine it meeting that

threshold in a concept -- in a context, for example, where the SEC investigation revealed serious misconduct that led to costly charges by the SEC and/or a financial restatement and the investors were left saying, that's why you should have told me about the SEC investigation.

Here, the situation is starkly different. Contemporaneously, in 2016, the company did disclose the underlying conduct and it's remediation.  And there were -- there were no consequences from that.

The plaintiffs now say, essentially, do you remember that conduct that 22nd Century disclosed and remediated years ago, without any penalty or suggestion of wrongdoing, well, there was an investigation around that time.

There is no reason why a reasonable investor would find that salient information or the materialization of an undisclosed risk, so that's the SEC investigation piece.

On the promotional articles side of the case, the amended complaint acknowledges that the articles, as Mr. Tucker mentioned, mostly parroted the company's press releases.  And the amend complaint doesn't allege that the articles were not true.

So what -- the key question here is what is the concealed risk of the authors undisclosed payments?  Is it that learning that anonymous authors of Internet articles had been paid would cause investors to discredit their analysis and

devalue the stock?

Our view is that it is not plausible that -- with these anonymous Internet articles, that were mostly parroting the company's press releases, that anyone was relying on their great independence and credibility, to the extent they were even offering analysis.  And the -- most importantly, for pleading purposes, the amended complaint doesn't allege anything like that.

So the bottom line is that the purported corrective disclosures in the amended complaint are insufficient to plead loss causation, because there is no manifestation of concealed risk.

So just to wrap up, the bottom line is that there is no dispute in this case that the duty to disclose payments for promotional articles lay with the authors alone.

There is no allegation that defendants knew that the authors didn't disclose payments.  And, certainly, no allegations that defendants directed authors not to disclose payments, as in the plaintiff's cases.

For the SEC investigation piece of the claim, the cases are clear, there is no duty to disclose.  Especially given that a year's old reported investigation, that imposed no penalty, and did not require any restatement of financials, where the company had already disclosed the underlying conduct and its prompt remediation.

So as Mr. Tucker suggested, we would direct you to the Cortina case, the SDNY case, the Galectin, the only -- the only Court of Appeals case from the Eleventh Circuit that has addressed the stock promotion context.  Both of these are right on point.

Look also at plaintiff's cases, which are all district court cases, from the Ninth Circuit, perhaps not coincidentally, but distinguishable on their facts.  And the law is clear in this circuit and elsewhere, that pleadings such as the amended complaint must be dismissed.

I will leave it there, and with the Court's permission reserve the remainder of our time for rebuttal.

**THE COURT:**  Okay.

Mr. Calandra, I'm very clear on why the defendants think this case should be dismissed.

Can you tell me why your complaint survives and why you get past the motion to dismiss and why their arguments are wrong?

**MR. CALANDRA:**  Yes.  Thank you, Your Honor.  I can. So at a 20,000 foot level, what this case really is is a classic case of a failing company.  And it's important to remember that.

This was a company that was hemorrhaging money.  That had just realized that a -- or was in the process of realizing that their lifeline to continue on, which was growing concern, was going away, a payment from British American Tobacco, and was

desperate.  They only had enough money to barely last them a few months.

And so to try to stay alive and keep on operating, they hatched a scheme to try to pump up the company's stock price for one last big go.  One chance at the market to try to make enough money to keep operating.

And so they hired a stock promoting company, knowing -- and I'll get to why they knew it in a moment -- knowing that these articles would be misleading and would violate the requirement that they disclose that they were paid promotions, and planted those articles in coordination with their press releases and usurping parts of their press releases, in an effort to get the stock up.

And you can tell by the way the stock reacted, starting in early 2017, and culminating in October of 2017, just before the offering, that this plan worked spectacularly.

The company's price tripled at one point.  And they were able to issue an offering at 172 percent of the price that the stock was when this -- in early 2017.

This netted them $50 million and allowed the company to keep operating.  It also created a windfall for Mr. Sicignano, who was able to walk away with over $150,000.  Something he bragged about, which I will also get to in a moment.

So that's what's happening here.  It is a tale as old

as time.  Failing company, desperate for money, that because whatever their offerings are, is not apparent to investors, they have to lie to the market or trick the market into allowing them to get money, to continue operating is a growing concern.  And that once the truth about what they did came out, the stock price crashed.

So starting with how we know the scheme existed, we know the scheme existed because Mr. Sicignano said it did.  And he said that to his executive assistant.

