# Exhibit 1

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, DC 20549**

**SCHEDULE 14A**
**(RULE 14a-101)**

**SCHEDULE 14A INFORMATION**

**Proxy Statement Pursuant to Section 14(a) of the Securities**
**Exchange Act of 1934**

Filed by the Registrant   ☒
Filed by a Party other than the Registrant   ☐

Check the appropriate box:

☐   Preliminary Proxy Statement
☐   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**
☒   Definitive Proxy Statement
☐   Definitive Additional Materials
☐   Soliciting Material Pursuant to §240.14a-12

**22nd Century Group, Inc.**

(Name of Registrant as Specified in its Charter)

(Name of Person(s) Filing Proxy Statement, if Other Than the Registrant)

Payment of Filing Fee (Check the appropriate box):
☒ No fee required.
☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

(1) Title of each class of securities to which transaction applies:

(2) Aggregate number of securities to which transaction applies:

(3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

(4) Proposed maximum aggregate value of transaction:

(5) Total fee paid:

☐ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

(1) Amount Previously Paid:

(2) Form, Schedule or Registration Statement No.:

(3) Filing Party:

(4) Date Filed:



## NOTICE OF 2016 ANNUAL MEETING OF STOCKHOLDERS

The 2016 annual meeting of stockholders of 22nd Century Group, Inc. (the "Company") will be held at The Buffalo Club, 388 Delaware Avenue, Buffalo, New York 14202, on Saturday, April 30, 2016, beginning at 1:00 P.M. local time. **Please note that The Buffalo Club has a mandatory dress code for entry into the annual meeting. Men must wear dress pants, coat and tie. Women must wear dresses, business suits, dress pants with blazers or formal pantsuits.** At the meeting, the holders of the Company's outstanding common stock will act on the following matters:

(1) The election of Dr. Joseph A. Dunn and Nora B. Sullivan, the two nominees named in the attached proxy statement, as Class II Directors to serve terms expiring at the annual meeting of stockholders to be held in 2019 and until their successors have been elected and qualified;

(2) The approval, on an advisory basis, of the 2015 compensation of the Company's named executive officers;

(3) The ratification of the appointment of Freed Maxick CPAs, P.C. as the Company's independent registered certified public firm for fiscal 2016; and

(4) The transaction of any other business as may properly come before the meeting or any adjournment or postponement thereof.

Stockholders of record at the close of business on March 8, 2016 are entitled to notice of and to vote at the annual meeting and any postponements or adjournments thereof.

It is hoped you will be able to attend the meeting, but in any event, please vote according to the instructions on the enclosed proxy as promptly as possible. If you are able to be present at the meeting, you may revoke your proxy and vote in person.

**Important Notice Regarding the Availability of Proxy Materials for the Annual Meeting of Stockholders to be Held on April 30, 2016**: The 2015 Annual Report on Form 10-K and proxy statement of 22nd Century Group, Inc. are available online at http://www.xxiicentury.com/sec-filings/. For directions to the annual meeting, please contact Nathan Schmitt at 716-270-1523 or through www.xxiicentury.com/contact.

By Order of the Board of Directors,
/s/ Henry Sicignano, III
Henry Sicignano, III
President and Chief Executive Officer

Dated: March 18, 2016

**TABLE OF CONTENTS**

ABOUT THE ANNUAL MEETING — 1

PRINCIPAL STOCKHOLDERS — 4

SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE — 6

PROPOSAL NO. 1 ELECTION OF DIRECTORS — 7

CORPORATE GOVERNANCE — 10

EXECUTIVE OFFICERS — 13

EXECUTIVE COMPENSATION — 15

CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS — 24

PROPOSAL NO. 2 ADVISORY RESOLUTION ON EXECUTIVE COMPENSATION — 25

PROPOSAL NO. 3 THE RATIFICATION OF THE APPOINTMENT OF FREED MAXICK CPAs, P.C. AS THE COMPANY'S INDEPENDENT REGISTERED CERTIFIED PUBLIC ACCOUNTING FIRM FOR FISCAL YEAR 2016 — 26

INDEPENDENT REGISTERED CERTIFIED PUBLIC ACCOUNTING FIRM FEES AND SERVICES — 27

AUDIT COMMITTEE REPORT — 27

STOCKHOLDER PROPOSALS FOR THE 2017 MEETING — 28

OTHER MATTERS — 28

i

**22nd Century Group, Inc.**
**9530 Main Street**
**Clarence, New York 14031**

**2016 ANNUAL MEETING OF STOCKHOLDERS**
**To Be Held April 30, 2016**

---

**PROXY STATEMENT**

---

The Board of Directors of 22nd Century Group, Inc. is soliciting proxies from its stockholders to be used at the annual meeting of stockholders to be held at The Buffalo Club, 388 Delaware Avenue, Buffalo, New York 14202 on Saturday, April 30, 2016, beginning at 1:00 P.M. local time, and at any postponements or adjournments thereof. **Please note that The Buffalo Club has a mandatory dress code for entry into the annual meeting. Men must wear dress pants, coat and tie. Women must wear dresses, business suits, dress pants with blazers or formal pantsuits.** This proxy statement contains information related to the annual meeting. This proxy statement and the accompanying form of proxy are first being sent to stockholders on or about March 18, 2016.

**ABOUT THE ANNUAL MEETING**

*Why did I receive these materials?*

Our Board of Directors is soliciting proxies for the 2016 annual meeting of stockholders. You are receiving a proxy statement because you owned shares of our common stock on March 8, 2016 and that entitles you to vote at the meeting. By use of a proxy, you can vote whether or not you attend the meeting. This proxy statement describes the matters on which we would like you to vote and provides information on those matters so that you can make an informed decision.

*What information is contained in this proxy statement?*

The information in this proxy statement relates to the proposals to be voted on at the annual meeting, the voting process, our Board, the compensation of Directors and executive officers and other information that the Securities and Exchange Commission requires us to provide annually to our stockholders.

*Who is entitled to vote at the meeting?*

Holders of common stock as of the close of business on the record date, March 8, 2016, will receive notice of, and be eligible to vote at, the annual meeting and at any adjournment or postponement of the annual meeting. At the close of business on the record date, we had outstanding and entitled to vote 76,009,960 shares of common stock.

*How many votes do I have?*

Each outstanding share of our common stock you owned as of the record date will be entitled to one vote for each matter considered at the meeting. There is no cumulative voting.

*Who can attend the meeting?*

Only persons with evidence of stock ownership as of the record date or who are invited guests of the Company, as determined by the Chairman of the Board or the executive officers of the Company, may attend and be admitted to the annual meeting of the stockholders. Stockholders with evidence of stock ownership as of the record date may be accompanied by one guest. Photo identification may be required (a valid driver's license, state identification or passport). If a stockholder's shares are registered in the name of a broker, trust, bank or other nominee, the stockholder must bring a proxy or a letter from that broker, trust, bank or other nominee or their most recent brokerage account statement that confirms that the stockholder was a beneficial owner of shares of stock of the Company as of the record date. Since seating is limited, admission to the meeting will be on a first-come, first-served basis.

1

Cameras (including cell phones with photographic capabilities), recording devices and other electronic devices will not be permitted at the meeting.

Please note that The Buffalo Club has a mandatory dress code for entry into the annual meeting. Men must wear dress pants, coat and tie. Women must wear dresses, business suits, dress pants with blazers or formal pantsuits.

***What constitutes a quorum?***

The presence at the meeting, in person or by proxy, of the holders of one-third (33.33%) of the voting power of common stock issued and outstanding on the record date will constitute a quorum, permitting the conduct of business at the meeting. Proxies received but marked as abstentions or broker non-votes, if any, will be included in the calculation of the number of votes considered to be present at the meeting for purposes of a quorum.

***How do I vote?***

If you are a holder of record (that is, your shares are registered in your own name with our transfer agent), you can vote either in person at the annual meeting or by proxy without attending the annual meeting. We urge you to vote by proxy even if you plan to attend the annual meeting.

Each stockholder receiving proxy materials by mail may vote by proxy by using the accompanying proxy card. When you return a proxy card that is properly signed and completed, the shares represented by your proxy will be voted as you specify on the proxy card.

If you hold your shares in "street name," you must either direct the bank, broker or other record holder of your shares as to how to vote your shares, or obtain a proxy from the bank, broker or other record holder to vote at the meeting. Please refer to the voter instruction cards used by your bank, broker or other record holder for specific instructions on methods of voting, including by telephone or by using the Internet.

Your shares will be voted as you indicate. If you return the proxy card but you do not indicate your voting preferences, then your shares will not be voted with respect to any proposal. The Board and management do not intend to present any matters at this time at the annual meeting other than those outlined in the notice of the annual meeting. Should any other matter requiring a vote of stockholders arise, stockholders returning the proxy card confer upon the individuals designated as proxy's discretionary authority to vote the shares represented by such proxy on any such other matter in accordance with their best judgment.

***Can I change my vote?***

Yes. If you are a stockholder of record, you may revoke or change your vote at any time before the proxy is exercised by filing a notice of revocation with our Secretary or by mailing a proxy bearing a later date or by attending the annual meeting and voting in person. For shares you hold beneficially in "street name," you may change your vote by submitting new voting instructions to your bank, broker, other record holder of your shares or other nominee or, if you have obtained a legal proxy from your bank, broker, other record holder of your shares or other nominee giving you the right to vote your shares, by attending the meeting and voting in person. In either case, the powers of the proxy holders will be suspended if you attend the meeting in person and so request, although attendance at the meeting will not by itself revoke a previously granted proxy.

***How are we soliciting this proxy?***

We are soliciting this proxy on behalf of our Board of Directors and will pay all expenses associated with this solicitation. In addition to mailing these proxy materials, certain of our officers and other employees may, without compensation other than their regular compensation, solicit proxies through further mailing or personal conversations, or by telephone, facsimile or other electronic means. We will also, upon request, reimburse brokers and other persons holding stock in their names, or in the names of nominees, for their reasonable out-of-pocket expenses for forwarding proxy materials to the beneficial owners of our stock and to obtain proxies.

***Will stockholders be asked to vote on any other matters?***

To the knowledge of the Company and its management, stockholders will vote only on the matters described in this proxy statement. However, if any other matters properly come before the meeting, the persons named as proxies for stockholders will vote on those matters in the manner they consider appropriate.

***What vote is required to approve each item?***

The two nominees receiving the highest vote totals of the eligible shares of our common stock that are present, in person or by proxy, and entitled to vote at the meeting will be elected as our directors. The approval of the advisory resolution on executive compensation and the ratification of the appointment of Freed Maxick CPAs, P.C. ("Freed") require the affirmative vote of the majority of the votes present, in person or by proxy, and entitled to vote at the meeting.

