UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK



_____

JOSEPH NOTO, GARDEN STATE
TIRE CORP., and STEPHENS
JOHNSON, Individually and on Behalf
of All Others Similarly Situated,

        Plaintiff,

       v.

22ND CENTURY GROUP, INC.,
HENRY SICIGNANO, III, and JOHN
T. BRODFUEHRER,

        Defendants,

_____

19-CV-1285 (JLS)

### DECISION AND ORDER

Defendant 22nd Century Group, Inc. is a publicly traded company that

engineers tobacco and cannabis plants to adjust nicotine and cannabinoid levels.

Defendants Henry Sicignano, III and John T. Brodfuehrer were 22nd Century's

CEO and CFO, respectively, during the relevant time period.  Plaintiffs Joseph

Noto, Garden State Tire Corp., and Stephens Johnson, individually and on behalf of

all others similarly situated, were investors in 22nd Century.

Defendants moved to dismiss Plaintiffs' amended complaint.[1]  For the

reasons below, the Court denies the remaining portion of Defendants' motion.

_____

[1] Plaintiffs alleged several claims against Defendants, which this Court dismissed
on a 12(b)(6) motion.  The Second Circuit affirmed, in part, and vacated, in part.
Plaintiffs' remaining causes of action include SEC Rule 10b-5(b) claims against all
Defendants and Section 20(a) claims against Defendants Sicignano and
Brodfuehrer.

## BACKGROUND

### I.   Factual Background

The Court takes the following facts from Plaintiffs' amended complaint.[2] Dkt. 31.  As it must, the Court treats Plaintiffs' well-pleaded factual allegations as true and draws all reasonable inferences in Plaintiffs' favor.

22nd Century is a Buffalo-based biotechnology company that claims to have the ability to breed tobacco and cannabis plants with specific levels of nicotine and THC.  Dkt. 31 ¶ 2.  Sicignano served as 22nd Century's CEO from March 2015 to July 2019.  *Id.* ¶ 35.  Brodfuehrer served as 22nd Century's CFO and Treasurer from April 2013 to December 2019.  *Id.* ¶ 36.  In 2013, around when Sicignano took over as CEO, 22nd Century struggled to maintain sufficient cash reserves to continue operating.  *Id.* ¶ 56.

Some time before 2016, the SEC began an investigation into purported material weaknesses in 22nd Century's internal accounting practices (the "SEC Investigation").  *Id.* ¶ 48.  According to a confidential witness hired to address 22nd Century's accounting weaknesses, as of February 2019, no notice was ever received indicating the SEC Investigation had concluded.  *Id.* ¶¶ 45, 47, 48.  22nd Century retained counsel to deal with the investigation, and Brodfuehrer traveled to Washington, D.C. to meet with the SEC.  *Id.* ¶ 49.  Brodfuehrer told a confidential witness he was worried the investigation may cost him his CPA license or result in

---

[2] Because the Second Circuit affirmed the dismissal of several of Plaintiffs' claims (Dkt. 58, at 2), the Court discusses Plaintiffs' allegations as they relate to the remaining causes of action.

his imprisonment. *Id.* He also told this confidential witness, on multiple occasions in 2017, that he was not comfortable signing 22nd Century's SEC filings because of Sicignano's improper conduct as CEO, stating that "people need to save Henry [Sicignano] from himself." *Id.* ¶ 208.

Between February 18, 2016, and July 31, 2019 (the "Class Period"), Defendants issued numerous public statements about the status of 22nd Century to influence public opinion about the company. *Id.* ¶ 1. On February 18, 2016, 22nd Century filed its 2015 10-K with the SEC ("2015 10-K"). *Id.* ¶ 193. The 2015 10-K stated that:

> [O]ur management concluded that as of December 31, 2015, that our internal controls over financial reporting were not effective and that material weaknesses exist in our internal control over financial reporting. The material weakness consists of controls associated with segregation of duties whereby individuals have incompatable duties within the financial reporting area. To address the material weakness we performed additional analyses and other post-closing procedures to ensure that our consolidated financial statements were prepared in accordance with accounting principles generally accepted in the United States of America (U.S. GAAP).

*Id.* On May 10, 2016, it filed its 2016 10-Q for the first quarter of 2016 ("Q1 2016 10-Q"). *Id.* ¶ 194. The Q1 2016 10-Q stated that:

> [O]ur chief executive officer and chief financial officer, after evaluating the effectiveness of the Company's "disclosure controls and procedures" (as defined in the Exchange Act Rules 13a-15(e) or 15d-15(e)) as of the end of the period covered by this quarterly report, have concluded that our disclosure controls and procedures were not effective and that material weaknesses described in our Form 10-K for the year ended December 31, 2015 exist in our internal control over financial reporting based on their evaluation of these controls and procedures as required by paragraph (b) of Exchange Act Rules 13a-15 or 15d-15.

*Id.* On August 9, 2016, it filed its 2016 10-Q for the second quarter of 2016

("Q2 2016 10-Q"). *Id.* ¶ 195. The Q2 2016 10-Q stated that:

> During the second quarter of 2016, we hired an additional accounting
> employee to assist with remediating our material weakness associated
> with a lack of segregation of duties. In addition, subsequent to the end
> of the second quarter of 2016, we engaged a third-party consultant to
> assist with material weakness remediation and to assist with our
> controls and procedures over our financial reporting. Except as set forth
> herein, there were no changes in the Company's internal control over
> financial reporting during the second quarter of 2016 that have
> materially affected, or are reasonably likely to materially affect, the
> Company's internal control over financial reporting.