Now, in their briefing and in Mr. Tucker's remarks, they kind of downplay the importance of our confidential witnesses and say that they don't add anything.

These confidential witnesses do add considerable amounts in allegations that are quite specific, because they tell us exactly what Mr. Sicignano and Mr. Brodfuehrer were doing at this time that we're talking about.

And it's worth pausing to note that although in their briefs they suggest that somehow the use of confidential witnesses cuts against our allegations, that is absolutely wrong on the law.

In the Second Circuit, a useful confidential witness, as long as the confidential witness is described in sufficient detail, the basis for their knowledge, those allegations must be accepted as true.

So our use of confidential witnesses, through the

executive assistant to Mr. Sicignano, as well as the person who worked directly for Mr. Brodfuehrer, we allege in great detail the basis for what they -- for what they knew about this scheme and about the investigation.

And so Your Honor must credit those allegations as true. You can't view them as somehow taking away from what we are -- from what we're alleging.

And then on top of that, to talk about the Internet articles, in the Galena case and the CytRx case and in the Rabkin case, all three of those cases, the motions to dismiss were denied on the basis of disclosures and Internet articles and the reports from whistleblowers.

And that is exactly what we have here, a confidential witness, who confirms allegations that were brought out in Internet articles.

Now, Mr. Tucker made a lot out of our apparent -- our purported inability to allege that Mr. Sicignano knew that the articles were not -- were not disclosed and that they were paid. And, respectfully, we disagree.

Mr. Sicignano told his executive assistant that he was working in secret to try to boost the stock price and working with a stock promotion firm, in secret, to try to boost the stock price.

We also allege that he expressed to this confidential -- to the executive assistant that he was -- he

knew that these articles did not contain -- would not contain disclosures and that what he was doing was wrong.

Now, what they -- what they harp on is our use of words that don't say he said.  All that means is our confidential witness wasn't able to quote Mr. Sicignano.

But I would point out that these were multiple conversations, that our confidential witness drove, because he could not understand how Mr. Sicignano was going to get anything positive about the company out, because the company had no products that FDA liked and was not planning to introduce any new products to the FDA.

So, in paragraphs 64 to 68, we have Mr. Sicignano admitting that this scheme was going on, knowing it was wrong and knowing that these disclosures weren't incorporated as part of these articles.

Now, what this takes us to is one of our claims, which defendants notably did not address in their -- in their opening. And that is that in their SEC filings during this time, the defendants made detailed disclosures about how their stock -- how the company's stock price could be affected by volatility.

And the defendants, even though they knew they were engaged in this promotional scheme, did not disclose that.  And in CytRx, Rabkin and -- in CytRx, Rabkin and Galena, that is exactly what the courts found.

If you were electing to make a detailed disclosure

about the volatility of your stock, you need to disclose that you are also involved in a scheme to manipulate that stock. And that is exactly what these defendants did not do here.

Now, in the briefing, defendants try to explain this away by saying that this issue was before the Court in Cortina. And it wasn't before the Court in Galectin or Garvey, another two cases that they cite.

But in Cortina, the problem there was that the disclosure was very vague and it just made a kind of casual reference to the fact that their stock could be affected -- the Cortina stock could -- or the company in Cortina, I believe, it was Anavex's stock would be affected by volatility, but that's not what we have here.

We have a 19 item bullet pointed list of ways that this stock is volatile. And we have also alleged actual knowledge of the fact that they were engaged in the scheme.

So, Your Honor, as far as this particular claim goes, that is a slam dunk. They had a duty to disclose as a result of the fact that they were describing in such detail facts that made their stock price volatile. They didn't disclose it and they knew that they were engaged in the scheme.

That is -- and then, for loss causation, when the scheme emerged -- when the scheme emerged -- when it came out in the connection with those Internet articles, the stock price dropped. That is a textbook securities fraud allegation.

Now, when it comes to the articles themselves, they are, we allege -- and we allege that the Court should infer that Mr. Sicignano had ultimate authority over these articles for these reasons.

First, he -- this was a pivotal point for this company, as I have said before.  They were running out of money and this was their only shot to get back to profitability.  And they were -- well, not even profitability.  Just to keep operating.

So to -- Mr. Sicignano told his executive assistant that this was essential to him.  They had to get on the Russell Index.  They had to make all of this effort to -- this was really what he was focusing on.

And from working so closely with him, his executive assistant saw that he edited every single press release within an inch of its life.

And he told the executive assistant that he was working with Earth Communications, the stock promotion company, to get this -- to get the stock price up.