***How are votes counted?***

With regard to the election of directors, votes may be cast in favor or withheld and votes that are withheld will be excluded entirely from the vote and will have no effect. You may not cumulate your votes for the election of directors.

For the other proposals, you may vote "FOR," "AGAINST" or "ABSTAIN." Abstentions are considered to be present and entitled to vote at the meeting and, therefore, will have the effect of a vote against each of the proposals.

If you hold your shares in "street name," the Company has supplied copies of its proxy materials for its 2016 annual meeting of stockholders to the broker, bank or other nominee holding your shares of record and they have the responsibility to send these proxy materials to you. Your broker, bank or other nominee that has not received voting instructions from you may not vote on any proposal other than the appointment of Freed. These so-called "broker non-votes" will be included in the calculation of the number of votes considered to be present at the meeting for purposes of determining a quorum, but will not be considered in determining the number of votes necessary for approval of any of the proposals and will have no effect on the outcome of any of the proposals. Your broker, bank or other nominee is permitted to vote your shares on the appointment of Freed as our independent auditor without receiving voting instructions from you.

***What should I do if I receive more than one set of voting materials?***

You may receive more than one set of voting materials, including multiple copies of this proxy statement and multiple proxy cards or voting instruction cards. For example, if you hold your shares in more than one brokerage account, you may receive a separate voting instruction card for each brokerage account in which you hold shares. If you are a stockholder of record and your shares are registered in more than one name, you will receive more than one proxy card. Please vote your shares applicable to each proxy card and voting instruction card that you receive.

**PRINCIPAL STOCKHOLDERS**

The following table sets forth information regarding the beneficial ownership of our common stock as of March 8, 2016 by (i) each person who, to our knowledge, owns more than 5% of our common stock, (ii) each of our current Directors and executive officers, and (iii) all of our current Directors and executive officers as a group. Derivative securities exercisable or convertible into shares of our common stock within sixty (60) days of March 8, 2016 are deemed to be beneficially owned and outstanding for computing the share ownership and percentage of the person holding securities, but are not deemed outstanding for computing the percentage of any other person. Beneficial ownership representing less than 1% is denoted with an asterisk (*). The address of named beneficial owners that are officers and/or directors of the Company is: c/o 22nd Century Group, Inc., 9530 Main Street, Clarence, New York 14031. The following table is based upon information supplied by officers and Directors, and with respect to 5% or greater stockholders who are not officers or Directors, information filed with the SEC.

| Name of Beneficial Owner | Number of Shares Beneficially Owned | Percentage Beneficially Owned (1) |
|---|---|---|
| **_Management and Directors:_** | | |
| Henry Sicignano, III (2) | 5,640,400 | 7.4% |
| Michael R. Moynihan, Ph.D. (3) | 1,508,463 | 2.0% |
| John T. Brodfuehrer (4) | 444,529 | * |
| Thomas L. James, Esq. (5) | 547,568 | * |
| Paul Rushton, Ph.D. (6) | — | * |
| Joseph Alexander Dunn, Ph.D. (7) | 326,500 | * |
| James W. Cornell (8) | 386,500 | * |
| Richard M. Sanders (9) | 155,000 | * |
| Nora B. Sullivan (10) | 16,375 | * |
| All directors and executive officers as a group (9 persons) (2) - (10) | 9,025,335 | 11.8% |
| **_Other 5% Owners:_** | | |
| Joseph Pandolfino (11) | 5,994,627 | 7.9% |
| Empery Asset Management, LP (12) | 5,479,836 | 7.2% |
| Crede CG III, Ltd. (13) | 7,524,986 | 9.9% |

(1) Based on 76,009,960 shares of common stock issued and outstanding (including outstanding restricted stock), as of March 8, 2016.

(2) Consists of (a) 2,328,053 shares of common stock, (b) 2,542,347 shares of common stock held by Henry Sicignano III Group, LLC, (c) 320,000 shares of common stock issuable upon exercise of warrants, and (d) 450,000 shares of common stock issuable upon exercise of stock options. Mr. Sicignano is Managing Member of Henry Sicignano III Group, LLC and, accordingly, exercises voting and investment power with respect to the shares held by Henry Sicignano III Group, LLC.

(3) Consists of (a) 988,934 shares of common stock, (b) 150,000 shares of common stock issuable upon exercise of warrants and (c) 369,529 shares issuable upon the exercise of stock options.

(4) Consists of (a) 250,000 shares of common stock and (b) 194,529 shares issuable upon the exercise of stock options.

(5) Consists of (a) 100,000 shares of common stock and (b) 447,568 shares issuable upon the exercise of stock options. The 100,000 shares of common stock are subject to potential forfeiture over time in the event Mr. James ceases employment with the Company prior to May 1, 2017. In addition, Mr. James was granted 50,000 stock options that are not included in the number of beneficially owned shares and are subject to forfeiture over time in the event Mr. James ceases employment with the Company prior to May 1, 2017.

(6) Dr. Rushton was granted 100,000 stock options on October 30, 2015, that are subject to forfeiture over time in the event Dr. Rushton ceases employment with the Company prior to November 1, 2016. Accordingly, these stock options are not included in the number of beneficially owned shares.

(7) Consists of (a) 85,000 shares of common stock, (b) 31,500 shares of common stock issuable upon exercise of warrants and (c) 210,000 shares issuable upon the exercise of stock options.

(8) Consists of (a) 145,000 shares of common stock, (b) 31,500 shares of common stock issuable upon exercise of warrants and (c) 210,000 shares issuable upon the exercise of stock options.

(9) Consists of (a) 55,000 shares of common stock and (b) 100,000 shares issuable upon the exercise of stock options.

(10) Consists of 16,375 shares of common stock. In addition, Ms. Sullivan was granted 61,643 stock options on May 20, 2015, that are subject to forfeiture over time in the event Ms. Sullivan ceases serving as a director of the Company prior to May 20, 2016. Accordingly, these stock options are not included in the number of beneficially owned shares.

(11) Consists of (a) 5,581,897 shares of common stock, (b) 312,730 shares of common stock issuable upon exercise of warrants and (c) 100,000 shares issuable upon the exercise of stock options.

(12) Information is based on Schedule 13G filed on February 12, 2016 on behalf of (i) Empery Asset Management, LP, a Delaware limited partnership ("Empery" or the "Investment Manager"), (ii) Ryan M. Lane, an individual who is a citizen of the United States of America ("Mr. Lane"), and (iii) Martin D. Hoe, an individual who is a citizen of the United States of America ("Mr. Hoe", together with Empery and Mr. Lane, the "Reporting Persons"). Empery serves as the investment manager with respect to the shares of Common Stock held by, and the underlying warrants held by, the funds (the "Empery Funds"). Each of Mr. Lane and Mr. Hoe is a Managing Member of Empery AM GP, LLC, the general partner of the Investment Manager. Each of the Empery Funds and Mr. Lane and Mr. Hoe disclaim any beneficial ownership of any such shares. Beneficial ownership consists of 5,479,836 shares of common stock. Excludes 5,500,000 shares of common stock issuable upon exercise of warrants because the warrants contain a blocker provision under which the holder thereof does not have the right to exercise the warrants to the extent (but only to that extent) that such exercise would result in beneficial ownership by the holder thereof or any of its affiliates of more than 4.99% of the common stock. The business office of Empery is 1 Rockefeller Plaza, Suite 1205, New York, NY 10020.

(13) Information is based on Schedule 13G/A filed on February 16, 2016 on behalf of (i) Crede CG III, Ltd., a Bermuda exempted company ("Crede CG III"), (ii) Crede Capital Group, LLC, a Delaware limited liability company ("Crede Capital"), (iii) Acuitas Financial Group, LLC, a California limited liability company ("Acuitas"), and (iv) Terren S. Peizer, an individual who is a citizen of the United States of America ("Mr. Peizer," together with Crede CG III, Crede Capital and Acuitas, the "Reporting Persons"). Beneficial ownership consists of 5,884,330 shares of common stock and 1,640,656 shares of common stock issuable upon exercise of warrants. Excludes 609,344 shares of common stock issuable upon exercise of warrants because such warrants contain a blocker provision under which the holder thereof does not have the right to exercise the warrants to the extent that such exercise would result in beneficial ownership by the holder thereof or any of its affiliates of more than 9.9% of the common stock. The sole stockholder of Crede CG III is Crede Capital. Acuitas holds all of the membership interests of Crede Capital and Mr. Peizer holds all of the membership interests of Acuitas. Voting and dispositive power with respect to the shares held by Crede CG III is exercised by Mr. Peizer, the sole and Managing Member of Acuitas, Crede Capital and Managing Director of Crede CG III, who acts as investment advisor to these entities. Mr. Peizer, Acuitas and Crede Capital disclaim beneficial ownership with respect to the shares held by Crede CG III. The principal business office of the Crede GC III is Clarendon House, 2 Church Street, Hamilton HM 11, Bermuda. The principal business office of each of Crede Capital, Acuitas and Mr. Peizer is 11150 Santa Monica Boulevard, Suite 1500, Los Angeles, California 90025.

**SECTION 16(a) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE**

Section 16(a) of the Exchange Act requires our directors, executive officers, and stockholders holding more than 10% of our outstanding common stock to file with the SEC initial reports of ownership and reports of changes in beneficial ownership of our common stock. Executive officers, directors and greater-than-10% stockholders are required by SEC regulations to furnish us with copies of all Section 16(a) reports they file. Based on a review of the Securities and Exchange Commission filed ownership reports during 2015, the Company believes that all Section 16(a) filing requirements were met during 2015.

6

**PROPOSAL NO. 1**
**ELECTION OF DIRECTORS**

**General**

The number of authorized Directors as of the date of this proxy statement is six (6), with five (5) persons currently serving as directors and with one (1) vacancy on the Board. All of the nominees have indicated to the Company that they will be available to continue to serve as Directors. If any nominee named herein for election as a Director should for any reason become unavailable to serve prior to the annual meeting, the Board may, prior to the annual meeting, (i) reduce the size of the Board to eliminate the position for which that person was nominated, (ii) nominate a new candidate in place of such person or (iii) leave the position vacant to be filled at a later time.

We maintain a staggered Board of Directors divided into three classes. Each Director generally serves for a term ending on the date of the third annual stockholders' meeting following the annual stockholders' meeting at which such director's class was most recently elected and until his or her successor is duly elected and qualified.

Currently, there are two Directors in Class I (Henry Sicignano, III and Richard M. Sanders), one Director in Class II (Joseph A. Dunn), and two directors in Class III (James W. Cornell and Nora B. Sullivan). The vacancy in our Class II Director position resulted from the resignation on November 6, 2015 of Joseph Pandolfino from our Board of Directors. Ms. Sullivan was previously appointed by our Board, effective on May 18, 2015, to serve for the unexpired portion of the vacancy that then existed in the Class III Director position. Our Nominating and Governance committee has nominated Ms. Sullivan to fill the position among the Class II Directors that was vacated with the resignation of Mr. Pandolfino. Accordingly, assuming she is elected, Ms. Sullivan's designation will change from Class III Director to Class II Director following the annual meeting.