*Id.* On November 8, 2016, it filed its 2016 10-Q for the third quarter of 2016

("Q3 2016 10-Q"). *Id.* ¶ 196. The Q3 2016 10-Q stated that:

> During the third quarter of 2016, an additional accounting employee
> hired during the second quarter of 2016 was fully deployed and with the
> assistance of a third-party consultant, we developed and commenced the
> implementation of a remediation plan targeted at eliminating our
> previously reported material weakness in our internal controls over
> financial reporting primarily resulting from a lack of segregation of
> duties. Except as set forth herein, there were no changes in the
> Company's internal controls over financial reporting during the third
> quarter of 2016 that have materially affected, or are reasonably likely
> to materially affect, the Company's internal control over financial
> reporting.

*Id.* And finally, on March 8, 2017, it filed its 2016 10-K ("2016 10-K"). *Id.* ¶

197. The 2016 10-K stated that:

> During the fourth quarter of 2016, we completed the implementation
> and testing of a remediation plan that was targeted at eliminating our
> previously reported material weakness in our internal controls over
> financial reporting primarily resulting from a lack of segregation of
> duties. Except as set forth herein, there were no changes in the
> Company's internal controls over financial reporting during the fourth
> quarter of 2016 that have materially affected, or are reasonably likely
> to materially affect, the Company's internal control over financial
> reporting.

*Id.* In each filing (collectively, the "SEC Filings"), Defendants disclosed that issues existed with 22nd Century's accounting practices, but did not mention the SEC Investigation. *Id.* ¶¶ 193–97. Plaintiffs argue that, because information regarding the SEC Investigation was omitted from these statements, the SEC Filings are each materially false or misleading. *Id.* ¶ 192.

Also during this time, 22nd Century executed multiple stock offerings to raise cash for the company at the cost of diluting the interests of existing shareholders. *Id.* ¶ 57. On February 5, 2016, 22nd Century closed a registered direct offering of common stock and warrants—consisting of 5,000,000 shares of common stock and warrants—to purchase 2,500,000 shares. *Id.* On July 27, 2016, 22nd Century closed another registered direct offering of common stock and warrants—consisting of 6,172,840 shares of common stock and warrants—to purchase 7,043,211 shares. *Id.* Finally, on October 19, 2016, 22nd Century sold 8,500,000 shares of common stock and warrants to purchase 4,250,000 shares. *Id.* On December 30, 2016, 22nd Century filed a Form S-3 with the SEC that was declared effective on January 17, 2017, allowing it to raise up to $100 million of capital over a three-year period ending on January 17, 2020. *Id.*

Later, on October 25, 2018, an author by the username "Fuzzy Panda" published a short seller report on financial news and analysis website, "Seeking Alpha." *Id.* ¶ 12 n.2. The author claimed that the SEC denied his FOIA request for documents relating to 22nd Century because the request would "reasonably be expected to interfere with on-going enforcement proceedings." *Id.* ¶ 17. As a result,

he accused 22nd Century of being under SEC investigation and failing to inform its shareholders. *Id.* After Fuzzy Panda posted this article, 22nd Century shares fell $0.11 per share, or 4.3%, to close at $2.45 per share on October 25, 2018. *Id.* ¶¶ 17, 139, 221. Fuzzy Panda previously raised questions regarding 22nd Century's technology claims on Seeking Alpha and, based on the shared username with a known account on another website, Defendants believed Fuzzy Panda was former 22nd Century CEO Joseph Pandolfino. *Id.* ¶ 12.

In response to the article, 22nd Century issued a press release on October 26, 2018 (the "2018 Press Release") that discredited Fuzzy Panda—without mentioning his suspected identity—and denied knowledge of any SEC enforcement proceedings, stating that "22nd Century has not received any notice of, and the Company has no knowledge of, any enforcement proceeding against 22nd Century by the SEC or any other regulator." *Id.* ¶ 19. The 2018 Press Release characterized the October 25 article as a "highly deceptive article published . . . by a self-professed short seller of the Company's stock who launched his smear campaign in an effort to dupe shareholders into selling their shares of 22nd Century Group stock." *Id.* ¶ 18. It further stated that, "[t]hough the author of the 'short and distort' article on 22nd Century failed to disclose his own name, the Company plans to notify the SEC of the article, of all persons associated with it, and of their intent to deceive 22nd Century's shareholders." *Id.* ¶ 140. The 2018 Press Release concluded that, "[b]y persuading unsophisticated shareholders that something is amiss, unscrupulous short sellers are essentially stealing from ordinary investors. We hope that the SEC

will punish such wrongful behavior.  In the meantime, we have a business to run and a mission to execute.  We will not respond to any further short seller articles." *Id.* ¶ 142.

On April 17, 2019, Fuzzy Panda posted another article criticizing 22nd Century.  *Id.* ¶ 20.  The article alleged, among other things, that 22nd Century's key patents behind the tobacco used in its FDA applications had begun expiring in 2018. The article also alleged that so-called "Big Tobacco" manufacturers now had the ability to manufacture low-nicotine tobacco patents that could adhere to FDA low nicotine standards.  *Id.* ¶ 143.  The stock price fell 1.6% to $1.89 per share on April 17, 2019, after the April 17 article was published, and fell 1.06% further the following day to $1.87 per share.  *Id.* ¶¶ 143, 222.