So the inference -- it's just -- it's a very reasonable inference that with so much on the line and with so much of his attention on this and with his ongoing concern with how the company was portrayed in public, that he would not edit, review, approve and do everything else required to make him have ultimate authority over these articles.  That is just not a

reasonable inference to suggest he was not doing that.

A reasonable inference is to infer from his conduct, his admissions, that he had and -- and that the company had ultimate authority over these articles.

That means -- now, they also tend align and they seem to say that the articles were misleading because they omit this disclosure, the disclosure that they were paid for -- that the authors received payments for the articles.

It's worth noting that three of the articles actually disclaim payment. And you will find those in paragraphs 167, 174 and -- I'm sorry.  1 -- 10 -- 167, 172 and 184 of the complaint, as well as 106 --

**COURT REPORTER:**  Wait, wait, wait.  Mr. Calandra -- hold on.  Hold on.

**MR. CALANDRA:**  And those three articles affirmatively misstate that --

**COURT REPORTER:**  Wait --

**MR. CALANDRA:**  -- that no payment was made in connection them.  And the other articles generally don't contain any kind of disclosure at all.

But what makes the articles misleading is that they are presented as independent investment analysis.  And that is also what makes these articles material, but I'll get to that in a moment.

So because --

THE COURT: Mr. Calandra -- Mr. Calandra, can you hear me for second?

MR. CALANDRA: I certain --

THE COURT: Can you give you us the paragraph numbers one more time, the court reporter couldn't hear you.

MR. CALANDRA: I am sorry. Do I need to -- it is very rare that someone says they can't hear me when I am speaking. So sorry, it was 106, 111, 122, 167, 172 and 184.

THE COURT: Thank you.

MR. CALANDRA: So the -- we have, in fact, alleged that Mr. Sicignano and the defendants had ultimate authority over the -- over the articles, which is what is necessary to plead -- to make them makers of the statements in the articles under Janus.

Finally, we have the third set of misstatements arising out of -- arising out of these -- this articles scheme, and that's in their responses to the Fuzzy Panda articles.

In these responses to the Fuzzy Panda articles, they deny that there was ever a scheme. For example, in the October 26th responses, they -- they say these -- and I -- this is a highly deceptive smear campaign to dupe shareholders that attempted to link 22nd Century to stock promoters who have absolutely nothing to do with the company. That is false.

The stock promoters had everything to do with the company. They were part of the scheme to push the stock price

up.   That is as clear a misrepresentation as one can get.

And the reason why they had a duty to disclose that they had engaged in this scheme, is because by choosing of their own volition to opine on the October 25th article, written by the user, Fuzzy Panda, they had a duty to say everything then to make that statement not misleading.

Now, when it comes to the -- when it comes to the investigation statements, again, we know the investigation occurred because we have a confidential witness, who was hired as part -- in response to that investigation and who discussed that investigation at length with Mr. Brodfuehrer.

We also know the investigation was important because Mr. Brodfuehrer feared going to jail and made a trip to the SEC to meet with them specifically.

And we also know that in their filings in 2016, they disclosed the existence of that material accounting weakness, but they did their best to downplay that material accounting weakness.

And they downplayed it, because during this time they were going to the market repeatedly to try to get more capital. This was part of what led to the article scheme, because as those offerings in 2016 loss of -- were less and less fruitful, their income declined.

Now, the disclosure -- these disclosure -- so the failure to disclose -- when they are saying that in the SEC

filings that this -- that there is a weakness, but downplaying that weakness, because they're saying, it doesn't require us to misstate anything and they were working actively to remediate it, those statements give a misleading impression that this is not a serious investigation, when, in fact, it was a serious investigation.

And this omission was material, because the market would view a company that was going again and again to try to get more capital, and that was -- was flailing very differently if that company is also subject to an SEC investigation about its accounting practices.

This was a microcap company.  And microcap companies have high risks associated with them, thus a microcap company that is under investigation for accounting weaknesses is very different from a microcap company that has just a problem because it's understaffed.

Now, moving on to -- again -- or staying with the accounting irregularities -- or staying with the accounting weakness disclosures, in -- in the October, 2017 and April, 2018 article, they affirmatively deny the existence of that -- of that investigation in both of those.

And in -- particularly, in their second disclosure in April of 2018, where they say that the Fuzzy Panda articles falsely accuse them of being under investigation.