At the annual meeting, the term of our current Class II Director, Joseph A. Dunn, will expire. At the annual meeting, our stockholders will elect two Class II Directors (Joseph A. Dunn and Nora B. Sullivan) to serve until our 2019 annual meeting of stockholders and until their successors are duly elected and qualified. Information about each of Dr. Dunn and Ms. Sullivan is set forth below.

The individuals named as proxy voters in the accompanying proxy, or their substitutes, will vote for the Board's nominees with respect to all proxies we receive unless instructions to the contrary are provided. If any nominee becomes unavailable for any reason, the votes will be cast for a substitute nominee designated by our Board. Our Directors have no reason to believe that any of the nominees named below will be unable to serve if elected. We strongly encourage our Directors to attend our annual meeting. All of our then-serving Directors attended our 2015 annual meeting.

The following sets forth certain information, as of March 8, 2016, about each of the Board's nominees for election at the annual meeting and each Director of our Company whose term will continue after our annual meeting.

**Nominees for Election at the Annual Meeting**

*Class II Directors — Terms Expiring 2019*

*Joseph Alexander Dunn, Ph.D.* Dr. Dunn, age 62, has served as a Director since March 4, 2011. Dr. Dunn is currently Associate Dean for Research and Professor of Pharmaceutical Sciences at D'Youville College of Pharmacy in Buffalo, New York and has served in this capacity since April 1, 2010. Dr. Dunn has also served as Chief Executive Officer of the National Center for Food and Agricultural Policy in Washington, D.C. since November 1, 2009 and as Chief Executive Officer and Director of Research at OmniPharm Research International, Inc., a drug company, and affiliated entities, Therex Technologies Inc., a drug company, and Therex LLC, a drug company, each located in Buffalo, New York since January, 1994. From May 1, 2008, until January 20, 2009, Dr. Dunn served as Deputy Under Secretary and from August 1, 2006, until April 30, 2008 Dr. Dunn served as Senior Scientific Advisor at the United States Department of Agriculture, Research, Education and Economics Mission Area in Washington, D.C. From December 1, 2006, until April 30, 2008 Dr. Dunn served as Executive Director of the United States Department of Agriculture NAREEE Advisory Board. From July, 1998 until July 1, 2006, Dr. Dunn served as Research Associate Professor in the Department of Oral Biology, School of Dental Medicine, at the State University of New York at Buffalo. Since June 1, 2010, Dr. Dunn has served as a member of the Board of Directors of Brothers of Mercy, Inc., a not-for-profit nursing and rehabilitation concern. Dr. Dunn holds a B.S. Degree in Medical Chemistry and a Ph.D. Degree in Pharmacology, both from the State University of New York at Buffalo School of Pharmacy. Dr. Dunn also served as a Postdoctoral Fellow in the Department of Pharmacology at Harvard Medical School and as a Staff Fellow at the National Institutes of Health, National Cancer Institute Laboratory of Cellular Carcinogenesis and Tumor Promotion. Dr. Dunn's extensive scientific and regulatory background led to our conclusion that he should serve as a director of our Company.

7

*Nora B. Sullivan.* Ms. Sullivan, age 58, has served as a Class III Director since her appointment on May 18, 2015 by the Board of Directors to fill the vacancy that then existed in the Class III directorship of the Company. Ms. Sullivan is currently President of Sullivan Capital Partners, LLC, a financial services company providing investment banking and consulting services to closely-held businesses. Prior to founding Sullivan Capital Partners in 2004, Ms. Sullivan worked for The Citigroup Private Bank from 2000 to 2004, providing wealth management and private equity services to high net worth individuals. From 1995 to 1999, Ms. Sullivan was Executive Vice President of Rand Capital Corporation (NASDAQ: RAND), a publicly traded closed-end investment management company providing capital and managerial expertise to small and mid-size businesses. Ms. Sullivan is a member of the Boards of Directors of Evans Bancorp, Inc. (NYSE: EVBN), Independent Health, Robinson Home Products, and Rosina Food Products. She is Chairman of the Technology Transfer Committee of the Roswell Park Cancer Institute. Ms. Sullivan holds an MBA degree in Finance and International Business from Columbia University Graduate School of Business and a JD degree from the University of Buffalo School of Law. Ms. Sullivan's extensive experience in investment banking, business strategy, business development and management led to our conclusion that she should serve as a director of our Company.

Our nominating and governance committee has nominated Ms. Sullivan to fill the position among the Class II Directors that was vacated with the resignation of Mr. Pandolfino. Accordingly, assuming she is elected, Ms. Sullivan's designation will change from Class III Director to Class II Director following the annual meeting.

**RECOMMENDATION OF THE BOARD: The Board of Directors recommends a vote for each of the above director nominees.**

**Directors Continuing in Office**

*Class III Directors — Term Expiring 2017*

*James W. Cornell*. Mr. Cornell, age 59, has served as a Director since March 4, 2011 and Chairman of the Board since October 25, 2014. Mr. Cornell is currently the President and Chief Executive Officer of Praxiis, LLC, an enterprise that provides support for clients in organizational change, leadership development and transactional advisory services. He has served in this capacity since October, 1988. Mr. Cornell is also the current Manager of Larkin Center Management, LLC, a real estate development company, and has served in this capacity since October 2010. From September 2006 until September 2010, Mr. Cornell served as Managing Director of New York New Jersey Rail, LLC, which is part of the national transportation rail system and moves rail freight by rail barge across New York City Harbor, and he now continues to serve as principal business advisor to that firm. From March 2005 until September 2008, Mr. Cornell served as the Chairman of the Board of Directors of New York Regional Rail Corp., which operates as a short-haul regional trucking company. From April 2006 until February 2007, Mr. Cornell served as Chief Restructuring Officer of Regus Industries, a waste management firm, and from January 2001 until November 2004, he served as Special Advisor to Pinkerton Government Services, Inc. and Securitas Nuclear and Government Services Unit, security services providers to the energy industry and government. Mr. Cornell holds a B.S. Degree in Business, Management, and Economics and an M.B.A. Degree, both from the State University of New York, Empire College. Mr. Cornell's extensive business management, strategy, and leadership experience led to our conclusion that he should serve as a director of our Company.

*Nora B. Sullivan.* Ms. Sullivan is currently serving as a Class III Director. Our nominating and governance committee has nominated Ms. Sullivan to fill the position among the Class II Directors that was vacated with the resignation of Mr. Pandolfino. Accordingly, assuming she is elected, Ms. Sullivan's designation will change from Class III Director to Class II Director following the annual meeting. Ms. Sullivan's biography is set forth above.

8

***Class I Directors — Terms Expiring 2018***

*Henry Sicignano, III, MBA*. Mr. Sicignano, age 48, has served as our Chief Executive Officer since March 3, 2015, as our President since January 25, 2011, as our Secretary from January 25, 2011 to May 27, 2014, as a Director since March 4, 2011, as Chief Operating Officer from October 25, 2014 to March 3, 2015, and previously as interim Chief Financial Officer from July 6, 2012 to April 1, 2013. From August 2005 to April 2009, Mr. Sicignano served as a General Manager and as the Director of Corporate Marketing for NOCO Energy Corp., a petroleum products company; and from March 2003 to July 2005, as Vice President of Kittinger Furniture Company, Inc., a fine furniture manufacturer. From February 1997 through July 2002, he served as Vice President and Marketing Director of Santa Fe Natural Tobacco Company, a specialty tobacco company, prior to the sale of that company to R.J. Reynolds Tobacco Company in 2002. Mr. Sicignano holds a B.A. Degree in Government from Harvard College and an M.B.A. Degree from Harvard University. Mr. Sicignano's extensive experience in competitive strategy, business development and management, including in the tobacco industry, led to our conclusion that he should serve as a director of our Company.

*Richard M. Sanders*. Mr. Sanders, age 63, has served as a Director since December 9, 2013. Since August 2009, Mr. Sanders has served as a General Partner of Phase One Ventures, LLC, a venture capital firm which focuses on nanotechnology and biotechnology start-up opportunities in New Mexico and surrounding states. From January 2002 until June 2009, Mr. Sanders served as President and CEO of Santa Fe Natural Tobacco Company ("SFNTC"), a division of Reynolds American, Inc., which manufactures and markets the Natural American Spirit cigarette brand. During his 7-year tenure as head of SFNTC, Mr. Sanders tripled Natural American Spirit's market share and SFNTC's operating earnings and directed the successful expansion of Natural American Spirit into international markets in Western Europe and Asia. Prior to directing SFNTC's robust growth, Mr. Sanders worked for R.J. Reynolds Tobacco Company where he began his career as a marketing assistant in 1977. From 1987 to 2002 he served in a wide spectrum of executive positions including, among others, Senior Vice President of Marketing and Vice President of Sales. A native of Minneapolis, Mr. Sanders earned a bachelor's degree in political science from Hamline University in St. Paul and an M.B.A. Degree in Marketing from Washington University in St. Louis, Missouri. Mr. Sanders' extensive experience in management, including in the tobacco industry, led to our conclusion that he should serve as a director of our Company.

**CORPORATE GOVERNANCE**

**Board Composition**

Directors hold office for a term ending on the date of the third annual stockholders' meeting following the annual meeting at which such director's class was most recently elected until the earlier of their death, resignation, removal or until their successors have been duly elected and qualified. There are no family relationships among our Directors. Our bylaws provide that the number of members of our Board of Directors may be changed from time to time by resolutions adopted by the Board of Directors and/or the stockholders. Our Board of Directors currently consists of five (5) members with one (1) vacancy on the Board.

**Board Leadership Structure**

Our Board of Directors does not have a policy on whether or not the roles of Chief Executive Officer and Chairman should be separate. Our Board reserves the right to assign the responsibilities of the Chief Executive Officer and Chairman position as determined by our Board to be in the best interest of our Company. In the circumstance where the responsibilities of the Chief Executive Officer and Chairman are vested in the same individual or in other circumstances when deemed appropriate, the Board will designate a lead independent director from among the independent directors to preside at the meetings of the non-employee director executive sessions.

The positions of Chief Executive Officer and Chairman have been separate since October 25, 2014, when our Board elected James W. Cornell as the non-executive Chairman of the Board. Our Board retains the authority to modify this structure to best address our Company's unique circumstances as and when appropriate.