In response, 22nd Century issued a press release on April 18, 2019 (the "2019 Press Release").  *Id.* ¶ 21.  22nd Century stated that "the self-serving 'hit piece' article falsely alleges that 22nd Century is supposedly under SEC investigation.  As 22nd Century has publicly stated on several occasions, 22nd Century has not received any notice of, and the Company has no knowledge of, any enforcement proceeding against 22nd Century by the SEC or any other regulator."  *Id.* ¶ 145. Plaintiffs allege that the failure to disclose the SEC Investigation into 22nd Century's internal accounting controls in the 2018 and 2019 Press Releases made these press releases materially false and misleading.  *Id.* ¶ 191.

On July 26, 2019, Sicignano resigned as CEO.  *Id.* ¶ 25.  When trading closed after the next trading day, on July 29, 2019, the Company's stock price had fallen

7

$0.05 per share to $1.81 per share, a decline of 2.7%. 22nd Century's share price continued to fall until it bottomed out at $1.36 per share on August 1, 2019, a decline of 26.9%. *Id.*

## II.   Procedural Background

Plaintiffs filed an amended class action complaint in November 2019 (Dkt. 31).[3] Defendants moved to dismiss the amended complaint for failure to state a claim. Dkt. 40. This Court granted the motion in its entirety. Dkt. 53. As relevant here, this Court dismissed Plaintiffs' material misrepresentation claims because Defendants had no duty to disclose the SEC Investigation and dismissed Plaintiffs' Section 20(a) claims for absence of a viable underlying claim. *Id.* at 4–5.

Plaintiffs appealed and the Second Circuit affirmed in part, vacated in part, and remanded the remaining claims to this Court. Dkt. 58. In particular, the Second Circuit vacated the dismissal of Plaintiffs' 10b-5(b) material misrepresentation claims, holding that Defendants had a duty to disclose the SEC Investigation because they addressed their accounting weaknesses in their 10-Ks and 10-Qs and, therefore, disclosing the SEC Investigation was necessary "to tell the whole truth." *Id.* at 14–16. The Second Circuit concluded: "the complaint adequately alleged that defendants violated Rule 10b-5(b) both by first omitting mention of the SEC investigation and then by affirmatively denying its existence."

_____

[3] The putative class includes any person or entity that acquired 22nd Century securities between February 18, 2016, and July 31, 2019. *Id.*

8

*Id.* at 16. It also vacated the dismissal of Plaintiffs' Section 20(a) claim because Plaintiffs now had a viable underlying claim. *Id.* at 18–19. The Second Circuit left Defendants' additional arguments for this Court to address in the first instance. *Id.* at 16 n.51.

Defendants now seek dismissal of Plaintiffs' remaining claims, arguing that: (1) the Second Circuit affirmed the dismissal of Plaintiffs' claims based on Defendants' alleged affirmative false statements; (2) Plaintiffs do not meet the enhanced securities fraud pleading requirements because they do not sufficiently allege scienter and loss causation; and (3) Plaintiffs cannot establish control person liability under Section 20(a). Dkt. 64.

## LEGAL STANDARD

On a motion to dismiss for failure to state a claim, the Court "assess[es] the legal feasibility of the complaint." *Lynch v. City of N.Y.*, 952 F.3d 67, 75 (2d Cir. 2020). The Court "take[s] the facts alleged in the complaint as true, drawing all reasonable inferences in [the plaintiff's] favor." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 91 (2d Cir. 2007). To survive a motion to dismiss, a complaint must contain sufficient facts, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Courts need "not . . . accept as true a legal conclusion couched as a factual allegation," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A plaintiff must allege "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Plausibility depends on numerous considerations, such as "the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *Fink v. Time Warner Cable*, 714 F.3d 739, 741 (2d Cir. 2013) (internal quotation marks and citation omitted).

Plaintiffs asserting securities fraud claims must meet the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Rule 9 requires a plaintiff to plead "the circumstances constituting fraud . . . with particularity." *Id.* (quoting Fed. R. Civ. P. 9(b)) (internal quotation marks omitted). The PSLRA requires a plaintiff to plead each misleading statement, the reasons why the statement is misleading, and, for allegations made upon information and belief, state with particularity all facts on which the belief is formed. 15 U.S.C. 78u-4(b)(1). In "an action for money damages requiring proof of a particular state of mind, 'the complaint shall, with respect to each act or omission . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *ATSI Commc'ns*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(2)). But these heightened pleading standards "do not require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

10

## DISCUSSION

To state a material misrepresentation claim under 10b-5(b), a plaintiff must allege "(1) a material misrepresentation or omission; (2) made by the defendants with scienter; (3) in connection with the purchase or sale of a security; (4) on which the plaintiff justifiably relied; (5) economic loss; and (6) a causal connection between the misrepresentation or omission and the plaintiff's loss." *Dura Pharm., Inc. v. Broundo*, 544 U.S. 336, 341–42 (2005).

The Second Circuit did not dismiss Plaintiffs' affirmative false statement-based claims.[4] And Plaintiffs sufficiently allege scienter and loss causation for their 10b-5(b) claims, as well as facts sufficient to support their Section 20(a) claims.

---

[4] The parties disagree about the claims for which the Second Circuit affirmed dismissal. Defendants argue the Second Circuit only vacated the 10b-5(b) claims based on the non-disclosure of the SEC Investigation. *See* Dkt. 64, at 7 n.5. They therefore argue that the Second Circuit affirmed dismissal of all 10b-5(b) claims based on any affirmative false statements relating to the SEC Investigation. *See id.*; Dkt. 68, at 4. Plaintiffs argue the Second Circuit vacated dismissal of the 10b-5(b) claims based on both non-disclosures and affirmatively false statements. *See* Dkt. 66, at 10–11.