We know that is not true, because we know the

investigation existed and we know from someone who was hired as part of that investigation, who worked closely with Mr. Brodfuehrer and talked to Mr. Brodfuehrer about this investigation, that person would know if that investigation had been closed.

So since that -- since the reasonable inference is that investigation was not closed and was, in fact, still open, for them to affirmatively come out and deny the existence of such investigation, that is misleading.

Now, they talk -- they point you to, repeatedly, going back to the -- going back to the article scheme.  They talk repeatedly about how their three cases, Cortina, Galectin and Garvey should control here.  And that is not -- that is not true.

All of those case are distinguishable.  And they were distinguishable, because those cases did not involve somebody inside, who would -- who had actual knowledge of the scheme occurring.

In CytRx, Rabkin and Galena, there were insiders -- whether constructive insiders, someone who is talking to the insiders or just whistleblowers, who were able to say that this is exactly what was happening.

In Cortina, Galectin and Garvey, it was just an inference that a scheme was in place.  There was nobody inside to actually confirm the existence of the scheme.

Also, something that they did not mention, but it is important to note, in Cortina, Galectin and Garvey, there were no allegations of the use of aliases.

Whereas in Rabkin, CytRx and Galena, there were aliases used to try to disguise the true identities of the authors.  And we allege here and identify which of those articles that were written under pseudonyms, that those pseudonyms existed.

Also, particularly in Galectin and Garvey, there was no denial of the scheme.  And here, a scheme is denied, both by -- by Mr. Sicignano, in his -- in the -- or denied by the defendants in their releases, October of 2017 and April of 2018.

And, finally, the Garvey case, which they cite, in that case, there were disclosures that there -- that a scheme was in place.  And here, there weren't those disclosures.

And I said finally, but unfortunately I have to go hunt for a couple of -- there are a couple of additional differences.

In Rabkin, for example, once -- once the board learned of a scheme, the perpetrator of the scheme, the CEO, was fired. Here, that is -- was fired under the guise of, quote, resigning. That is also exactly what happened here.

When the board learned of Mr. Sicignano's involvement in the scheme, they fired him, under, quote, the guise of resigning.

So those are the differences. And I -- in a rare moment of agreement with the defendants, I would also encourage you to compare these two -- these two sets of cases.

Cortina, Galectin and Garvey, don't have whistleblower testimony. Didn't use aliases. There weren't denials of the participation. There wasn't an allegation of profiting. Whereas here, Mr. Sicignano reaped an enormous bonus, that he bragged about.

Whereas in the CytRx, Rabkin and Galena cases, those cases had somebody inside explaining what was going on. There were aliases used. There was a denial. And there was a motive and there -- a motive in terms of reaping gains from the scheme and there was a fire.

So -- so it would be our position that their cases are not controlling, but ours are controlling. And before I move on to -- before I move on to scienter, just one more note.

They make a big deal out of the Lions Gate case. And, in fact, suggest that it is dispositive. Lions Gate is irrelevant. The portion of that case that they cite to deals with a pure omission.

The question of whether there was a duty to affirmatively come out and disclose the investigation existed. That's not what we have here. What we have here is specific statements that are misleading as a result of failing to disclose the investigation.

Now, there are other parts of the Lions Gate case that they don't cite to, where the Court does address that, but -- or does address something similar, but those are a little different, because what was in that case, what was pled to be misleading were risk factors.

And we're not saying a risk factor was misleading.  We are saying a specific disclosure about a weakness was misleading.  Because in effect, they didn't disclose the extent of that weakness and tell the investors something highly material, which was that this company -- it looked like you were about to ask a question, Your Honor.

**THE COURT:**  Go ahead and finish that point and then I'm going to interrupt you.

**MR. CALANDRA:**  All right.  Which is that this company that was going to the market again and again is -- is, in fact, there is a weakness there that the SEC has taken an issue to -- issue or interest in, that, in fact, threatens the freedom and the job of their CFO.

That is something that makes this materially different from what's happening in Lions Gate.  And, in fact, I don't think Lions Gate adds anything to their analysis.

**THE COURT:**  So before you move on, Mr. Calandra -- I apologize.  I should have made this clear to both sides.  I've been through the papers on the cases with my law clerk extensively.

So for the remainder of your argument, try to keep it -- we're running pretty long here -- keep it to things that are not in the papers, please.

**MR. CALANDRA:**  Absolutely, Your Honor.

**THE COURT:**  And if there is nothing that's not in the papers, that's okay, too.  I'm not going to hold that against you.