**Board Role in Risk Oversight**

Our full Board is responsible for the oversight of our operational risk management process. Our Board has assigned responsibility for addressing certain risks, and the steps management has taken to monitor, control and report such risk, to our Audit Committee, including risks relating to execution of our growth strategy, with appropriate reporting to the full Board. Our Board relies on our Compensation Committee to address significant risk exposures facing our Company with respect to compensation. Our Compensation Committee periodically conducts a review of our compensation policies and practices to assess whether any risks arising from such policies and practices are reasonably likely to materially adversely affect our Company.

**Number of Meetings of the Board of Directors**

The Board held 4 meetings during 2015. Directors are expected to attend Board meetings and to spend time needed to meet as frequently as necessary to properly discharge their responsibilities. Each Director attended at least 75% of the aggregate number of meetings of the Board during 2015.

**Director Independence**

The Board has determined that each of Joseph Alexander Dunn, Ph.D., James W. Cornell, Richard M. Sanders and Nora B. Sullivan qualify as "independent" directors under the applicable definition of the listing standards of the New York Stock Exchange MKT ("NYSE MKT").

**Stockholder Communications**

Stockholders may send communications to the Company's Directors as a group or individually, by writing to those individuals or the group: c/o the General Counsel of 22nd Century Group, Inc., 9530 Main Street, Clarence, New York 14031. The General Counsel will review all correspondence received and will forward all correspondence that is relevant to the duties and responsibilities of the Board or the business of the Company to the intended Director(s). Examples of inappropriate communication include business solicitations, advertising and communication that is frivolous in nature, relates to routine business matters or raises grievances that are personal to the person submitting the communication. Upon request, any Director may review communication that is not forwarded to the Directors pursuant to this policy.

**Committees of the Board of Directors**

Our Board of Directors currently has four active committees: (i) a Nominating and Governance Committee, (ii) an Audit Committee, (iii) a Compensation Committee and (iv) a Scientific and Technical Advisory and Support Committee. Each of these Board committees are described below. Members of these committees are elected annually at the regular Board meeting held in conjunction with the annual stockholders' meeting. The charters of our Nominating and Governance Committee, Audit Committee and Compensation Committee are available on the investor relations section of our website at www.xxiicentury.com.

*Nominating and Governance Committee*

The Nominating and Governance Committee consists of Ms. Sullivan and Messrs. Cornell, Sanders and Dunn, with Ms. Sullivan serving as chair. The Nominating and Governance Committee is responsible for: (a) developing and recommending corporate governance principles and procedures applicable to our board and employees; (b) recommending committee composition and assignments; (c) overseeing periodic self-evaluations by the Board, its committees, individual directors and management with respect to their respective performance; (d) identifying individuals qualified to become directors; (e) recommending director nominees; (f) assisting in succession planning; (g) recommending whether incumbent directors should be nominated for re-election to our Board; and (h) reviewing the adequacy of the Nominating and Governance Committee charter on an annual basis. The Nominating and Governance Committee met two (2) times during 2015.

Nominations of persons for election to the Board at the annual meeting may also be made by any stockholder entitled to vote for the election of directors at the meeting who complies with the notice procedures set forth in our bylaws. Such nominations by any stockholder shall be made pursuant to timely notice in writing to the Secretary. To be timely, a stockholder's notice shall be delivered to the Secretary at our principal executive offices not later than the close of business on the ninetieth (90th) day nor earlier than the close of business on the one hundred twentieth (120th) day prior to the first anniversary of the preceding year's annual meeting; provided, however, that in the event that the date of the annual meeting is more than thirty (30) days before or more than seventy (70) days after such anniversary date, notice by the stockholder must be so delivered not earlier than the close of business on the one hundred twentieth (120th) day prior to such annual meeting and not later than the close of business on the later of the ninetieth (90th) day prior to such annual meeting or the tenth (10th) day following the day on which public announcement of the date of such meeting is first made.

*Audit Committee*

The Audit Committee consists of Ms. Sullivan and Messrs. Cornell and Sanders, with Mr. Cornell serving as chair. Our Board has determined that Mr. Cornell and Ms. Sullivan are the Audit Committee financial experts as defined under the rules of the U.S. Securities and Exchange Commission ("SEC") and that all audit committee members are independent under the applicable listing standards of the NYSE MKT and applicable rules of the SEC related to audit committee members. The audit committee oversees our accounting and financial reporting processes and the audits of our financial statements. The audit committee met five (5) times during 2015.

The Audit Committee has sole authority for the appointment, compensation and oversight of the work of our independent registered public accounting firm, and responsibility for reviewing and discussing with management and our independent registered public accounting firm our audited consolidated financial statements included in our Annual Report on Form 10-K, our interim financial statements and our earnings press releases. The Audit Committee also reviews the independence and quality control procedures of our independent registered public accounting firm, reviews management's assessment of the effectiveness of internal controls, discusses with management the Company's policies with respect to risk assessment and risk management and reviews the adequacy of the Audit Committee charter on an annual basis.

11

*Compensation Committee*

The Compensation Committee consists of Ms. Sullivan and Messrs. Sanders and Cornell, with Mr. Sanders serving as chair. The Compensation Committee establishes, administers and reviews our policies, programs and procedures for compensating our executive officers and directors. The Compensation Committee met four (4) times during 2015.

The Compensation Committee is responsible for: (a) assisting our Board in fulfilling its fiduciary duties with respect to the oversight of the Company's compensation plans, policies and programs, including assessing our overall compensation structure, reviewing all executive compensation programs, incentive compensation plans and equity-based plans, and determining executive compensation; and (b) reviewing the adequacy of the Compensation Committee charter on an annual basis.

*Scientific and Technical Advisory and Support Committee*

The Scientific and Technical Advisory and Support Committee consists of Dr. Dunn, Mr. Cornell and Mr. Sicignano with Dr. Dunn serving as Chair. The Scientific and Technical Advisory and Support Committee reviews management's direction and investment in research, development and technology initiatives to ensure that the scientific strategy and its implementation are consistent with and support the strategic and business objectives of the Company. The Scientific and Technical Advisory and Support Committee also works with management and the Board to identify operational risks with respect to current and future research and development programs and products and technology in which the Company is investing its research and development efforts.

The Scientific and Technical Advisory and Support Committee may appoint an independent Scientific Advisory Board to assists the Committee, management and the Board on an advisory basis with respect to the research, development, clinical, regulatory and commercial plans and activities relating to research, manufacture, use and/or sale of the Company's products. The Scientific Advisory Board would meet on an *ad hoc* basis with members of the Scientific and Technical Advisory and Support Committee, and may attend meetings of the Board at the Board's request.

**Director Compensation**

In 2015, non-employee Directors each received an annual retainer of $10,000 plus an equity award of 100,000 stock options under our equity incentive plan with an exercise price of $1.43 per share, which was substantially above the market price of the common stock on the date of grant of March 3, 2015, with such stock options vesting on March 3, 2016 and expiring in five years on March 3, 2020. In addition, each non-employee Director received $2,000 for attendance at each regularly-scheduled quarterly Board meeting. The non-executive Directors received $5,000 per annum for chairing a Board Committee and $1,000 per annum for participating on a Board Committee where they did not serve as the chair. The Chairman of the Board also received $10,000 per annum for serving in that position.

| Name | Year | Fees Earned or paid in cash | | Option Awards (1) | | All Other Compensation | | Total | |
|---|---|---|---|---|---|---|---|---|---|
| James W. Cornell (2) | 2015 | $ | 77,200 | $ | 36,700 | $ | - | $ | 113,900 |
| Joseph A. Dunn, Ph.D. | 2015 | $ | 25,000 | $ | 36,700 | $ | - | $ | 61,700 |
| Richard M. Sanders | 2015 | $ | 26,500 | $ | 36,700 | $ | - | $ | 63,200 |
| Nora B. Sullivan (3) | 2015 | $ | 11,664 | $ | 28,911 | $ | - | $ | 40,575 |
| Joseph Pandolfino (4) | 2015 | $ | 13,500 | $ | 36,700 | $ | - | $ | 50,200 |

12

(1) Represents the grant date fair value calculated pursuant to FASB ASC 718. The fair value of each option grant is estimated on the date of grant using the Black-Scholes option-pricing model. The following assumptions were used for options granted in 2015:

| | |
|---|---|
| Risk-free interest rate | 1.09% |
| Expected dividend yield | 0% |
| Expected stock price volatility | 90% |
| Expected life of options | 5 years |

(2) Includes fees for prior service on the Board's Executive Committee.

(3) Ms. Sullivan was appointed a Director of the Company on May 18, 2015. Ms. Sullivan received a prorated annual retainer and equity award of stock options based on her appointment as a Director in the amount of $6,164 and 61,643, respectively.

(4) Mr. Pandolfino resigned as a Director of the Company on November 6, 2015.

## EXECUTIVE OFFICERS

Certain information regarding our executive officers is provided below:

| Name | Age | Position |
|---|---|---|
| Henry Sicignano, III | 48 | President, Chief Executive Officer and Director |
| John T. Brodfuehrer | 58 | Chief Financial Officer |
| Michael R. Moynihan, Ph.D. | 63 | Vice President of R&D |
| Thomas L. James, Esq. | 57 | Vice President, General Counsel and Secretary |
| Paul J. Rushton, Ph.D. | 53 | Vice President of Plant Biotechnology |

For information with respect to Henry Sicignano, III, please see the information about the members of our Board of Directors on the preceding pages. There are no family relationships among our Directors or executive officers.

*John T. Brodfuehrer, Chief Financial Officer.* Mr. Brodfuehrer has served as our Chief Financial Officer since April 2013. Prior to that, Mr. Brodfuehrer served from March 2011 through December 2012 as Chief Financial Officer of Latina Boulevard Foods, LLC, or LBF, an entity formed as the result of a merger of two long-time Western New York wholesale food distributors. Prior to his employment with LBF, from May 2010 through February 2011, Mr. Brodfuehrer was Vice-President of Retail Accounting for United Refining Company, or URC, an independent refiner and marketer of petroleum products. Prior to his time at URC, from April 1985 through July 2009, Mr. Brodfuehrer served in multiple roles over a twenty-four year span with NOCO Energy Corp, a diversified distributor of energy products and related services. Mr. Brodfuehrer served as NOCO's Chief Financial Officer, Vice-President and as a member of the Board of Directors from 2000 to 2009. Mr. Brodfuehrer earned a Bachelor of Science in Business Administration, *summa cum laude*, from the State University of New York at Buffalo in 1979 and became a New York State Certified Public Accountant in 1981.