The Court concludes that the Second Circuit vacated the dismissal of all 10b-5(b) claims based on the non-disclosures of, and false statements regarding, the SEC Investigation. The Second Circuit stated:

> [D]efendants' false public denial of any knowledge of the SEC investigation amounts to an admission of the materiality of its nondisclosure. . . . Moreover, these denials were affirmatively misleading in their own right. Thus, we easily find that the complaint adequately alleged that defendants violated Rule 10b-5(b) *both* by first omitting mention of the SEC investigation *and then by affirmatively denying its existence.*

Dkt. 58, at 16 (emphasis added). This statement, which follows the Second Circuit's discussion of the SEC Investigation-related 10b-5(b) claims, expressly affirms that Plaintiffs' 10b-5(b) claims based on both non-disclosures and false statements

I.    **Scienter**

Plaintiffs allege sufficient facts to meet the scienter requirement for their remaining 10b-5(b) claims.

The PSLRA requires a plaintiff to "plead 'with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting 15 U.S.C. § 78u-4(b)(2)). For a 10b-5(b) claim, a plaintiff must allege "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976). An inference of scienter is sufficiently strong when it is "more than merely plausible or reasonable[;] it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). But the inference "need not be irrefutable, . . . or even the most plausible of competing inferences." *Id.* at 324 (quotations omitted). The question is "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23.

---

survived dismissal. This express affirmation cannot be ignored simply because the Second Circuit mentions non-disclosure 10b-5(b) claims while omitting false statement 10b-5(b) claims elsewhere in the decision. *See id.* at 18–19. Accordingly, the Court will assess both the alleged non-disclosures and affirmative false statements regarding the SEC Investigation as potential grounds for Plaintiffs' remaining 10b-5(b) claims.

12

To meet this standard, a plaintiff may allege facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Communs*, 493 F.3d at 99. The Court must assess these two categories as a whole—not as strictly separate means of establishing a "strong inference." *See In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 137–38 (2d Cir. 2021) (district court erred by failing to weigh plaintiffs' scienter allegations as a whole—specifically, by failing "to assess the total weight of the circumstantial allegations together with the allegations of motive and opportunity").

Considering Plaintiffs' allegations of each category as a whole, the Court concludes that Plaintiffs sufficiently allege scienter.

### a. Motive and Opportunity

Plaintiffs allege facts indicating that Defendants had a motive and opportunity to commit fraud in their 2015 10-K, Q1 2016 10-Q, and Q2 2016 10-Q filings, but did not allege facts indicating the subsequent filings—or Defendants' 2018 and 2019 Press Releases—were motivated by fraud.

As to motive, a plaintiff must allege "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994). And as to opportunity, a plaintiff must allege "the means and likely prospect of achieving concrete benefits by the means alleged." *Id.* The alleged benefits must be more than mere general corporate interests, like the desires to "maintain a high corporate

credit rating[,] . . . sustain the appearance of corporate profitability, or of the

success of an investment[,] . . . maintain a high stock price in order to increase

executive compensation, . . . or prolong the benefits of holding corporate office."

*Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (internal quotation marks and

citations omitted); *see also In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 313

(S.D.N.Y. 2021) ("[I]ncentive-based compensation is typically insufficient to support

an inference of scienter.").

Plaintiffs appear to concede that their allegations regarding increases in

bonus compensation do not establish motive. *See* Dkt. 66, at 16–17; *HEXO Corp.*,

524 F. Supp. 3d at 313. But the parties disagree about whether bolstered capital

acquisition through a specific stock offering is a concrete benefit sufficient to allege

motive.

One district court concluded that potentially-bolstered capital from a stock

offering was insufficient to establish motive. *In re Emex Corp. Sec. Litig.*, No. 01

CIV. 4886 (SWK), 2002 WL 31093612, at *5 (S.D.N.Y. Sept. 18, 2002). There, the

defendant company sought to raise capital through a proposed offer to existing

shareholders to purchase more stock and a proposed sale of common stock to the

public.[5] *Id.* Beforehand, the company issued a misleading press release indicating

it had acquired funding for the project underlying the offerings, which dramatically

increased the stock price. *Id.* at *2. These allegations did not establish a motive to

---

[5] It does not appear that these stock offerings were ever actually executed. *See generally id.*

14

make the misrepresentations because "plaintiffs only allege[d] defendants committed fraud . . . to increase the share price . . . in advance of a rights offering and a proposed sale of common stock to the public," and "a desire to raise much needed capital is an insufficient generalized motive to support an inference of scienter." *Id.* at \*5–\*6 (internal quotation marks and citation omitted).[6]

On the other hand, the Second Circuit has concluded that the alleged bolstered capital collections from a stock offering are a sufficient benefit to establish motive. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 269 (2d Cir. 1993). There, the company allegedly misrepresented its prospects of developing strategic partnerships to offset a significant amount of newly acquired debt. *Id.* at 262. Plaintiffs claimed the company made this misrepresentation to negate an expected drop in stock price after the company announced it did not secure a substantial partnership, and would need to dilute shareholder interests through a stock offering to offset the debt. *Id.* The court considered whether the company reasonably could have expected "the effects of the alleged artificial raising of the stock price . . . not to have been completely dissipated by the announcement of the rights offering, . . . enabling the company to set the . . . offering price . . . higher than would have been