**MR. CALANDRA:**  No.  That's -- there actually are things that are not -- that are not in the papers, that I do want to -- so that takes me very -- actually, very neatly to market activity.

And Mr. Freidman explained very eloquently the law of high market activity, but he left something out.  And that's in City of Providence v. Bats Global Markets, Inc., 878 F. 3d 50.  That's a Second Circuit case from 2017, after ATSI.

The Supreme Court -- I knew I was going to make that mistake -- the Second Circuit expressly held that trading activity is not required for market activity.  It's not limited to wash trades, false pricing of trades, et cetera.

It's -- and based on -- and I cite, Sante Fe, a Supreme Court case, it's any market activity that has any impact on a stock price.  And here, that's exactly what we allege.

It's not the omission of the disclosure that is the scheme.  It's the working with Earth.  It's the -- it's the working with Earth.  It's the -- the stylings are posed as

independent investment analysis.  And it's placing these in conjunction with press releases, as well as some of these articles effectively refer to each other.

And I would refer to the Court to paragraphs 180 and 181 of the complaint, which are two articles published on two different sites that were essentially reenforcing each other. This is -- this is market activity.  And it was held to be market activity in CytRx, Rabkin and Galena.

And so the idea -- which I think was the thrust -- which I think was the thrust of Mr. Friedman's point was you need some kind of trading activity to be market activity, and that is not the case.  That is just not the law.

And here we have a concerted effort, that was admitted to again by Mr. Sicignano, to manipulate the stock price, based on convincing the market at large that there was a diverse series of independent investors interested in what was happening, interested in this particular company, and that is the market activity.

And recently, there was a SDNY case.  SEC was very impressed, 2019, U.S. Dist.  LEXIS 40697, from March 13, 2019, where this exact kind of conduct was found to be market activity, in support of a -- in support of a manipulation claim.

And just -- just so that there is no confusion -- Mr. Freidman did not bring this up, but it is mentioned in their reply, that our -- the point of market activity should be deemed

conceded, because we don't use the -- market activity in our opposition, and that's incorrect.

As Mr. Friedman said, the point of market activity is that you need some kind of conduct separate from the misrepresentation and omission. And that is exactly what we have alleged.

The plotting of these articles, the making them seem like investment analysis, the scheduling them around press releases, and the publishing of them to get the stock price up, that is manipulative activity.

And to differentiate this -- because they made a point of pointing you to Cannavest, the Cannavest case is materially different.

In that case, what happened was a company exaggerated the value of an acquisition it made. And it made that same misstatement over and over again in press releases. And that had the effect of driving the price -- the stock price up.

And the Court said, one single misrepresentation repeated is not market manipulation. And yet that's different from what we have here, because here -- in Cannavest, that misrepresentation was made by the company itself. It was attributed to the company itself. And it was just a single -- a single statement made over and over again that happened to be false.

Here, we have an entire scheme to manipulate the

market, based on the placement of these articles.  And these articles use aliases to prevent the connection to the defendants, and the defendants deny this connection.  That is -- that is market activity.  That is conduct separate and apart from the misrepresentations at issue in this case.

Now, with scienter, I do stand on my papers, largely, but, hopefully, in the space of one sentence, I want to emphasize that we do allege actual knowledge.  We do allege a motive.  And it's a motive different from the cases they use in their briefs.

The motives in the Time Warner case, the Second Circuit held unequivocally that targeting a specific offering is a motive for a company.  And that's exactly what we allege here, they were targeting the October 22nd offering.

At the same time, the -- a specific bonus, based on the outcome of a specific offering, can be a -- or is proof of a motive.  And that is precisely what we allege here.

The size of the -- the outsized nature of the bonus is not as important, especially when here, Mr. Sicignano hadn't received any bonus for two years and then he gets a $90,000 bonus.  And then after getting token raises for a couple of years, he got a monster raise.  This was about two thirds of his salary in the space of this.

And on top of that, we have him bragging about the fact that he got this money as a result of his efforts.  That is

particularized -- those are particularized allegations of motive.

Finally -- or, finally, turning to loss causation, Mr. Freidman, although very articulately, outlined the nature loss causation or the law regarding it, kind of meshed together two distinct concepts.

One is corrective disclosure and the other is materialization of the risk. And we allege, as it relates to the investigation, that this was a corrective disclosure.

The market didn't know about an investigation and then it found out and the stock price dropped. That is textbook, black letter law, loss causation.

And adding the element of materialization of a risk in there, it muddies the water. And perhaps I should have began with this, but it's important to note that we don't need to plead loss causation with particularity and this is not intended to be a great hurtle. All we have to do is give the defendants some idea of where we're coming from.