*Michael R. Moynihan, Ph.D., Vice President of R&D.* Dr. Moynihan has served as our Vice President of R&D since March 2011 and served as Vice President of R&D for 22nd Century Limited, LLC since January, 2007. He has also been a consultant for 22nd Century Limited, LLC since 1999. From 2001 to 2006, he served as Director of Biotechnology Development at Fundacion Chile and from 1995 to 2000 as Senior Project Director at InterLink Biotechnologies LLC. Dr. Moynihan holds a Bachelor of Science Degree in Biology from Brown University and a Master's Degree and Ph.D. in Biology from Harvard University. He previously served as a Visiting Research Fellow at the Institute for Molecular and Cellular Biology, Osaka University, Japan; a Postdoctoral Associate in the Section of Plant Biology, Cornell University; and a Postdoctoral Associate at the Center for Agricultural Molecular Biology, Rutgers University.

*Thomas L. James, Esq., Vice President, General Counsel and Secretary*. Mr. James has served as our Vice President, General Counsel and Secretary since May 2014. Prior to that time, Mr. James served for 13 years as a Partner and later as an Of Counsel attorney with Foley & Lardner LLP. Prior to that time, Mr. James was a Partner in the law firm of Freedman, Levy, Kroll & Simonds and attorney with other law firms. Mr. James is a graduate of the Georgetown University Law Center in Washington, D.C. (Juris Doctor Degree, 1985) and the University of Maryland (B.S. Degree, 1980). He is a member of the District of Columbia Bar and is also admitted to practice before the United States Supreme Court.

*Paul J. Rushton, Ph.D., Vice President of Plant Biotechnology*. Dr. Paul Rushton was appointed as Vice President of Plant Biotechnology on October 7, 2015. From 2013 until joining the Company, Dr. Rushton was an Associate Professor of Systems Biology at Texas A&M University, from 2009 to 2013, Dr. Rushton was an Associate Professor of Biology and Microbiology at South Dakota State University, and from 2005 to 2009, Dr. Rushton held various positions up to Research Assistant Professor at the University of Virginia and during that same time Dr. Rushton was also a part of the team of scientists at the University of Virginia who worked on the sponsored research projects of the Company. Dr. Rushton also previously worked in various research positions at the University of Bristol in the United Kingdom and the Max Planck Institute for Plant Breeding in Germany. Dr. Rushton has published over fifty scientific articles and he serves on the editorial boards of a number of scientific journals. Dr. Rushton obtain hi bachelor's degree in biochemistry at the University of Cambridge and his Ph.D. degree in biochemistry at Manchester University.

14

**EXECUTIVE COMPENSATION**

**Compensation Discussion and Analysis**

This compensation discussion and analysis describes the material elements of compensation awarded to, earned by, or paid to each of our named executive officers, whom we refer to as our "NEOs," during 2015 and describes our policies and decisions made with respect to the information contained in the following tables, related footnotes and narrative for 2015. The NEOs are identified below in the table titled "Summary Compensation Table." In this compensation discussion and analysis, we also describe various actions regarding NEO compensation taken before or after 2015 when we believe it enhances the understanding of our executive compensation program.

**Overview of Our Executive Compensation Philosophy and Design**

We believe that a skilled, experienced and dedicated management team is essential to the future performance of our Company and to building stockholder value. We have sought to establish competitive compensation programs that enable us to attract and retain executive officers with these qualities. The other objectives of our compensation programs for our executive officers are the following:

· to motivate our executive officers to achieve and create stockholder value;

· to attract and retain executive officers who we believe have the experience, temperament, talents, and convictions to contribute significantly to our future success; and

· to align the economic interests of our executive officers with the interests of our stockholders.

In light of these objectives, we have sought to reward our NEOs for creating value for our stockholders and for loyalty and dedication to our Company.

**Setting Executive Compensation**

Our Compensation Committee has primary responsibility for, among other things, determining our compensation philosophy, evaluating the performance of our executive officers, setting the compensation and other benefits of our executive officers, overseeing the Company's response to the outcome of the advisory votes of stockholders on executive compensation, assessing the relative enterprise risk of our compensation program and administering our incentive compensation plans.

Our Board of Directors, our Compensation Committee and our Chief Executive Officer each play a role in setting the compensation of our NEOs. Our Board of Directors appoints the members of our Compensation Committee and delegates to the Compensation Committee the direct responsibility for overseeing the design and administration of our executive compensation program.

Our Compensation Committee engaged the firm of Towers Watson in 2015 to provide broad executive compensation benchmarks based upon surveys of public and private companies which were similarly sized to us. Based upon these survey results, the Committee adopted a comprehensive executive compensation structure that it felt would best align the interests of our management with those of our stockholders. The key elements of our compensation structure are:

· Rationalize the base pay (annual salary) of each NEO based on the job description and scope of responsibilities of that position. Each position is assigned a target annual salary and range, with minimum and maximum salaries established for each position.

· Establish annual incentive awards (bonuses) for each NEO. Annual incentive awards are based on a percentage of each position's base pay and are tied to the achievement of 4-6 weighted, measurable objectives defined for that position in the upcoming calendar year.

· Establish a Long-Term Incentive Pay Program which provides for continuity of key management personnel through grants of stock incentives. These incentives are designed to vest over multiple years and will be determined in dollar amounts as a multiple of each executive's base salary.

To assure independence, the Compensation Committee pre-approves all other work unrelated to executive compensation proposed to be provided by Towers Watson, if any. The Compensation Committee also considered all factors relevant to the consultant's independence from management, including but not limited to the following factors:

· The provision of other services that the consultant provides to us;

· The amount of fees received from us as a percentage of the consultant's total revenue;

· The consultant's policies and procedures designed to prevent conflicts of interest;

· Business or personal relationships of the consultant with our Compensation Committee members;

· The amount of our stock owned by the consultant; and

· Business or personal relationships of the consultant with our executive officers.

**Elements of Executive Compensation**

Our current executive compensation program for our NEOs consists of the following elements:

· Base salary;

· Short-term (annual) incentive compensation;

· Long-term incentive compensation; and

· Retirement and other benefits.

*Base Salary*

We pay our NEOs a base salary to compensate them for services rendered and to provide them with a steady source of income for living expenses throughout the year. The fiscal 2016 base salaries for our NEOs, as well as the percentage increase from the fiscal 2015 base salaries, are as follows:

| Name | Fiscal 2016 Base Salary | | Percentage Increase Over Fiscal 2015 Base Salary |
| --- | --- | --- | --- |
| Henry Sicignano, III | $ | 236,000 | 4.9% |
| John T. Brodfuehrer | $ | 190,000 | 18.8% |
| Michael R. Moynihan, Ph.D. | $ | 160,000 | - |
| Thomas L. James | $ | 200,000 | - |
| Paul J. Rushton, Ph. D. | $ | 150,000 | - |

*Incentive Compensation*

For 2015, our incentive compensation program consisted of (i) a discretionary cash bonus opportunity and (ii) long-term equity incentive compensation consisting of equity awards. The cash bonus opportunity and the long-term equity incentive compensation for 2015 are discussed in detail below.

16

*Discretionary Cash Bonus Opportunity*

The Compensation Committee has the authority to award discretionary annual cash bonuses to our NEOs. The cash bonuses are intended to compensate NEOs for individual performance achievements and for achieving important goals and objectives, including those set out in performance reviews from the prior year. In addition to individual performance, determination of a NEO's achievements generally takes into account such factors as our overall financial performance and improving our operations. Bonus levels vary depending on the individual executive and are not formulaic, but instead are based upon an objective and subjective evaluation of performance and other circumstances. Target bonus levels were established by the Compensation Committee as follows: $146,250 for Mr. Sicignano (65% of 2015 base salary), $90,000 for Mr. James (45% of 2015 base salary), $72,000 for Mr. Brodfuehrer (45% of 2015 base salary) and $72,000 for Dr. Moynihan (45% of 2015 base salary). Due to the timing of Dr. Rushton's employment, the compensation committee did not set a target bonus level for him in 2015.

The Compensation Committee recommended, and the Board of Directors unanimously approved, the award of a cash bonus of $75,000 (83% of target bonus) in February 2016 to Thomas James in recognition of his work performance in 2015. The Compensation Committee did not award a cash bonus to Henry Sicignano, III, John T. Brodfuehrer, and Michael R. Moynihan, Ph.D. for 2015. In lieu of a cash bonus for 2015 for Mr. Sicignano and Mr. Brodfuehrer, the Compensation Committee recommended and the Board of Directors unanimously approved the award of a larger amount of stock options as long-term equity incentive compensation for each of Mr. Sicignano and Mr. Brodfuehrer.

*Long-Term Equity Incentive Compensation*

Our Compensation Committee believes that equity awards enhance the alignment of the economic interests of our NEOs and the economic interest of our stockholders and provides our NEOs with incentives to remain in our employment. In 2015, we granted awards of stock options to our NEOs to motivate and retain our NEOs while aligning their economic interest with our stockholders through potential long-term equity ownership.

For 2015, we awarded our NEOs with the following stock options valued at $230,300 for Mr. Sicignano, $128,000 for Mr. Brodfuehrer, $130,000 for Mr. James and $128,000 for Dr. Moynihan (with the dollar values converted into a specific number of stock options based on fair value of the stock options as computed using the Black-Scholes pricing model). The stock option awards resulted in a grant of the following number of shares purchasable by our NEOs under such stock options as of the date of grant on February 16, 2015:

| Name | Stock Options (#) |
|---|---|
| Henry Sicignano, III | 350,000 |
| John T. Brodfuehrer | 194,529 |
| Thomas L. James | 197,568 |
| Michael R. Moynihan, Ph.D. | 194,529 |

**Retirement and Other Benefits**

We are strongly committed to encouraging all employees to save for retirement. To provide employees with the opportunity to save for retirement on a tax-deferred basis, we sponsor a 401(k) plan pursuant to which we make a safe harbor non-elective contribution of 3% of the employee's annual compensation. We also provide health and dental insurance to the employees.

17

**Appointment of New Executive Officer**

On October 7, 2015, the Company entered into an employment agreement with Dr. Paul Rushton as the new Vice President of Plant Biotechnology of the Company. In connection with his hiring, Dr. Rushton was awarded a stock option to purchase one hundred thousand (100,000) shares of common stock, all of which are subject to forfeiture until November 1, 2016, except in connection with a change in control or certain termination events.