---

[6] Defendants cite several other cases involving insufficient allegations to establish motive, but those cases do not involve specific stock offerings. *See Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (motivation to inflate stock price to increase officer compensation, not to increase capital gained from a specific stock offering); *Cortina v. Anavex Life Scis. Corp.*, No. 15-CV-10162 (JMF), 2016 WL 7480415, at \*6 (S.D.N.Y. Dec. 29, 2016) (motive related to general interest in inflating stock price, not an interest in inflating stock price immediately before a specific stock offering); *Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 212 n.16 (S.D.N.Y. 2012) (no scienter for general desire to inflate stock price; no specific stock offering involved).

possible without the misleading statements and to lessen the dilutive effect of the offering." *Id.* at 269.  It concluded that this motive theory survived a motion to dismiss because the defendants arguably "acted in the belief that they could somewhat reduce the degree of dilution by artificially enhancing the price of the stock." *Id.* at 270.

Other courts have followed *Time Warner.  See In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000) (plaintiffs sufficiently alleged motive, where they alleged the defendant sought to "inflate the stock price to maximize revenue from the secondary offering, so as to provide it capital to retire debt and complete a previously arranged corporate acquisition" and "maximize the value of [Defendant]'s stock in the stock-for-stock trade . . . , thus minimizing the actual number of [Defendant] shares to be tendered"); *In re Am. Bank Note Holographics Sec. Litig.*, 93 F. Supp. 2d 424, 444 (S.D.N.Y. 2000) (because defendant "had the most to win by inflating the price of the IPO," it was "motivated to make statements or omit facts that would result in a higher price").

Under *Time Warner*, potential increases in raised revenue from specific stock offerings establishes a "concrete benefit" sufficient to establish motive.  But Plaintiffs allege only a potentially fraudulent motive for the alleged misrepresentations before October 19, 2016.  The amended complaint alleges that multiple specific stock offerings were executed over the course of 2016—the last of which occurred on October 19, 2016.  Dkt. 31 ¶¶ 3, 57.  Alleged misrepresentations *before* this final stock offering could have been motivated by a desire to bolster

16

capital gained from the stock offering. *See Time Warner Inc. Sec. Litig.*, 9 F.3d at

269. Accordingly, Plaintiffs' claims based on the 2015 10-K filed on February 18,

2016, the Q1 2016 10-Q filed on May 10, 2016, and the Q2 2016 10-Q filed on

August 9, 2016 allege an improper motive.[7]

But alleged misrepresentations *after* the October 19, 2016 final offering could

not actually affect any specific stock offerings. *See Time Warner Inc. Sec. Litig.*, 9

F.3d at 269. As a result, those alleged misrepresentations could not have been

motivated by a desire to bolster nonexistent future stock offerings.[8] Plaintiffs allege

Defendants were authorized to raise more capital until January 17, 2020, but this

general authorization does not demonstrate a specific stock offering. *Cf. In re Time*

*Warner Inc. Sec. Litig.*, 9 F.3d at 269; *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp.

2d at 206; *In re Am. Bank Note Holographics Sec. Litig.*, 93 F. Supp. 2d at 444.

---

[7] Defendants note that Plaintiffs do not expressly allege that the *SEC Filing* caused
a bolstering to these stock offers but, instead, expressly state that the *stock
promotion campaign* caused this bolstering. *See* Dkt. 68, at 2 n.2. But it is
reasonable to infer from the amended complaint that the SEC Investigation
misrepresentations also impacted the stock offering. *See In re NYSE Specialists
Sec. Litig.*, 503 F.3d at 91. Plaintiffs sufficiently allege motivation to commit fraud
with respect to these filings.

[8] The amended complaint states that Defendants' Q3 2016 10-Q was filed on May
10, 2016—before the final stock offering on October 19, 2016. Dkt. 31 ¶ 196. But
Defendants submit a copy of 22nd Century's Q3 2016 10-Q, which indicates it was
filed on November 8, 2016. Dkt. 65 ¶ 2; Dkt. 65-4, at 2. Because Plaintiffs
reference this document in the amended complaint, the Court may consider it on
this motion to dismiss. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d
Cir. 2010) ("a district court may consider . . . documents incorporated by reference in
the [pleading]" on a Rule 12(b)(6) motion). The copy of 22nd Century's Q3 2016 10-
Q indicates a filing date *after* the final alleged stock offering, so that filing does not
establish an improper motive.

Accordingly, this general authorization does not allege an improper motive regarding the post-October 19, 2016 misrepresentations.

### b.  Conscious Misbehavior or Recklessness

Plaintiffs sufficiently allege circumstantial evidence of conscious misbehavior or recklessness by Defendants for their remaining 10b-5(b) claims.