And staying with the investigation for a moment, they declare in their reply brief that a speculation from an anonymous short seller is not proof -- or is not a corrective disclosure. That's just wrong by the law.

In Fairfax Holdings, 886 F.Supp.2d 328, the Court cited cases and states that to form an adequate basis for loss causation, a given disclosure need not emanate from a particular

source, take a particular form, or be of a particular quality. All that matters is the truth gets out there. And that's exactly what the disclosure of this investigation did.

Now, where we do allege materialization of the risk, is in relation to Mr. Sicignano's departure from 22nd Century. And in this case, what we allege is that the denials of the scheme in April of -- or April of 2018 and October of 2017 concealed his involvement in the scheme. And that the risk -- the very foreseeable risk is that his involvement in the scheme would mean he would be fired.

This is a classic materialization of the risk, because what happened -- this is no different than if a company is healthy one day and then the next day discovers it has -- that it's not liquid. It's gone bankrupt.

There is -- a law suit is then filed. And then in the process of litigating that lawsuit, it comes out that the auditors -- the auditors misrepresented the value of certain assets within that company.

Now, by that point, the company is already valued less, the stock price is already dropped. And it doesn't come out until later that it was, in fact, the auditor's fault and that was the reason why market didn't know this sooner.

But the timing of the actual revelation is not as important as the materialization of the risk itself. And the facts I just described are in a case called, in re: Parmalat,

375 F.Supp.2d 278, where Judge Kaplan says that the true extent of the fraud was not revealed to the public until February, after Parmalat Cares were worthless and after the close of the class period is immaterial.

Whereas here, the risk allegedly concealed by defendants materialized during that time and arguably caused the decline of shareholder and bondholder value.

So, we know that Mr. Sicignano resigned -- was fired, because of our confidential witness's letter to the board, because the confidential witness sent that letter on May 31st, 2018.

Two weeks later -- '18 or 2019, I'm sorry, Sicignano was fired or Sicignano was stripped of his responsibilities two weeks later. And then six weeks after that, given enough time to not make it so obvious that he was leaving, he resigned for, quote, personal reasons.

That is no different than if -- that is no different than coming out after a company has become insolvent that in fact, it was lies about that company's assets that made it insolvent, that would have noted to the public that it was insolvent all along.

And with that, Your Honor, unless you have further questions, I close.

**THE COURT:** I don't have any other questions.

Mr. Freidman, Mr. Tucker, I'm very reluctant. I

really do have a handle on things here, is there something that you absolutely must tell me that I do not know from your papers?

Here's what I'm going to do -- I can't hear you, Mr. Tucker, but here's what I'm going to do, by next Friday, if either side has any cases that you want me to see, that are not cited in your briefs, send me a letter and just list the cases.

And, Mr. Calandra, you cited a bunch into the record today, but put those into your letter, in one week, tell me the cases that aren't in your briefs that I need to look at and I'll look at them.

And I'm going to move on to a quick housekeeping matter, which is caption of the case. Is it correct or do we need to change the plaintiff that's in the caption here?

**MR. CALANDRA:** Your Honor, the reason why the caption is the way it is is because that was the order of the Court in the -- I think we were in the Eastern District to begin with.

So it is correct, based on what that court said we should caption the case. But if Your Honor wants us to recaption the case, we can send you a stipulation that you can sign that recaptions it to 22nd Century Investor Group.

**THE COURT:** Please do that.

**MR. CALANDRA:** I assume that's okay, if the guys on the defense nod.

**THE COURT:** Okay.

**MR. FRIEDMAN:** Judge, that's fine. We don't object to

that.

THE COURT:  Okay.

Mr. Tucker, I can't hear you.  You are on mute.

MR. TUCKER:  I'm sorry, Judge.  It didn't show I was on mute.  If I could say two things -- and I'll be very brief.

THE COURT:  I'm not listening, Mr. Tucker.

MR. TUCKER:  All right.  I won't say --

THE COURT:  I've got it.  I've got it.  If there's case law that supports you, put it in the letter, okay?

Thank you.  Have a good day.

MR. TUCKER:  All right.  Thank you.

MR. CALANDRA:  Thank you, Your Honor.

(Proceedings concluded at 11:24 a.m.)

*   *   *

"I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter."


   s/ Bonnie S. Weber                          August 4, 2020
Signature                                      Date


Bonnie S. Weber