**Summary Compensation Table**

The following table summarizes the compensation paid by the Company in each of the last three completed fiscal years for our NEOs:

| Name and Principal Position | Year | Salary | Bonus | Stock Awards(1) | Option Awards(2) | All Other Compensation(3) | Total |
|---|---|---|---|---|---|---|---|
| Henry Sicignano, III | 2015 | $ 224,231 | $ - | $ - | $ 230,300 | $ 24,773 | $ 479,304 |
| President and Chief Executive Officer | 2014 | $ 200,000 | $ - | $ 169,500 | $ - | $ 49,248 | $ 418,748 |
| | 2013 | $ 159,615 | $ - | $ 180,000 | $ - | $ 37,179 | $ 376,794 |
| John T. Brodfuehrer | 2015 | $ 158,981 | $ - | $ - | $ 128,000 | $ 12,491 | $ 299,472 |
| Chief Financial Officer and Treasurer | 2014 | $ 135,000 | $ 45,000 | $ 316,400 | $ - | $ 59,542 | $ 555,942 |
| | 2013 | $ 83,077 | $ - | $ 90,000 | $ - | $ 12,979 | $ 186,056 |
| Michael R. Moynihan, Ph.D. | 2015 | $ 159,308 | $ - | $ - | $ 128,000 | $ 14,831 | $ 302,139 |
| VP of R&D | 2014 | $ 140,000 | $ 45,000 | $ 361,600 | $ - | $ 67,818 | $ 614,418 |
| | 2013 | $ 124,231 | $ - | $ 60,000 | $ 51,563 | $ 17,908 | $ 253,702 |
| Thomas L. James (4) | 2015 | $ 200,769 | $ 75,000 | $ - | $ 130,000 | $ 20,770 | $ 426,539 |
| VP, General Counsel and Secretary | 2014 | $ 111,179 | $ 215,000 | $ 242,000 | $ 619,500 | $ 8,110 | $1,195,789 |
| Paul J. Rushton, Ph.D. (5) | 2015 | $ 25,962 | $ 32,000 | $ - | $ 60,700 | $ 9,811 | $ 128,473 |
| Vice President of Plant Biotechnology | | | | | | | |

(1)  The amounts included in this column are the aggregate grant date fair value determined in accordance with FASB ASC 718.

(2)  Represents the grant date fair value calculated pursuant to FASB ASC 718. The fair value of each option grant is estimated on the date of grant using the Black-Scholes option-pricing model. The following assumptions were used for options granted in 2015:

| | |
|---|---|
| Risk-free interest rate | 1.61% |
| Expected dividend yield | 0% |
| Expected stock price volatility | 90% |
| Expected life of options | 10 years |

(3)  All Other Compensation consists of the following:

| Name | Year | Health and Dental Insurance | Employer Contributions to Company 401(k) Plan | Other | All Other Compensation Total |
|---|---|---|---|---|---|
| Henry Sicignano, III | 2015 | $ 18,109 | $ 6,664 | $ - | $ 24,773 |
| John T. Brodfuehrer | 2015 | $ 6,427 | $ 6,064 | $ - | $ 12,491 |
| Michael R. Moynihan, Ph.D. | 2015 | $ 8,750 | $ 6,081 | $ - | $ 14,831 |
| Thomas L. James | 2015 | $ 12,520 | $ 8,250 | $ - | $ 20,770 |
| Paul J. Rushton, Ph.D. | 2015 | $ 3,161 | $ - | $ 6,650 | $ 9,811 |

(4)  Mr. James' employment with the Company began in May 2014. The bonus amount for 2014 reflects both (i) a one-time signing bonus paid to Mr. James at the commencement of his employment in May 2014 and (ii) a bonus paid to Mr. James in February 2015. The stock awards and option awards include shares that are not yet vested or exercisable by Mr. James.

(5)  Dr. Rushton's employment with the Company began in October 2015. The bonus amount for 2015 reflects a one-time signing bonus paid to Dr. Rushton at the commencement of his employment in October 2015.

18

**Grant of Plan-Based Awards**

As described above in the Compensation Discussion and Analysis, we granted stock options to certain of our NEOs in 2015. The following table sets forth information regarding all such awards

| Name | Grant Date | Date of Board Action | All Other Stock Awards: Number of Shares of Stock (#) | All Other Option Awards: Number of Securities Underlying Options (#)(1) | Exercise Price of Option Awards ($/Sh) | | Grant Date Fair Value of Stock and Option Awards ($) (2) | |
|---|---|---|---|---|---|---|---|---|
| Henry Sicignano, III | 2/16/2015 | 1/14/2015 | - | 350,000 | $ | 0.96 | $ | 230,300 |
| John T. Brodfuehrer | 2/16/2015 | 1/14/2015 | - | 194,529 | $ | 0.96 | $ | 128,000 |
| Michael R. Moynihan, Ph.D. | 2/16/2015 | 1/14/2015 | - | 194,529 | $ | 0.96 | $ | 128,000 |
| Thomas L. James | 2/16/2015 | 1/14/2015 | - | 197,568 | $ | 0.96 | $ | 130,000 |
| Paul J. Rushton, Ph.D. | 10/30/2015 | 9/30/2015 | - | 100,000 | $ | 0.84 | $ | 60,700 |

(1) Options vest 100% on the one-year anniversary of the date of grant.
(2) Represents the grant fair value computed in accordance with FASB ASC 718.

19

**Outstanding Equity Awards at 2015 Fiscal Year-End**

| | Option Awards | | | | Stock Awards | | | |
|---|---|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Un-exercisable (#) | Option Exercise Price | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($) [2] | Equity Incentive Plan Awards: Number of Unearned Shares, Units or Other Rights That Have Not Vested (#) | Equity Incentive Plan Awards: Market or Payout Value of Unearned Shares, Units or Other Rights That Have Not Vested ($) [2] |
| Mr. Sicignano | 100,000 | - | $ 0.69 | 5/18/2022 | - | $ - | - | $ - |
| | - | 350,000 | $ 0.96 | 2/16/2025 | - | $ - | - | $ - |
| Dr. Moynihan | 100,000 | - | $ 0.69 | 5/18/2022 | - | $ - | - | $ - |
| | 75,000 | - | $ 0.80 | 2/25/2023 | - | $ - | - | $ - |
| | - | 194,529 | $ 0.96 | 2/16/2025 | - | $ - | - | $ - |
| Mr. Brodfuehrer | - | 194,529 | $ 0.96 | 2/16/2025 | - | $ - | - | $ - |
| Mr. James | 150,000 | 150,000 | $ 2.61 | 5/27/2024 | - | $ - | 100,000(1) | $ 140,000 |
| | - | 197,568 | $ 0.96 | 2/16/2025 | - | $ - | - | $ - |
| Dr. Rushton | - | 100,000 | $ 0.84 | 10/30/2025 | - | $ - | - | $ - |

(1)    Shares are time-based awards subject to forfeiture, such that the shares shall no longer be subject to forfeiture on May 1, 2017.

(2)    Market value calculated based on the price of our common stock as of the last business day of our fiscal year.

**Option Exercise and Stock Vested for Fiscal 2015**

The following table sets forth information about the exercise of options by our NEOs and the vesting of their restricted stock awards in fiscal 2015.

| | Option Awards | | Restricted Stock Awards | |
|---|---|---|---|---|
| Name | Number of Shares Acquired on Exercise (#) | Value Realized on Exercise ($) | Number of Shares Acquired on Vesting (#) | Value Realized on Vesting ($) (1) |
| Henry Sicignano, III | - | $ - | 325,000 | $ 355,250 |
| John T. Brodfuehrer | - | $ - | 140,000 | $ 169,400 |
| Michael Moynihan, Ph.D. | - | $ - | 160,000 | $ 193,600 |
| Thomas L. James | - | $ - | - | $ - |

(1)    The amounts in this column have been computed based on the closing price of our common stock on the vesting date of January 27, 2015 for Mr. Brodfuehrer and Dr. Moynihan, and on the vesting dates of January 27, 2015, April 1, 2015 and December 31, 2015 for Mr. Sicignano.

20

**Employment Agreements with Executive Officers**

We have entered into employment agreements with each of our NEOs as follows:

*Henry Sicignano, III.* Mr. Sicignano entered into an employment agreement with us on January 25, 2011 for an initial term of five years that automatically renews on an annual basis thereafter unless terminated. If Mr. Sicignano's employment is terminated by the Company without Cause or by Mr. Sicignano for Good Reason (as such terms are defined in his employment agreement), Mr. Sicignano will be entitled to a severance benefit in the form of a continuation of his then-base salary until the later of (i) three years from the termination date or (ii) the expiration of the initial five-year term.

The employment agreement of Mr. Sicignano provides that in the event of a change in control (as defined in his employment agreement) of our Company, then during the three (3)-year period following such change in control if certain triggering events occur, such as if he is terminated other than for Cause (as defined in his employment agreement), death or disability, or if his responsibilities are diminished after the change in control as compared to his responsibilities prior to the change in control, or if his base salary or benefits are reduced, or he is required to relocate more than twenty-five (25) miles from his current place of employment, then in any such events he will have the option, exercisable within ninety (90) days of the occurrence of such an event, to resign his employment with us, in which case he will be entitled to receive: (A) the greater of either his base salary for the then remaining portion of the initial 5-year term of the agreement or his base salary for three (3) years thereafter; (B) reimbursement for eighteen (18) months of his reasonable costs for medical, dental, life, disability and other benefits and insurance coverage that he received during his employment; (C) outplacement services for two (2) years; and (D) the immediate vesting of all options and/or restricted stock grants previously granted or to be granted to him.

The employment agreement of Mr. Sicignano provides that during his employment by us and for a period of two (2) years after he ceases to be employed by us, the following non-compete covenants will apply: (i) he will not (except on behalf of us) provide or offer to provide any goods or services to any entity engaged in the United States in the making, offering, marketing, distributing and/or selling of products made from the tobacco (*Nicotiana*) plant, and/or providing or offering to provide the same or substantially similar services to any customer or prospective customer, (ii) he will not interfere with our relationships with any customer, prospective customer, supplier, distributor, farmer and/or manufacturer, and (iii) he will not induce or attempt to induce any persons employed by us to leave their employment with us, nor hire or employ, or attempt to hire or employ, any persons employed by us, nor assist or facilitate in any way any other person or entity in the hiring of any persons employed by us.

*Michael R. Moynihan, Ph. D.* Dr. Moynihan entered into an employment agreement with us on March 15, 2011 for an initial term of three years that automatically renews on an annual basis thereafter unless terminated. If Dr. Moynihan's employment is terminated by the Company without Cause or by Dr. Moynihan for Good Reason (as such terms are defined in the employment agreement), Dr. Moynihan will be entitled to a severance benefit in the form of a continuation of his then-base salary for one year from the termination date.

The employment agreement of Dr. Moynihan provides that in the event of a change in control (as defined in his employment agreement) of our Company, then during the three (3)-year period following such change in control if certain triggering events occur, such as if he is terminated other than for Cause (as defined in his employment agreement), death or disability, or if his responsibilities are diminished after the change in control as compared to his responsibilities prior to the change in control, or if his base salary or benefits are reduced, then in any such events he will have the option, exercisable within ninety (90) days of the occurrence of such an event, to resign his employment with us, in which case he will be entitled to receive: (A) his base salary which remains unpaid for the remainder of the ninety day period and (B) the immediate vesting of all options and/or restricted stock grants previously granted or to be granted to him.