A plaintiff may establish scienter "by alleging facts to show . . . strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW*, 553 F.3d at 198.  Circumstantial evidence can support an inference of scienter in several ways, "including where defendants . . . knew facts or had access to information suggesting that their public statements were not accurate . . . ." *Employees' Ret. Sys. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (quotations omitted).  Such evidence is further strengthened when circumstances indicate that public statements were made to placate the market in response to inquiries about accounting practices.  *See Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 552 (S.D.N.Y. 2017); *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 CIV. 6728 (CM), 2018 WL 6167889, at *16 (S.D.N.Y. Nov. 26, 2018).[9]

Plaintiffs sufficiently allege that Defendants knew or had access to information indicating that their statements regarding the SEC Investigation were

---

[9] Defendants argue that Plaintiffs' allegations fail to constitute "highly unreasonable" conduct required to demonstrate recklessness. *See* Dkt. 64, at 11 (citing *Novak*, 216 F.3d at 308).  But a plaintiff meets this standard by alleging a defendant knew facts or had access to information contradicting their public statements. *See Novak*, 216 F.3d at 308 ("[S]ecurities fraud claims . . . state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.").

inaccurate. Plaintiffs claim that Brodfuehrer met with the SEC in 2016, and told a confidential witness he "feared he could lose his CPA license or even be imprisoned." Dkt. 31 ¶ 49.[10] They also claim Sicignano worked closely with Brodfuehrer, and Brodfuehrer was concerned about Sicignano's conduct to the point of not wanting to sign 22nd Century's SEC Filings. *See* Dkt. 31 ¶¶ 69, 208. These allegations directly tie Brodfuehrer and Sicignano to involvement with the SEC Investigation, and indicate they knew or had access to information that the investigation was ongoing. Brodfuehrer's concern about his CPA license, Sicignano's conduct, and Brodfuehrer's reluctance to sign the SEC Filings based on that conduct also indicate that both individuals were aware of misleading information in those filings.

Plaintiffs also allege circumstances indicating the 2018 and 2019 Press Releases may have been made to "placate the market," further supporting the allegation that Defendants consciously disregarded signs that the statements in those releases were false. *See Fresno Cnty. Employees' Ret. Ass'n.*, 268 F. Supp. 3d at 552 ("It is a plausible and cogent inference that Matta and Wesley knew or consciously disregarded the possibility that their protestations of accurate accounting treatment for nonmonetary transactions were false."). In particular,

---

[10] Defendants argue Brodfuehrer's alleged fear of losing his CPA license does not establish that he knew he acted improperly by failing to disclose the investigation, but merely establishes that he was concerned about the investigation in general. *See* Dkt. 64, at 12 n.7. But this allegation asserts that Brodfuehrer was aware of the investigation, and knew the subject of the investigation could result in prison time. This allegation establishes that Brodfuehrer "knew facts or had access to information suggesting that [the SEC Filings] were *not accurate*," even if it does not establish that he was aware of his legal duty to disclose the investigation in the filings. *See Employees' Ret. Sys.*, 794 F.3d at 306 (emphasis added).

Plaintiffs allege the 2018 and 2019 Press Releases were in response to Fuzzy Panda's protestations of 22nd Century's artificial stock inflation. *See* Dkt. 31 ¶ 186. These allegations further demonstrate a plausible inference that Defendants knew or consciously disregarded the chance that Fuzzy Panda's critiques of their accounting practices were true with respect to the 2018 and 2019 Press Release-based claims.

Finally, Plaintiffs allege that Defendants knew that Fuzzy Panda was former CEO Joseph Pandolfino, but concealed this fact to avoid giving more credit to his statements against 22nd Century. *See* Dkt. 31 ¶¶ 132–34, 140, 142, 144, 203. This allegation further demonstrates conscious misbehavior in Defendants' 2018 and 2019 Press Releases by alleging that Defendants knew Pandolfino's criticisms were more credible than they indicated in the press releases. *See* Dkt. 31 ¶¶ 141, 144.

The most likely inference from Plaintiffs' allegations is that Defendants "knew facts or had access to information suggesting that their public statements were not accurate . . . ." *See Employees' Ret. Sys.*, 794 F.3d at 306. Plaintiffs allege facts supporting this inference dating back to 2016, raising a likely inference that Defendants knew all of their SEC Filings and the 2018 and 2019 Press Releases were not accurate. *See* Dkt. 31 ¶¶ 48 (alleging, via a confidential witness, that the SEC Investigation was underway before he began working at 22nd Century in 2016), 49 (alleging that Brodfuehrer met with the SEC in 2016), 69 (alleging, via a confidential witness, that Brodfuehrer worked very closely with Sicignano and that he was concerned about Sicignano's behavior to the point of not wanting to sign

22nd Century's SEC Filings in 2017).  And because Plaintiffs sufficiently allege that Brodfuehrer and Sicignano—both high ranking officers of 22nd Century—knew of these statements, liability is imputed to 22nd Century as well.  *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("When the defendant is a corporate entity, . . . the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter . . . .  [T]he most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant.").

Allegations of Sicignano's knowledge do not expressly date back to the oldest alleged misrepresentations in the 2015 10-K and 2016 10-Qs.  But the Court views this evidence of conscious misbehavior or recklessness *in conjunction with* the aforementioned evidence of motive and opportunity, which applies to these older misrepresentations.  *See In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th at 137–38.  Likewise, even though the aforementioned evidence of motive and opportunity does not apply to the 2018 and 2019 Press Releases, Plaintiffs allege additional evidence of conscious misbehavior or recklessness for these statements.  *See* Dkt. 31 ¶¶ 186 (indicating 2018 and 2019 Press Releases were made to placate the market), 132–34, 140, 142, 144, 203 (indicating 2018 and 2019 Press Releases deliberately hid Pandolfino's identity).  Based on the allegations of conscious misbehavior or recklessness and the allegations of motive and opportunity to defraud, Plaintiffs

sufficiently plead scienter against all Defendants for their remaining 10b-5(b) claims.