The employment agreement of Dr. Moynihan also contains similar non-competition and non-interference covenants as Mr. Sicignano; however, the non-competition and non-solicitation covenants are in effect for a period of three (3) years and the non-interference covenants are in effect for a period of four (4) years after the he ceases to be employed by us.

21

*John T. Brodfuehrer.* Mr. Brodfuehrer entered into an employment agreement with us on March 19, 2013 for an initial term of two years that automatically renews on an annual basis thereafter unless terminated. If Mr. Brodfuehrer's employment is terminated by the Company without Cause or by Mr. Brodfuehrer for Good Reason (as such terms are defined in the employment agreement), Mr. Brodfuehrer will be entitled to a severance benefit in the form of a continuation of his then-base salary for six months from the termination date.

The employment agreement of Mr. Brodfuehrer provides that in the event of a change in control (as defined in his employment agreement) of our Company, then during the three (3)-year period following such change in control if certain triggering events occur, such as if he is terminated other than for Cause (as defined in his employment agreement), death or disability, or if his responsibilities are diminished after the change in control as compared to his responsibilities prior to the change in control, or if his base salary or benefits are reduced, then in any such events he will have the option, exercisable within ninety (90) days of the occurrence of such an event, to resign his employment with us, in which case he will be entitled to receive: (A) a severance benefit in the form of a continuation of his then-base salary for six months from the termination date and (B) the immediate vesting of all options and/or restricted stock grants previously granted or to be granted to him.

The employment agreement of Mr. Brodfuehrer contains the same non-competition and non-interference covenants as Mr. Sicignano but they are in effect for a period of four (4) years after he ceases to be employed by us.

*Thomas L. James.* Mr. James entered into an employment agreement with us on May 12, 2014 for an initial term of three years that automatically renews on an annual basis thereafter unless terminated. Mr. James commenced his employment with us on May 27, 2014. If Mr. James' employment is terminated by the Company without Cause or by Mr. James for Good Reason (as such terms are defined in the employment agreement), Mr. James will be entitled to a severance benefit in the form of a continuation of his then-base salary until the later of (i) three years from the termination date or (ii) the expiration of the initial three-year term.

The employment agreement of Mr. James provides that in the event of a change in control (as defined in his employment agreement) of our Company, then during the three (3)-year period following such change in control if certain triggering events occur, such as if he is terminated other than for Cause (as defined in his employment agreement), death or disability, or if his responsibilities are diminished after the change in control as compared to his responsibilities prior to the change in control, or if his base salary or benefits are reduced, then in any such events he will have the option, exercisable within ninety (90) days of the occurrence of such an event, to resign his employment with us, in which case he will be entitled to receive: (A) the greater of either his base salary for the then remaining portion of the initial 3-year term of the agreement or his base salary for three (3) years thereafter; (B) reimbursement for eighteen (18) months of his reasonable costs for medical, dental, life, disability and other benefits and insurance coverage that he received during his employment; (C) outplacement services for two (2) years; and (D) the immediate vesting of all options and/or restricted stock grants previously granted or to be granted to him.

The employment agreement of Mr. James contains the same non-compete covenants as Mr. Sicignano, which will be in effect for a period of two (2) years after he ceases to be employed by us.

*Dr. Paul Rushton.* Dr. Rushton executed an employment agreement with the Company effective October 30, 2015 for an initial term of three years that automatically renews on an annual basis thereafter unless terminated. Pursuant to the employment agreement, Dr. Rushton will earn an initial base salary of One Hundred Fifty Thousand Dollars ($150,000) and may become eligible for future bonuses and equity awards. Dr. Rushton also received a signing bonus of Thirty-Two Thousand Dollars ($32,000) and was reimbursed by the Company for a temporary apartment near the Company's offices in Clarence, New York from November 1, 2015 until January 31, 2016. Further, if Dr. Rushton's employment is terminated by the Company without "Cause" or by Dr. Rushton for "Good Reason" (as such terms are defined in the Employment Agreement), then Dr. Rushton will be entitled to a severance benefit in the form of a continuation of his then-base salary for a period of twelve months. If Dr. Rushton is terminated or his responsibilities or salary are reduced and Dr. Rushton elects to terminate the Employment Agreement within the one- year period following a "Change in Control" (as defined in the Employment Agreement), then Dr. Rushton will be entitled to a severance benefit in the form of a continuation of his then-base salary for a period of twelve months.

The employment agreement of Dr. Rushton contains the same non-compete covenants as Mr. Sicignano, which will be in effect for a period of three (3) years after he ceases to be employed by us.

## Equity Plans

*Equity Incentive Plan*. On October 21, 2010, we established the 2010 Equity Incentive Plan (the "EIP") for officers, employees, Directors, consultants and advisors to the Company and its affiliates, consisting of 4,250,000 shares of common stock reserved for issuance under the EIP. The EIP has a term of ten years and is administered by our Board or a committee to be established by our Board, to determine the various types of incentive awards that may be granted to recipients under this plan, such as stock grants, stock options, stock appreciation rights, performance share awards, restricted stock and restricted stock units, and the number of shares of common stock to underlie each such award under the EIP. There are no additional shares of common stock available for issuance under the EIP.

*22nd Century Group, Inc. 2014 Omnibus Incentive Plan*. Our Board of Directors adopted, and our stockholders approved at our 2014 annual meeting of stockholders, the 22nd Century Group, Inc. 2014 Omnibus Incentive Plan (the "Plan"). The Plan allows for the granting of equity and cash incentive awards to eligible individuals, including the issuance of up to 5,000,000 shares of our common stock pursuant to awards under the Plan. Awards under the Plan are intended to support the creation of long-term value for our stockholders. We believe the Plan strikes an appropriate balance between rewarding performance and limiting stockholder dilution, while providing our Company with the flexibility to meet changing compensation needs. The Compensation Committee of our Board of Directors administers the Plan. The Plan permits the grant of stock options (including incentive stock options), stock appreciation rights, restricted stock, restricted stock units, performance shares, performance units, annual cash incentives, long-term cash incentives, dividend equivalent units and other types of stock-based awards.

## Compensation Policies and Practices and Risk Management

The Compensation Committee considers, in establishing and reviewing our compensation philosophy and programs, whether such programs encourage unnecessary or excessive risk taking. Base salaries are fixed in amount and consequently the Compensation Committee does not see them as encouraging risk taking. We also provide NEOs with equity awards to help further align their interests with those of our stockholders. The Compensation Committee believes that these awards do not encourage unnecessary or excessive risk taking since the awards are generally provided at the beginning of an employee's tenure or at various intervals to award achievements or provide additional incentive to build long-term value and are subject to vesting schedules to help ensure that executives have significant value tied to our long-term corporate success and performance.

The Compensation Committee believes that our compensation philosophy and programs encourage employees to strive to achieve both short- and long-term goals that are important to our success and building stockholder's value, without promoting unnecessary or excessive risk taking. The Compensation Committee has concluded that our compensation philosophy and practices are not reasonably likely to have a material adverse effect on us.

### Compensation Committee Interlocks and Insider Participation

During the last fiscal year, no member of the Compensation Committee had a relationship with us that required disclosure under Item 404 of Regulation S-K. During the past fiscal year, none of our executive officers served as a member of the board of directors or compensation committee, or other committee serving an equivalent function, of any entity that has one or more executive officers who served as members of our board of directors or our compensation committee. None of the members of our Compensation Committee is an officer or employee of our Company, nor have they ever been an officer or employee of our Company

23

**Compensation Committee Report**

Our Compensation Committee has reviewed and discussed the "Compensation Discussion and Analysis" contained in this proxy statement with management. Based on our Compensation Committee's review and discussions with management, our Compensation Committee recommended to our Board of Directors that the Compensation Discussion and Analysis be included in this proxy statement.

Richard M. Sanders (Chair)
James W. Cornell
Nora B. Sullivan

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

Our policy is to enter into transactions with related persons on terms that, on the whole, are no less favorable to us than those available from unaffiliated third parties. Our Board of Directors has adopted written policies and procedures regarding related person transaction. For purposes of these policies and procedures:

· A "related person" means any of our Directors, executive officers, nominees for director, holder of 5% or more of our common stock or any of their immediate family members; and

· A "related person transaction" generally is a transaction (including any indebtedness or a guarantee of indebtedness) in which we were or are to be a participant and the amount involved exceeds $120,000 and in which a related person had or will have a direct or indirect material interest.

Each of our executive officers, Directors or nominees for director is required to disclose to our Audit Committee certain information relating to related person transactions for review, approval or ratification by our Audit Committee. In making a determination about approval or ratification of a related person transaction, our Audit Committee will consider the information provided regarding the related person transaction and whether consummation of the transaction is believed by the committee to be in our best interests. Our Audit Committee may take into account the effect of a Director's related person transaction on the Director's status as in independent member of our Board of Directors and eligibility to serve on committees of our Board under SEC rules and the listing standards of NYSE MKT. Any related person transaction must be disclosed to our full Board of Directors. There were no related party transactions in 2015 and 2014.

**PROPOSAL NO. 2**
**ADVISORY RESOLUTION ON EXECUTIVE COMPENSATION**

We are asking stockholders to approve an advisory resolution on the Company's 2015 executive compensation as reported in this proxy statement.

We urge stockholders to read the "Executive Compensation" section beginning on page 15 of this proxy statement, as well as the Compensation Discussion and Analysis, the Summary Compensation Table and other related compensation tables and narrative in this proxy statement, which provide detailed information on the compensation of our NEOs.

In accordance with Section 14A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and as a matter of good corporate governance, we are asking stockholders to approve the following advisory resolution:

> RESOLVED, that the stockholders of 22nd Century Group, Inc. (the "Company") approve, on an advisory basis, the 2015 compensation of the Company's named executive officers disclosed in the Executive Compensation section and the related compensation tables, notes and narrative in the Proxy Statement for the Company's 2016 Annual Meeting of Stockholders.

This advisory resolution, commonly referred to as a "say-on-pay" resolution, is non-binding on the Board of Directors. Although non-binding, the Board and compensation committee will review and consider the voting results when making future decisions regarding our executive compensation program.

**Our Board of Directors recommends that a vote FOR the approval of the advisory**
**resolution on executive compensation.**

25

**PROPOSAL NO. 3**
**THE RATIFICATION OF THE APPOINTMENT OF FREED MAXICK CPAs, P.C. AS**
**THE COMPANY'S INDEPENDENT REGISTERED CERTIFIED PUBLIC ACCOUNTING FIRM FOR**
**FISCAL YEAR 2016**

The Audit Committee has appointed Freed Maxick CPAs, P.C. ("Freed") as our independent registered certified public accounting firm for the fiscal year 2016 and has further directed that the selection of Freed be submitted to a vote of stockholders at the annual meeting for ratification.