Defendants argue that Sicignano and Brodfuehrer could not have acted with intent to defraud solely based on their positions in the company and certification of the allegedly misleading filings. *See* Dkt. 64, at 14. Plaintiffs, though, allege several specific grounds for Sicignano and Brodfuehrer's awareness of the misleading statements, and do not rely generally on their senior positions with 22nd Century or signatures on the allegedly misleading filings. *See* Dkt. 66, at 12. Such specific allegations are strengthened by evidence that the misstatements were made to placate the market in response to accounting practice inquiries. *See Fresno Cnty. Employees' Ret. Ass'n.*, 268 F. Supp. 3d at 552; *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *16.

Defendants also argue that the material they did disclose regarding their accounting weaknesses, in light of their interpretation of the controlling case law at the time, indicates they did not act with the required intent to defraud. Dkt. 64, at 14. However, the Court cannot weigh this purported evidence of good faith compliance with the law against Plaintiffs' allegations of fraudulent intent at the motion to dismiss stage. *See United States SEC v. Mudd*, 885 F. Supp. 2d 654, 669 (S.D.N.Y. 2012) ("Defendants argue that FNMA's extensive disclosure process— whereby the purported misstatements were reviewed by, among others, an attorney—negates scienter. This argument, at best, raises issues of fact that are premature at this juncture."); *Schlanger v. Four-Phase Sys., Inc.*, 582 F. Supp. 128,

135 (S.D.N.Y. 1984) ("There is also no merit in defendants' contention that summary judgment is warranted because good faith reliance upon advice of counsel relieves them of any liability.  It has never been the law that defendants may avoid liability under § 10(b) or Rule 10b-5 by consulting with counsel before engaging in fraudulent conduct, or uttering material false statements.").  Defendants' argument is a proper topic for discovery and may be considered at the summary judgment or trial stage, when these conflicting allegations may be properly assessed.

Plaintiffs sufficiently plead scienter against all Defendants for their remaining 10b-5(b) claims.

## II.   Loss Causation

Plaintiffs sufficiently plead loss causation for their 10b-5(b) claims based on the alleged misrepresentations in their SEC Filings and 2018 and 2019 Press Releases.  To plead loss causation, a plaintiff must allege that the supposed misstatement or omission "concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005) (disclosure may include the "materialization of the concealed risk," which must foreseeably cause the loss).  So Plaintiffs must allege that: (1) each SEC Filing and press release concealed the SEC Investigation; and (2) a later disclosure or materialization caused a drop in the value of 22nd Century's shares. *See id.*

### a. Concealment of SEC Investigation

Plaintiffs allege Defendants concealed the SEC Investigation from the market by omitting information from their SEC Filings and denying allegations of the investigation in their 2018 and 2019 Press Releases. *See* Dkt. 31 ¶¶ 186, 193–97. In particular, Plaintiffs allege that concealment *of the existence* of the SEC Investigation—not the *subject or potential results* of that investigation—created a foreseeable risk of loss. Dkt. 31 ¶ 154. The Second Circuit noted that the *existence* of the SEC Investigation was material. *See* Dkt. 58, at 16 ("[T]he existence of an SEC investigation related to the accounting weaknesses was material information that a reasonable investor would have wanted to know. . . . By not disclosing that the SEC was investigating the Company's specific accounting weakness, defendants' statements about that weakness were not accurate and complete."). Plaintiffs' allegations that Defendants concealed the SEC investigation by omitting it from their SEC filings and denying it in press releases therefore support their 10b-5(b) claims.

### b. Disclosures or Materializations Causing Loss

Plaintiffs sufficiently allege that each claimed concealment of the SEC Investigation was later disclosed or materialized with negative effects.

Plaintiffs allege the omissions from the SEC Filings were later revealed in Pandolfino's October 25, 2018 article claiming that 22nd Century was under SEC investigation. *See* Dkt. 31 ¶¶ 137–139, 221. Plaintiffs also allege that the false statements in Defendants' 2018 Press Release—the further denial that the SEC

24

Investigation existed—was later revealed in Pandolfino's follow-up April 17, 2019 article refuting this 2018 Press Release. *See* Dkt. 31 ¶ 222. Whether a disclosure refuting the denial of a previous disclosure reveals any new content is a question that the Court may not resolve on a motion to dismiss. *See Ap-Fonden v. Goldman Sachs Grp., Inc.*, 545 F. Supp. 3d 120, 149–50 (S.D.N.Y. 2021) ("[L]oss causation is [] a fact-based inquiry that [g]enerally . . . is a matter of proof at trial and not to be decided on a . . . motion to dismiss.") (internal citations and quotation marks omitted); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 253 (S.D.N.Y. 2007) ("[T]he determination whether . . . two events . . . are different phenomena that may exert different influences on the market price of a company's stock is one for the jury to make."). At this stage, Plaintiffs sufficiently allege loss causation with respect to the 2018 Press Release.[11]

Lastly, Plaintiffs sufficiently assert a materialization of the risk caused by the alleged misstatements in Defendants' 2019 Press Release when Sicignano resigned from 22nd Century. To establish loss causation, a plaintiff must allege that a concealed fact was *either* subsequently disclosed *or* subsequently

---

[11] Defendants claim the alleged drop in stock price of 1.6% from this April 17, 2019 disclosure is too insignificant to constitute a corrective disclosure. *See* Dkt. 64, at 18. But Plaintiffs allege this corrective disclosure, over two trading sessions, actually dropped 2.6%. *See* Dkt. 31 ¶¶ 137–39, 221. At least one court has found adequate allegations of loss causation based on a 2.0% decline in stock price. *See In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 165 (S.D.N.Y. 2008). Defendants do not cite persuasive authority that concludes otherwise. *See City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.*, 928 F. Supp. 2d 705, 715 (S.D.N.Y. 2013) (plaintiffs did not distinguish an alleged stock price drop from wider market price drops, and referring to the alleged 1.5% drop in stock price as a "minimal decline in value" relative to subsequent market-wide decline).