In selecting Freed to be our independent registered public accounting firm for 2016, our Audit Committee considered the results from its review of Freed's independence, including (i) all relationships between Freed and our Company and any disclosed relationships or services that may impact Freed's objectivity and independence; (ii) Freed's performance and qualification as an independent registered public accounting firm; and (iii) the fact that the Freed engagement audit partner is rotated on a regular basis as required by applicable laws and regulations.

Our Audit Committee charter does not require that our stockholders ratify the selection of Freed as our independent registered public accounting firm. We are doing so because we believe it is a matter of good corporate governance practice. If our stockholders do not ratify the selection, our Audit Committee may reconsider whether to retain Freed, but still may retain the firm. Even if the selection is ratified, our Audit Committee, in its discretion, may change the appointment at any time during the year if it determines that such a change would be in the best interests of us and our stockholders.

Representatives of Freed are expected to attend the annual meeting, where they will be available to respond to appropriate questions and, if they desire, to make a statement.

**Our Board of Directors recommends a vote FOR the ratification of the appointment of**
**Freed as our independent registered certified public accounting firm for the year 2016.**
**If the appointment is not ratified, our Audit Committee will consider whether it should select another**
**independent registered certified public accounting firm.**

**INDEPENDENT REGISTERED CERTIFIED PUBLIC ACCOUNTING FIRM FEES AND SERVICES**

The following table shows the fees billed to us for the audits and other services provided by for the fiscal years ended December 31, 2015 and 2014, respectively.

|  | 2015 | 2014 |
|---|---|---|
| Audit fees | $ 179,000 | $ 171,000 |
| Audit-related fees | - | 27,000 |
| Tax fees | 3,000 | 25,000 |
| All other fees | - | - |
|  | $ 182,000 | $ 223,000 |

Audit Fees consist of the aggregate fees billed for professional services rendered for the audit of our consolidated annual financial statements and the quarterly reviews of financial statements and for any other services that are normally provided by our independent public accountants in connection with our statutory and regulatory filings or engagements.

Audit Related Fees consist of the aggregate fees billed for professional services rendered for assurance and related services that were reasonably related to the performance of the audit or review of our financial statements and the financial statements of our subsidiary that were not otherwise included in Audit Fees. Amounts include services rendered in connection with the filing of Forms S-3 and S-8 with the SEC during 2014 and due diligence services related to a potential acquisition target.

Tax fees consist of tax focused due diligence related to a potential acquisition target and tax consulting services related to future sales opportunities in Europe.

**Policy on Audit Committee Pre-Approval of Audit and Non-Audit Services**

The Audit Committee, in accordance with its charter, must pre-approve all non-audit services provided by our independent registered public accountants. The Audit Committee generally pre-approves specified series in the defined categories of audit services, audit related services and tax services up to specified amounts. Pre-approval may also be given as part of our Audit Committee's approval of the scope of the engagement of the independent registered public accountants or on an individual, explicit case-by-case basis before the independent auditor is engaged to provide each service.

The Audit Committee has considered whether the provision of the services not related to the audit of the financial statements acknowledged in the table above was compatible with maintaining the independence of Freed's and is of the opinion that the provision of these services was compatible with maintaining Freed's independence.

**AUDIT COMMITTEE REPORT**

The Audit Committee has reviewed and discussed the audited financial statements with management, which has represented that the financial statements were prepared in accordance with accounting principles generally accepted in the United States. The Audit Committee discussed with management the quality and acceptability of the accounting principles employed, including all critical accounting policies used in the preparation of the financial statements and related notes, the reasonableness of judgments made, and the clarity of the disclosures included in the statements.

The Audit Committee also reviewed our consolidated financial statements for fiscal 2015 with Freed, our independent auditors for fiscal 2015, who are responsible for expressing an opinion on the conformity of those audited financial statements with accounting principles generally accepted in the United States. The Board of Directors has discussed with Freed the matters required to be discussed by Statement on Auditing Standards No. 61, as amended.

The Audit Committee has received the written disclosures and the letter from Freed mandated by applicable requirements of the Public Company Accounting Oversight Board regarding the independent auditors' communications with the Board of Directors concerning independence and has discussed with Freed its independence and has considered whether the provision of non-audit services provided by Freed is compatible with maintaining Freed's independence.

Based on the reviews and discussions referred to above, the Board of Directors recommended that the audited financial statements be included in our Annual Report on Form 10-K for the year ended December 31, 2015 for filing with the Securities and Exchange Commission. The Board of Directors has selected Freed as our independent auditor for 2016.

This report is submitted by the members of the Audit Committee of the Board of Directors:

James W. Cornell (Chair)
Richard M. Sanders
Nora B. Sullivan

## STOCKHOLDER PROPOSALS FOR THE 2017 MEETING

Our amended and restated bylaws provide that, for matters to be properly brought before an annual meeting, business must be either (i) specified in the notice of annual meeting (or any supplement or amendment thereto) given by or at the direction of the Board of Directors, (ii) otherwise brought before the annual meeting by or at the direction of the Board of Directors, or (iii) otherwise properly brought before the annual meeting by a stockholder.

Stockholder proposals intended for inclusion in our proxy statement relating to the next annual meeting in 2017 must be received by us no later than November 18, 2016. Any such proposal must comply with Rule 14a-8 of Regulation 14A of the proxy rules of the SEC.

Notice to us of a stockholder proposal submitted otherwise than pursuant to Rule 14a-8 also will be considered untimely if received at our principal executive offices other than during the time period set forth below and will not be placed on the agenda for the meeting. In addition to any other applicable requirements, for business to be properly brought before an annual meeting by a stockholder, the stockholder must have given timely notice thereof in writing to our secretary. To be timely, a stockholder's notice must be delivered to the secretary at our principal executive offices not later than the close of business on the ninetieth (90th) day nor earlier than the close of business on the one hundred twentieth (120th) day prior to the first anniversary of the preceding year's annual meeting; provided, however, that in the event that the date of the annual meeting is more than thirty (30) days before or more than seventy (70) days after such anniversary date, notice by the stockholder must be so delivered not earlier than the close of business on the one hundred twentieth (120th) day prior to such annual meeting and not later than the close of business on the later of the ninetieth (90th) day prior to such annual meeting or the tenth (10th) day following the day on which public announcement of the date of such meeting is first made by us.

## OTHER MATTERS

The Board knows of no matter to be brought before the annual meeting other than the matters identified in this proxy statement. However, if any other matter properly comes before the annual meeting or any adjournment of the meeting, it is the intention of the persons named in the proxy solicited by the Board to vote the shares represented by them in accordance with their best judgment.

**2016 ANNUAL MEETING OF STOCKHOLDERS OF**
**22nd Century Group, Inc.**
**April 30, 2016**

**NOTICE OF INTERNET AVAILABILITY OF PROXY MATERIAL**:

The 2015 Annual Report on Form 10-K and proxy statement of 22nd Century Group, Inc. are available online at http://www.xxiicentury.com/sec filings/. For directions to the annual meeting, please contact Nathan Schmitt at 716-270-1523 or through www.xxiicentury.com/contact.

---

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" PROPOSALS 2 AND 3 AND "FOR ALL NOMINEES" IN PROPOSAL 1.**

**PLEASE SIGN, DATE AND RETURN THIS PROXY CARD PROMPTLY IN THE ENCLOSED ENVELOPE.**
**PLEASE MARK YOUR VOTE IN BLUE OR BLACK INK AS SHOWN HERE ☒**

In their discretion, the proxies are authorized to vote upon such other business as may properly come before the Annual Meeting. This proxy when properly executed will be voted as directed herein by the undersigned stockholder. If no direction is made, **this proxy will be voted FOR Proposals 2 and 3 and FOR ALL NOMINEES in Proposal 1.**

**1. ELECTION OF DIRECTORS NOMINATED BY THE BOARD OF DIRECTORS TO SERVE A THREE-YEAR TERM AND UNTIL THEIR SUCCESSORS HAVE BEEN ELECTED AND QUALIFIED:**

FOR ALL NOMINEES ☐

WITHHOLD AUTHORITY FOR ALL NOMINEES ☐

FOR ALL EXCEPT ☐
(See instructions below)

    O Joseph A. Dunn, Ph.D.

    O Nora B. Sullivan

**INSTRUCTIONS:** To withhold authority to vote for any individual nominee(s), mark "FOR ALL EXCEPT" and fill in the circle next to each nominee you wish to withhold.

**2. ADVISORY RESOLUTION ON EXECUTIVE COMPENSATION FOR FISCAL YEAR 2015:**

RESOLVED, that the stockholders of 22nd Century Group, Inc. (the "Company") approve, on an advisory basis, the 2015 compensation of the Company's named executive officers disclosed in the Executive Compensation section and the related compensation tables, notes and narrative in the Proxy Statement for the Company's 2016 Annual Meeting of Stockholders.

    FOR ☐    AGAINST ☐    ABSTAIN ☐

**3. RATIFICATION OF APPOINTMENT OF FREED MAXICK CPAs, P.C. AS INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM FOR FISCAL YEAR 2016:**

    FOR ☐    AGAINST ☐    ABSTAIN ☐

**Proxy for 2016 Annual Meeting of Stockholders on April 30, 2016**
**Solicited on Behalf of the Board of Directors**

The undersigned hereby appoints Thomas L. James and John T. Brodfuehrer, and each of them, with full power of substitution and power to act alone, as proxies to vote all the shares of common stock which the undersigned would be entitled to vote if personally present and acting at the annual meeting of stockholders of 22nd Century Group, Inc. to be held at The Buffalo Club (*), 388 Delaware Avenue, Buffalo, NY 14202, on Saturday, April 30, 2016, beginning at 1:00 P.M. local time and at any adjournments or postponements thereof, as shown on the reverse side hereof.

To change the address on your account, please check the box at right and indicate your new address in the address space on this Proxy Card. Please note that changes to the registered name(s) on the account may not be submitted via this method.

**Note:** Please sign exactly as your name or names appear on this Proxy. When shares are held jointly, each holder should sign. When signing as executor, administrator, attorney, trustee or guardian, please give full title as such. If the signer is a corporation, please sign full corporate name by duly authorized officer, giving full title as such. If signer is a partnership, please sign in partnership name by authorized person.

_____     _____          _____     _____
Signature                                            Date                        Signature (Joint Owners)                        Date

**(*) Please note that The Buffalo Club has a mandatory dress code for entry into the annual meeting. Men must wear dress pants, coat and tie. Women must wear dresses, business suits, dress pants with blazers or formal pantsuits.**