materialized, causing the stock price to drop. *Lentell*, 396 F.3d at 173-74. Plaintiffs allege that the risk associated with disclosing the SEC Investigation later materialized when Sicignano resigned from 22nd Century due to his purported involvement in concealing the investigation. Dkt. 31 ¶ 223. While Defendants contend that Sicignano resigned for personal reasons, *see id.*, ruling on this disputed issue would be inappropriate on a motion to dismiss. *See Ap-Fonden*, 545 F. Supp. 3d at 149–50.

Defendants argue that none of the aforementioned disclosures actually caused harm to 22nd Century's stock, relying on intraday trading information that purportedly shows a drop in 22nd Century's stock before Pandolfino posted his article. *See* Dkt. 64, at 16-17; Dkt. 65-7. The Court will not take judicial notice of this material on this 12(b)(6) motion.

A court "may take judicial notice of well-publicized stock prices without converting [a] motion to dismiss into a motion for summary judgment." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 n.8 (2d Cir. 2000). But before dismissing a claim based on materials outside of the record, it must be clear that: (1) "no dispute exists regarding the authenticity or accuracy of the document"; and "there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) (citations omitted). The defendant must demonstrate that the material meets these requirements. *In re Bausch & Lomb, Inc. Sec. Litig.*, No. 01-CV-6190-CJS, 2003 WL 23101782, at *16 (W.D.N.Y. Mar. 28, 2003).

Defendants did not demonstrate that the intraday trading information they ask the Court to consider meets those criteria. In particular, a dispute exists about the accuracy of the information. Defendants rely on data purportedly "[d]ownloaded from Barchart.com as of 08-08-2022 12:14pm CDT." Dkt. 65-7. First, Defendants did not show that "Barchart.com," which disclaims the accuracy of its own data, is reputable. *See* Dkt. 67-5. *Cf. Ganino*, 228 F.3d at 166 (involving judicial notice of data directly from the New York Stock Exchange). This Court has found no instances where a federal court took judicial notice of data from Barchart.com. Second, the exhibit does not make clear if Defendants took it directly from Barchart.com, or if Defendants harvested data from Barchart.com and created their own table. Third, the parties dispute whether the table demonstrates a drop in share price.[12] And fourth, any purported rise in stock price, on this motion, does not automatically disprove that Fuzzy Panda's article had no negative impact on 22nd Century's stock value. *See Bus. Exposure Reduction Grp. (BERG) Assocs., LLC v. Pershing Square Capital Mgmt., L.P.*, 549 F. Supp. 3d 318, 323 n.3 (S.D.N.Y. 2021) ("The Court may, and does, take judicial notice of the fact of the stock price rise. The Court, however, may not credit on this motion Pershing's causal claim that the

---

[12] Defendants assert that the hourly markers demonstrate a 0.2% increase in stock price over the 12:00 trading hour. *See* Dkt. 64, at 17. But the chart also shows the price dropping to a day-low 2.3479 at some point during the 12:00 hour. *See* Dkt. 67-5. Furthermore, the final price for the day, demonstrated by the "last" price for the 3:00 trading hour, was 2.45. *Id.* This is .02 lower than the open price at 12:00. The chart also provides no stock price data for the following days of trading. Accordingly, the chart alone does not demonstrate that 22nd Century's stock price did not drop after the article.

27

increased price disproves BERG's thesis that Pershing's use of BERG's work product was damaging to the stock price, and therefore helpful to Pershing.").

The accuracy and meaning of the exhibit cannot be resolved on a 12(b)(6) motion to dismiss. *See Faulkner*, 463 F.3d at 134. The disputed issue of whether, or to what degree, 22nd Century's stock was affected by the alleged disclosures is more appropriately addressed at the summary judgment or trial stage.

Finally, Defendants argue that Plaintiffs' failure to disclose the SEC Investigation did not cause any losses because the amended complaint attributes all losses to the alleged stock promotional campaign, which the Second Circuit concluded did not give rise to a 10b-5(b) claim. *See* Dkt. 64, at 19–20. But Plaintiffs allege—at least in part—that disclosure of the SEC Investigation caused the corresponding share price drops. *See* Dkt. 31 ¶¶ 221–22. Accordingly, Plaintiffs have sufficiently alleged loss causation.

### III.   Section 20(a) Claims Against Brodfuehrer and Sicignano

Plaintiffs sufficiently allege claims for control person liability against Defendants Brodfuehrer and Sicignano.

To state a claim for control person liability, a plaintiff must allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Communs., Inc.*, 493 F.3d at 108.

As discussed above, Plaintiffs allege primary violations of 10b-5(b), and allege evidence of conscious misbehavior by Brodfuehrer and Sicignano.  Dkt. 31 ¶¶ 49, 69, 208.  Plaintiffs therefore allege claims against Brodfuehrer and Sicignano for control person liability.

## CONCLUSION

For the above reasons, the Court DENIES Defendants' motion to dismiss (Dkt. 63).


SO ORDERED.


Dated:       January 6, 2023
             Buffalo, New York

_____
JOHN L. SINATRA, JR.
UNITED STATES DISTRICT JUDGE