**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| JOSEPH NOTO, GARDEN STATE TIRE CORP., and STEPHENS JOHNSON, Individually and on behalf of all others similarly situated,<br><br>               Plaintiff,<br><br>    v.<br><br>22ND CENTURY GROUP, INC., HENRY SICIGNANO, III and JOHN T. BRODFUEHRER,<br><br>               Defendants. | Civil Action No. 19-cv-01285-JLS-MJR |

**DECLARATION OF BRIAN CALANDRA IN SUPPORT OF: (I) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND (II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND COMPENSATORY AWARDS TO PLAINTIFFS**

{00567731;1 }

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................... 2

II.    PROSECUTION OF THE ACTION....................................................................... 5

       A.    Commencement Of The Action And Appointment Of Lead
             Plaintiff And Lead Counsel ................................................................... 5

       B.    The Comprehensive Pre-Filing Investigation And The
             Preparation Of The Complaint............................................................... 5

       C.    Defendants' Motion To Dismiss The Complaint And
             Plaintiffs' Response ............................................................................... 6

       D.    Mediation Efforts, Settlement Negotiations, and
             Preliminary Approval of the Settlement ................................................ 7

III.   THE RISKS OF CONTINUED LITIGATION....................................................... 8

       A.    Risks In Proving Liability....................................................................... 8

       B.    Risks To Proving Loss Causation And Damages ..................................... 9

       C.    Risks Faced In Obtaining And Maintaining Class Action Status ........... 11

       D.    Other Risks............................................................................................ 12

       E.    The Settlement Is Reasonable In Light Of Potential
             Recovery In The Action......................................................................... 12

IV.    PLAINTIFFS' COMPLIANCE WITH THE COURT'S
       PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE  13

V.     ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT.............................. 16

VI.    LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES
       AND REIMBURSEMENT OF LITIGATION EXPENSES......................................... 19

       A.    The Fee Application............................................................................... 20

             1.    The Favorable Outcome Achieved Is the Result of
                   the Significant Time and Labor That Plaintiffs'
                   Counsel Devoted to the Class Action ......................................... 20

             2.    The Magnitude and Complexity of the Action ............................ 24

             3.    The Significant Risks Borne By Plaintiffs' Counsel ................... 24

             4.    The Quality of Representation, Including the
                   Result Obtained, the Experience and Expertise
                   of Lead Counsel, and the Standing and Caliber of
                   Defendants' Counsel................................................................... 25

             5.    The Requested Fee In Relation to the Settlement....................... 26

6.    Interests of Public Policy, Including the Need to
      Ensure the Availability of Experienced Counsel
      in High-Risk Contingent Securities Cases .............................................. 26

7.    The Reaction of the Class Supports Class Counsel's Fee Request........... 27

8.    Plaintiffs Support Lead Counsel's Fee Request........................................ 27

B.    Reimbursement of The Requested Litigation Expenses
      Is Fair And Reasonable ........................................................................... 28

C.    Awards for Lead Plaintiff and Named Plaintiff...................................... 29

VII. CONCLUSION .................................................................................................... 31

## TABLE OF EXHIBITS TO DECLARATION

| EXHIBIT | TITLE |
|---------|-------|
| 1 | Declaration of Garth Spencer dated August 29, 2023 ("GPM Decl.") |
| 2 | Lodestar Report of Pomerantz LLP |
| 3 | Table of Peer Law Firm Billing Rates |
| 4 | Biography of Pomerantz LLP |
| 5 | Biography of Glancy Prongay & Murray LLP |
| 6 | Schedule of Cases Where Courts Award Fees Of One-Third In Securities Class Action Settlements |
| 7 | Declaration of Joseph Noto dated August 23, 2023 ("Noto Decl.") |
| 8 | Declaration of Garden State Tire Corp. dated August 23, 2023 ("Garden State Tire Corp. Decl.") |
| 9 | Declaration of Stephens Johnson dated August 23, 2023 ("Johnson Decl.") |
| 10 | Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2021 Full-Year Review* (NERA Jan. 25, 2022) |
| 11 | Declaration of Joseph Mahan dated August 29, 2023 ("Epiq Decl.") |

I, Brian Calandra, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.    I am a partner at Pomerantz LLP ("Pomerantz"), Court-appointed Lead Counsel ("Lead Counsel") for Court-appointed Lead Plaintiffs Joseph Noto ("Noto"), Garden State Tire Corp. ("Garden State"), and Stephens Johnson ("Johnson," and with Noto and Garden State, "Plaintiffs") in this action (the "Action").[1]  *See* ECF No. 22.  I have personal knowledge of the matters set forth herein based on my participation in the prosecution and settlement of the claims asserted on behalf of the Settlement Class in this Action.

2.    I respectfully submit this Declaration in support of Plaintiffs' motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed $3,000,000 settlement (the "Settlement") that the Court preliminarily approved by Order dated June 30, 2023 (the "Preliminary Approval Order") (ECF No. 86); as well as final approval of the proposed plan for allocating the proceeds of the Net Settlement Fund to eligible Settlement Class Members (the "Plan of Allocation") (collectively, the "Final Approval Motion").

3.    I also respectfully submit this Declaration in support of Lead Counsel's motion, on behalf of all Plaintiffs' Counsel,[2] for an award of attorneys' fees amount of 33 1/3% of the Settlement Fund, which equates to $1,000,000, plus interest earned at the same rate as the Settlement Fund; reimbursement of Lead Counsel's out-of-pocket expenses in the amount of $106,473.75; and a total of $15,000 to Plaintiffs ($5,000 to each Plaintiff), in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA") for costs and expenses, including lost wages, incurred in connection with their representation of the Settlement Class (the "Fee and

---

[1] Unless otherwise noted, capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated April 25, 2023 ("Stipulation"). ECF No. 81-1.

[2] "Plaintiffs' Counsel" means Lead Counsel and Bronstein, Gewirtz & Grossman, LLC ("BGG"), Glancy Prongay & Murray LLP ("GPM"), and Vita Law Offices, P.C. ("VLO").

Expense Application").

4.      As part of the Preliminary Approval Order, the Court directed notice of the Settlement to be disseminated to the Settlement Class. *See* ECF No. 86. Pursuant to the Preliminary Approval Order, Epiq Class Action & Claims Solutions, Inc. ("Epiq"), the Court-approved Claims Administrator, implemented a comprehensive notice program under the direction of Lead Counsel, whereby notice was given to potential Settlement Class Members by mail and/or email and by publication.

5.      In total, more than 4,376 copies of the Postcard Notice or Notice and Claim Form have been disseminated to potential Settlement Class Members, and, to date, no requests for exclusion have been received and no objections have been filed with the Court or received by Lead Counsel.

## I.      INTRODUCTION

6.      This is a consolidated securities class action pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder and Section 20(a) of the Exchange Act. Plaintiffs asserted claims against defendant 22nd Century Group, Inc. ("22nd Century" or the "Company"), and defendants Henry Sicignano and John Brodfuehrer (collectively, the "Individual Defendants," and, together with 22nd Century, the "Defendants").

7.      On November 19, 2019, Plaintiffs filed their Amended Class Action Complaint (the "Complaint") asserting claims against all Defendants under Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act. ECF No. 31. The Complaint alleged, among other things, that Defendants made materially false and misleading statements and omissions concerning a scheme

to use promotional articles to inflate 22nd Century's share price and a Securities and Exchange Commission ("SEC") investigation into a material weakness in 22nd Century's accounting controls, from February 18, 2016 through July 31, 2019. *Id.*

8.      The proposed Settlement provides for the resolution of all claims in the Action in exchange for a cash payment of $3 million (the "Settlement Amount") for the benefit of the Settlement Class.  As detailed herein, Plaintiffs and Lead Counsel believe that the proposed Settlement represents an excellent result for the Settlement Class considering the significant risks of continued litigation.

9.      The Settlement was reached over four years of hotly contested litigation.  Plaintiffs' Counsel's efforts involved, among other things: (i) conducting a comprehensive investigation into Defendants' allegedly wrongful acts, which included consultation with loss causation and damages experts; (ii) drafting and filing a comprehensive 80-page Complaint based on an extensive investigation; (iii) unsuccessfully opposing Defendants' motion to dismiss the Complaint; (iv) obtaining a reversal in part of the dismissal of the Complaint on appeal; (v) successfully opposing Defendants' second motion to dismiss in full.

10.      After the Court denied Defendants' second motion to dismiss, Lead Counsel and Defendants' counsel arranged to mediation Plaintiffs' surviving claims. In preparation for the mediation, Lead Counsel drafted a detailed mediation statement and thoroughly reviewed and analyzed Defendants' mediation statement.  Following the exchange of detailed mediation statements addressing both liability and damages, Lead Counsel prepared for and engaged in a full-day mediation session before Jed D. Melnick, Esq. ("Melnick"), an experienced JAMS mediator; and engaged in negotiations regarding the terms of the proposed Settlement, which resulted in an agreement in principle to settle the Action for $3 million.

{00567731;1 }                                          3

11.     Based on the foregoing efforts, Plaintiffs and Lead Counsel are well informed of the strengths and weaknesses of the claims and defenses in the Action, and believe the Settlement represents an extremely favorable outcome for the Settlement Class and is in the best interests of its members.  For all the reasons set forth herein and in the accompanying memoranda and declarations, Plaintiffs and Lead Counsel respectfully submit that the Settlement is "fair, reasonable, and adequate" in all respects, and the Court should grant final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

12.     In addition, Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable.  As discussed in further detail below, Lead Counsel developed the Plan of Allocation with the assistance of Plaintiffs' damages consultant.  The Plan of Allocation provides for the distribution of the Net Settlement Fund to each Authorized Claimant on a *pro rata* basis based on their Recognized Loss amounts.

13.     Finally, Lead Counsel, on behalf of all Plaintiffs' Counsel, seek approval of the request for attorneys' fees and reimbursement of Litigation Expenses as set forth in the Fee and Expense Application.  As discussed in detail in the accompanying Fee and Expense Application, the requested 33 1/3% fee is within the range of percentage awards granted by courts in this Circuit in comparable complex litigation.  Additionally, the fairness and reasonableness of the request is confirmed by a lodestar cross-check, and is warranted in light of the extent and quality of the work performed and the substantial result achieved.  Likewise, the requested out-of-pocket litigation costs of $106,473.75 and the requested awards of $5,000 to each Plaintiff pursuant to the PSLRA are also fair and reasonable.  Accordingly, for the reasons set forth in the Fee and Expense Application and for the additional reasons set forth herein, Lead Counsel respectfully submits that the request for attorneys' fees and reimbursement of Litigation Expenses be approved.

{00567731;1 }                                           4

## II.   PROSECUTION OF THE ACTION

### A.   Commencement Of The Action And Appointment Of Lead Plaintiff And Lead Counsel

14.   On January 21, 2019, Matthew Bull filed a securities class action against Defendants in the United States District Court for the Eastern District of New York ("E.D.N.Y."). ECF No. 1. On August 1, 2019, E.D.N.Y. Judge Nicholas Garaufis appointed Noto, Garden State, and Johnson Lead Plaintiffs and appointed Pomerantz LLP as Lead Counsel. ECF No. 22.

### B.   The Comprehensive Pre-Filing Investigation And The Preparation Of The Complaint

15.   Following Lead Counsel's appointment, counsel consented to transfer of venue for the Action from the E.D.N.Y. to this Court. Lead Counsel then conducted a comprehensive investigation into 22nd Century's allegedly wrongful acts, which included, among other things: (1) reviewing and analyzing (a) 22nd Century's filings with the SEC, (b) public reports and announcements, research reports prepared by analysts, and news articles concerning 22nd Century, (c) 22nd Century's investor call transcripts, and (d) other publicly available material related to 22nd Century; and (2) conducting an extensive investigation (with the aid of a private investigator) that involved, *inter alia*, numerous interviews of former 22nd Century employees. Lead Counsel also consulted with damages and loss causation experts.

16.   On March 1, 2021, Plaintiffs filed the 80-page Complaint, which asserted claims against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act. ECF No. 31.

17.   Among other things, the Complaint alleged that Defendants violated Section 10(b) of the Exchange Act by, among other things, making materially false and misleading statements and omissions concerning a scheme to use promotional articles to inflate 22nd Century's share

price and a Securities and Exchange Commission ("SEC") investigation into a material weakness in 22nd Century's accounting controls, from February 18, 2016 through July 31, 2019. ¶ 154.[3]

18.    In addition to alleging that these statements were false and misleading, the SAC alleged that the price of 22nd Century's common stock was artificially inflated during the Settlement Class Period as a result of Defendants' allegedly false and misleading statements and declined when the truth was revealed. ¶ 231.

C.    **Defendants' Motion To Dismiss The Complaint And Plaintiffs' Response**

19.    On January 29, 2020, Defendants moved to dismiss the Complaint. ECF Nos. 36, 40-41. In moving to dismiss, Defendants emphasized that Defendants had no duty to disclose that paid promotional articles were using to support 22nd Century's stock price or the existence of any SEC investigation.  *See* ECF No. 41 at 2.  Defendants also argued that Plaintiffs failed to plead a strong inference of scienter because Plaintiffs did not allege that the Individual Defendants received a concrete and personal benefit from the alleged fraud, and that Plaintiffs' other allegations did not sufficiently support scienter. *Id.* at 2-3.

20.    On March 30, 2020, Plaintiffs opposed Defendants' motion to dismiss. ECF Nos. 38, 43-44. On April 29, 2020, Defendants filed a reply in further support of their motions to dismiss and transfer. ECF Nos. 39, 45.

21.    On January 14, 2021, Judge Sinatra granted Defendants' motion to dismiss with prejudice. ECF Nos. 53-54. Plaintiffs filed a timely appeal of that order (*see* ECF No. 55), and on June 14, 2022, a panel of the United Stated Court of Appeals for the Second Circuit reversed the dismissal of the Complaint in part and held that Defendants did have a duty to disclose the SEC investigation given their statements about a material accounting weakness at the Company and

---

[3] References to "¶__" or "¶¶__" are to paragraphs in the Complaint.

their later statements effectively denying the existence of such an investigation (*see* ECF No. 58).

22.    On August 8, 2022, Defendants filed a second motion to dismiss the Complaint on the grounds that Plaintiffs failed to allege scienter or loss causation, Plaintiffs opposed that motion on September 22, 2022, and Defendants replied to that opposition on October 12, 2022. ECF No. 63-68. On January 6, 2023, the Court denied Defendants' motion in full. ECF No. 69.

**D.    Mediation Efforts, Settlement Negotiations, and Preliminary Approval of the Settlement**

23.    On March 21, 2023, the parties participated in a private full-day mediation session before Melnick, an experienced JAMS mediator. In advance of the mediation session, Lead Counsel dedicated substantial efforts to preparing a persuasive mediation statement setting forth the relevant factual and legal predicates for their claims. The Parties then exchanged mediation statements.

24.    During the mediation, the parties reached an agreement in principle to settle the action for $3,000,000.00 for the benefit of the Settlement Class, subject to the execution of a settlement stipulation and related papers.

25.    On March 30, 2023, the parties informed the Court of the agreement in principle, and the Court agreed to adjourn case deadlines. ECF No. 77-78.

26.    Thereafter, the Parties exchanged multiple drafts of—and ultimately executed—the Stipulation dated April 25, 2023. ECF No. 81-1. On April 25, 2023, Plaintiffs submitted their Unopposed Motion for Preliminary Approval of Class Action Settlement ("Preliminary Approval Motion").  ECF Nos. 79-81.

27.    On June 15, 2023, Magistrate Judge Michael J. Roemer issued a report and recommendation recommending that the District Court grant the Preliminary Approval Motion ("R&R"). ECF No. 84.

28.     On June 30, 2023, the District Court adopted the R&R and issued its Decision and Order granting the Preliminary Approval Motion.  ECF No. 86.

## III.     THE RISKS OF CONTINUED LITIGATION

29.     The Settlement provides an immediate and certain benefit to the Settlement Class in the form of a non-reversionary cash payment of $3 million.  As explained more fully below, there were significant risks that the Settlement Class might recover substantially less than the Settlement Amount—or nothing at all—if the case were to proceed through continued litigation to a jury trial, followed by the inevitable appeals.  Before trial and a potentially litigated verdict, the most immediate risk faced by the Settlement Class related to Plaintiffs' forthcoming motion for class certification.  There was no guarantee that Plaintiffs and the Settlement Class would surmount this hurdle and, even if they did, later achieve any recovery, let alone one greater than $3 million.

### A.     Risks In Proving Liability

30.     When the Settlement was reached, Plaintiffs had successfully appealed in part the District Court's dismissal of their claims with prejudice, and successfully opposed Defendants' motion to dismiss the Complaint. Accordingly, Plaintiffs could only pursue a subset of the claims alleged in the Complaint.  Plaintiffs' defeat of Defendants' motion to dismiss was especially striking given the challenges Plaintiffs faced in asserting their claims.  For example, courts have been reluctant to sustain claims where, as here, investors allege that Defendants made misrepresentations concerning a government investigation that had not resulted in any finding of wrongdoing.

31.     The fact that Plaintiffs ultimately could pursue a subset of their claims, however, was not a guarantee of ultimate success.  Plaintiffs faced ongoing risks associated with their forthcoming motion for class certification as well as Defendants' forthcoming summary judgment

motions, in limine motions, trial, and likely appeals, which would extend the litigation for years and might lead to a smaller recovery or no recovery at all. While Plaintiffs believe they effectively demonstrated that Defendants made materially false and misleading statements in violation of the federal securities laws, Defendants will contest at summary judgment and trial whether their statements are actionable because they had no duty to disclose an SEC investigation that resulted in no finding of wrongdoing or penalties.

32.     Additionally, Defendants contended that the alleged false and misleading statements were not made with the requisite state of mind (*i.e.*, scienter) to support the securities fraud claims alleged. While Lead Counsel believes that the Complaint adequately alleges scienter, Lead Counsel was well aware of the high hurdle they would have to prove that the Defendants acted with the intent to "deceive, manipulate, or defraud" investors under the federal securities laws.

33.     Here, Defendants argued that the alleged false and misleading statements were not made with the requisite state of mind (*i.e.*, scienter) to support the securities fraud claims alleged, because the SAC did not allege that the Individual Defendants received a concrete and personal benefit from the alleged fraud, and that Plaintiffs' other allegations did not sufficiently support scienter.

**B.     Risks To Proving Loss Causation And Damages**

34.     Even assuming that Plaintiffs overcame the risk of establishing Defendants' liability, as discussed above, Plaintiffs would have confronted considerable challenges in establishing loss causation and class-wide damages.

35.     Plaintiffs allege that the truth about 22nd Century's failure to disclose the SEC investigation leaked into the market through a series of corrective disclosures culminating in the materialization of the risk that Defendant Sicignano would be forced to resign once investors

learned of the undisclosed investigation. It was unclear, however, whether the disclosure of the investigation actually caused the Company's share price to decline, whether an alleged corrective disclosure was statistically significant, and whether Sicignano's resignation was related to the disclosure of the investigation.

36.     Pursuant to *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), it is the plaintiff's burden to prove loss causation and damages. This would require Plaintiffs to proffer expert testimony as to: (a) what the "true value" of 22nd Century's stock would have been had there been no alleged material misstatements or omissions; (b) the amount by which the value of 22nd Century's common stock was inflated by the alleged material misstatements and omissions; and (c) the amount of artificial inflation removed by each alleged corrective disclosure. Defendants almost certainly would have presented their own damages expert(s), who would have no doubt asserted that there was no factual connection between the disclosure of the investigation and stock price declines, and whatever declines were attributable to investigation were not statistically significant, and thus that declines in 22nd Century's share price on the dates of the alleged corrective disclosures were not caused by the alleged corrective disclosures. At bottom, the burden of proving loss causation and damages would require a jury to decide the "battle of the experts"—an expensive and intrinsically unpredictable process.

37.     Indeed, expert testimony can often rest on many assumptions, any of which risks being rejected by a jury.  A jury's reaction to such expert testimony is highly unpredictable, and Plaintiffs recognize that, in a such a battle, there is the possibility that a jury could be swayed by Defendants' expert(s) and find there were no damages, or that they were only a fraction of the amount claimed by Plaintiffs.  Thus, the amount of damages that the Settlement Class would actually recover at trial, even if successful on liability issues, was uncertain.  Similarly, there was

no assurance that Plaintiffs' key evidence and testimony relating to liability and damages would be admitted as evidence by the Court at trial.  These issues could have seriously affected Plaintiffs' ability to successfully prosecute the Action.

38.    In sum, had any of Defendants' loss causation and damages arguments been accepted at summary judgment or trial, they could have dramatically limited—if not eliminated—any potential recovery by the Settlement Class.

**C.    Risks Faced In Obtaining And Maintaining Class Action Status**

39.    Defendants undoubtedly would have opposed Plaintiffs' forthcoming motion for class certification.  While Lead Counsel has researched and analyzed class certification and is confident that all the Rule 23 requirements are satisfied, and that the Court would certify the proposed class, Plaintiffs bear the burden of proof on class certification, and Defendants would have undoubtedly raised a host of arguments challenging the propriety of class certification.

40.    Plaintiffs also faced the significant risk that Defendants could successfully argue that Defendants' misstatements did not affect the price of 22nd Century's securities. For example, Defendants' second motion to dismiss the Complaint argued that the Company's share price had already fallen before the investigation was disclosed to the public and thus that the disclosure did not result in any harm to investors. Defendants further asserted that on the date of the second corrective disclosure, there was no statistically significant share price decline, and that the resignation of Defendant Sicignano was unrelated to the disclosure of the investigation. In other words, according to Defendants, the price of 22nd Century shares was not inflated by any alleged misstatements. While Plaintiffs believe that they could rebut these assertions, there is no guarantee that the Court would agree.

41.    Even if Plaintiffs successfully obtained class certification, Defendants could have

sought permission from the Second Circuit to appeal any class certification order under Federal Rule of Civil Procedure 23(f), further delaying or precluding any potential recovery. Class certification was, by no means, a foregone conclusion. Further, even if the Court were to certify the class, there is always a risk that the certified class could be decertified at a later stage in the proceedings.

### D.     Other Risks

42.     In addition, obtaining class certification, Plaintiffs would have had to prevail at several later stages of the litigation, each of which presenting significant risks in complex class actions such as this Action.

43.     Plaintiffs would have to successfully navigate and prevail against Defendants' eventual motion(s) for summary judgment, and at trial. Each of these several stages of litigation present significant risks in complex class actions such as this one. Lead Counsel know from experience that despite the most vigorous and competent efforts, success in complex litigation such as this case is never assured.

44.     Even if Plaintiffs succeeded in proving all the elements of their case at trial and obtained a jury verdict, Defendants almost certainly would have appealed. An appeal not only would have renewed the risks faced by Plaintiffs—as Defendants would have reasserted their arguments summarized above—but also would have resulted in significant additional delay. Given these significant litigation risks, Plaintiffs and Lead Counsel believe the Settlement represents an excellent result for the Settlement Class.

### E.     The Settlement Is Reasonable In Light Of Potential Recovery In The Action

45.     In addition to the risks of litigation discussed above, the Settlement is also fair and reasonable in light of the potential recovery of available damages. If Plaintiffs had fully prevailed on each of their claims at both summary judgment and after a jury trial, if the Court certified the

same class period as the Settlement Class Period, and if the Court and jury if Plaintiffs fully prevailed at summary judgment and trial, and the Court and jury accepted Plaintiffs' damages theory, the most reasonable estimate of potential damages would be approximately $50.7 million. Thus, the $3 million Settlement represents a recovery of approximately 5.9%, well above the median recovery of 1.8% of estimated damages in securities class actions settled in 2022. *See* Ex. 10 at 18 (Fig. 19).

46.    However, if Defendants prevailed on any or all of their arguments concerning liability, Plaintiffs would have recovered far less, if anything.

## IV.    PLAINTIFFS' COMPLIANCE WITH THE COURT'S PRELIMINARY APPROVAL ORDER REQUIRING ISSUANCE OF THE NOTICE

47.    Pursuant to the Preliminary Approval Order, Lead Counsel and the Court-approved Claims Administrator, Epiq, implemented a comprehensive notice program whereby notice was given to potential Settlement Class Members by mail, email, and publication.

48.    The Preliminary Approval Order directed that the Postcard Notice be mailed to potential Settlement Class Members and set a deadline of September 12, 2023 (21 calendar days before the final fairness hearing) for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion from the Settlement Class, and a final fairness hearing date of October 3, 2023 (the "Settlement Hearing").

49.    Pursuant to the Preliminary Approval Order, Lead Counsel instructed Epiq, the Court-approved Claims Administrator, to disseminate copies of the Postcard Notice and publish the Summary Notice.  Contemporaneously with the mailing of the Postcard Notice, Lead Counsel instructed Epiq to post downloadable copies of the Notice of (I) Pendency of Class Action, Certification of Settlement Class, and Proposed Settlement of Class Action; (II) Settlement

Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Notice") and Claim Form online at www.22ndCenturySecuritiesLitigation.com (the "Settlement Website"). The Postcard Notice directed Settlement Class Members to the Settlement Website in order to obtain additional information on the Settlement, including how to file a claim, request exclusion or object to the Settlement, and access to downloadable copies of the Notice and Claim Form.

50. The Notice disclosed, among other things, the following information to Settlement Class Members: (a) a summary of the Settlement, including the $3 million Settlement Amount; (b) the proposed Plan of Allocation; (c) that Lead Counsel would apply for an award of attorneys' fees on behalf of all Plaintiffs' Counsel in an amount not to exceed 33 1/3% of the Settlement Fund (*i.e.*, $1,000,000, plus interest), as well as Litigation Expenses, which may include an application for reimbursement to Plaintiffs for their costs and expenses related to their representation of the Settlement Class; (d) that any Settlement Class Member could object to the requested attorneys' fees and Litigation Expenses; (e) an explanation of the reasons for the Settlement; (f) that requests for exclusion from the Settlement must be submitted to the Claims Administrator no later than September 12, 2023; (g) that objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application must be filed with the Court no later than September 12, 2023; and (h) that the deadline for submitting a Claim Form is October 10, 2023.

51. To disseminate the Postcard Notice, on August 1, 2023, Epiq mailed a copy of the Postcard Notice to 18 individuals and organizations identified in the transfer agent records provided by 22nd Century's counsel. *See* Declaration of Joseph Mahan Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections ("Epiq Decl."), attached hereto as Exhibit 11 at ¶¶ 5-6.

52.    In addition, Epiq maintains a proprietary database with names and addresses of the largest and most common banks, brokerage firms, institutions, and other third-party nominees.  On August 1, 2023, Epiq caused Notice Packets to be mailed or emailed to the 1,043 nominees and institutional groups contained in the Epiq master mailing list.  Epiq Decl., ¶¶ 4, 6.  The Notice directed those who purchased or otherwise acquired 22nd Century securities during the Class Period, for the beneficial interest of a person or entity other than themselves, to either (i) within seven (7) calendar days of receipt of the Notice, request from the Claims Administrator sufficient copies of the Postcard Notice to forward to all such beneficial owners and within seven (7) calendar days of receipt of those Postcard Notices forward them to all such beneficial owners; or (ii) within seven (7) calendar days of receipt of the Notice, provide a list of the names, mailing addresses, and, if available, email addresses of all such beneficial owners to Epiq.  Epiq Decl. ¶¶ 14-16 and Exs. A & B.

53.    As of August 29, 2023, 4,376 potential Settlement Class Members have been mailed copies of the Postcard Notice  and/or have received a link to the Notice and Claim Form.  *See id.* at ¶¶ 6-7.

54.    On July 31, 2023, in accordance with the Preliminary Approval Order, Epiq caused the Summary Notice to be published once in *Investor's Business Daily* and to be transmitted over *PR Newswire*.  *See id.* at ¶ 9; Ex. B (confirmations of publications).

55.    Lead Counsel also caused Epiq to establish the dedicated Settlement Website, which became operational on July 28, 2023, to provide potential Settlement Class Members with information concerning the Settlement, including exclusion, objection, and claim-filing deadlines for the case; the online claim filing link; the date and time of the Settlement Hearing; and downloadable versions of the Notice and Claim Form, as well as copies of the Stipulation and

Preliminary Approval Order. Epiq Decl. ¶ 13.

56.    Epiq maintains a toll-free telephone number for potential Settlement Class Members to call and obtain information about the Settlement and/or request a Notice and Claim Form.  Epiq promptly responds to each telephone inquiry and will continue to address potential Settlement Class Members' inquiries.  *Id.* at ¶¶ 10-11.

57.    As set forth above, the Postcard Notice and Notice informed potential Settlement Class Members that the deadline to file objections to the Settlement, the proposed Plan of Allocation, and/or the Fee and Expense Application is September 12, 2023, and that the deadline to request exclusion from the Settlement Class is September 12, 2023.  To date, no requests for exclusion have been received.  *Id.* at ¶¶ 14-15.

58.    In addition, to date, no objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application have been entered on this Court's docket or have otherwise been received by Lead Counsel or Epiq.  Lead Counsel will file reply papers by September 26, 2023, which will address any objections that may be received.  Lead Counsel's reply papers will include a supplemental affidavit from Epiq addressing whether any requests for exclusion have been received.

## V.    ALLOCATION OF THE NET PROCEEDS OF THE SETTLEMENT

59.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who want to participate in the distribution of the Net Settlement Fund (*i.e.*, the Settlement Fund less (a) any Taxes, (b) any Notice and Administration Costs, (c) any Litigation Expenses awarded by the Court, and (d) any attorneys' fees awarded by the Court) must submit a valid Claim Form with all required information postmarked no later than October 10,

{00567731;1 }                          16

2023. As set forth in the Notice, the Net Settlement Fund will be distributed among Settlement Class Members according to the plan of allocation approved by the Court.

60. Plaintiffs' damages expert developed the proposed Plan of Allocation in consultation with Lead Counsel. Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund among Settlement Class Members who suffered losses as a result of the conduct alleged in the Complaint.

61. The Plan of Allocation is set forth at pages 13 to 21 of the Notice. *See* ECF No. 81-1 at 74-82 (Notice). As described in the Notice, the calculations made pursuant to the Plan of Allocation are not intended to be estimates of, nor indicative of, the amounts that Settlement Class Members might have been able to recover after a trial. Nor are the calculations pursuant to the Plan of Allocation intended to be estimates of the amounts that will be paid to Authorized Claimants pursuant to the Settlement. The computations under the Plan of Allocation are only a method to weigh the claims of Authorized Claimants against one another for the purposes of making *pro rata* allocations of the Net Settlement Fund.

62. In developing the Plan of Allocation, Plaintiffs' damages expert calculated the amount of estimated alleged artificial inflation in the per share closing prices of 22nd Century securities that were allegedly proximately caused by Defendants' purportedly false or misleading statements and omissions. In calculating the estimated artificial inflation caused by Defendants' alleged misrepresentations and omissions, Plaintiffs' damages expert considered the price change in 22nd Century common stock that occurred on October 25, 2018, and April 17, 2019, and July 29-31, 2019, respectively, and adjusted the price change observed on this day for changes that were attributable to market or industry forces.

63. Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for

each purchase of 22nd Century common stock during the Settlement Class Period (*i.e.*, from February 18, 2016 through and including July 31, 2019) that is listed in the Claim Form and for which adequate documentation is provided.  The calculation of Recognized Loss Amounts will depend upon several factors, including how many shares of 22nd Century common stock the Claimant purchased, when the 22nd Century common stock was bought, acquired, or sold (or if it was still held at the end of the Settlement Class Period), and the purchase price and sales price (if sold).  In general, the Recognized Loss Amount calculated will be the difference between the estimated artificial inflation on the date of purchase and the estimated artificial inflation on the date of sale (with certain adjustments based on the 90-day average price following the end of the Settlement Class Period if the stock was still held as of the end of the Settlement Class Period), or the difference between the actual purchase price and sales price of the stock, whichever is less.

64.     Claimants who purchased 22nd Century common stock during the Settlement Class Period and sold those shares before the alleged corrective disclosures impacted the Company's share price (on October 25, 2018, and April 17, 2019, and July 29-31, 2019, respectively) will have no Recognized Loss Amount for those transactions.  The Plan of Allocation also incorporates the "Lookback Period" damage claim ceiling provisions of the PSLRA.  Recognized Loss Amounts for shares of 22nd Century common stock sold during the 90-day period after the end of the Settlement Class Period or still held at the end of trading on October 29, 2019, the end of the 90-day period, are also limited by the difference between the purchase price and the average closing price of 22nd Century common stock during that period, consistent with provisions of the PSLRA, 15 U.S.C. § 78u-4(e).

65.     The sum of the Recognized Loss Amounts for all of a Claimant's purchases of 22nd Century common stock during the Settlement Class Period is the Claimant's "Recognized Claim"

and the Net Settlement Fund will be allocated to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims.

66.     In sum, the Plan of Allocation was designed to fairly and rationally allocate the proceeds of the Net Settlement Fund among Settlement Class Members based on the losses they suffered on transactions in 22nd Century common stock that were attributable to the conduct alleged in the Complaint.  Accordingly, Lead Counsel respectfully submits that the Plan of Allocation is fair and reasonable and should be approved by the Court.

67.     To date, no objections to the proposed Plan of Allocation have been received by Lead Counsel or the Claims Administrator or posted on the Court's docket.  *See* Epiq Decl. at ¶ 17.

## VI.     LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

68.     In addition to seeking final approval of the Settlement and Plan of Allocation, Lead Counsel is applying for a fee award of 33 1/3% of the Settlement Fund (or $1,000,000, plus interest earned at the same rate as the Settlement Fund).  Lead Counsel also requests reimbursement of Litigation Expenses from the Settlement Fund in the amount of $106,473.75 in out-of-pocket expenses that Plaintiffs' Counsel incurred in connection with the prosecution of the Action. Finally, Plaintiffs request awards of $5,000 to each Plaintiff as an award in connection with representing the Settlement Class.  The total Litigation Expenses amount of $106,473.75 is below the maximum expense amount of $200,000, set forth in the Settlement Website, Long Form Notice, and Postcard Notice.  The legal authorities supporting a 33 1/3% fee award are set forth in the accompanying Fee and Expense Application, filed concurrently herewith.  The primary factual bases for the requested fee and reimbursement of Litigation Expenses are summarized below.

{00567731;1 }                                         19

#### A.    The Fee Application

69.    Lead Counsel is applying for a percentage-of-the-common-fund fee award to compensate them for the services they rendered on behalf of the Settlement Class.  As set forth in the accompanying Fee and Expense Application, the percentage method is the best method for determining a fair attorneys' fee award, because unlike the lodestar method, it aligns the lawyers' interest with that of the Settlement Class in achieving the maximum recovery.  The lawyers are motivated to achieve maximum recovery in the shortest amount of time required under the circumstances.  This paradigm minimizes unnecessary drain on the Court's resources.  Notably, the percentage-of-the-fund method has been recognized as appropriate by the Supreme Court and the Second Circuit for cases of this nature.  Furthermore, the requested fee is fully supported by a "lodestar multiplier cross-check."

70.    Based on the quality of the result achieved, the extent and quality of the work performed, the significant risks of the litigation, and the fully contingent nature of the representation, Lead Counsel respectfully submit that the requested fee award is fair and reasonable and should be approved.  As discussed in the Fee and Expense Application, a 33 1/3% fee award is well within the range of percentages awarded in securities class actions with comparable settlements in this Circuit.

#### 1.    The Favorable Outcome Achieved Is the Result of the Significant Time and Labor That Plaintiffs' Counsel Devoted to the Class Action

71.    Plaintiffs' Counsel spent considerable time prosecuting this Action on behalf of the Settlement Class.  As previously summarized above, Plaintiffs' Counsel, among other things:

- drafted the initial complaint in the Action and moved for the appointment of Lead Plaintiff and Lead Counsel;
- conducted an extensive investigation of the claims asserted in the Action, which included, among other things: (a) reviewing and analyzing (i) 22nd Century's filings with the U.S. Securities and Exchange Commission ("SEC"), (ii) research

{00567731;1 }                                    20

reports prepared by securities and financial analysts, and news and industry articles, concerning 22nd Century, (iii) 22nd Century's investor call transcripts and (iv) other publicly available material related to the Company; (b) retaining and working with private investigator, who interviewed numerous former Company employees; and (c) working with a damages and loss causation expert to analyze 22nd Century's stock price movements;

- utilized the foregoing comprehensive investigation and additional research to draft and file the comprehensive 80-page Complaint (ECF No. 31, which asserted claims against all Defendants under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, and against the Individual Defendants under Section 20(a) of the Exchange Act;

- researched and drafted the opposition to Defendants' first motion to dismiss (ECF Nos. 40-45);

- after the Court granted Defendants' motion to dismiss, successfully obtaining a reversal of the Court's dismissal in part after an appeal to the United States Court of Appeals for the Second Judicial Circuit ("Second Circuit") (ECF No. 58);

- research and drafted the opposition to Defendants' second motion to dismiss and successfully defeated that motion in its entirety (ECF Nos. 63-69);

- engaged in a mediation process overseen by a highly experienced third-party mediator, Jed D. Melnick, Esq. ("Melnick"), an experienced JAMS mediator, which involved an exchange of written submissions concerning the facts of the case, liability and damages, a full-day formal mediation session, and extensive consultation with Plaintiffs' expert on damages and loss causation;

- negotiated a detailed confidential settlement term sheet with Defendants' counsel, which was executed on March 24, 2023;

- drafted and then negotiated the terms of the Stipulation (including the exhibits thereto) and Supplemental Agreement with Defendants' Counsel;

- worked with a damages expert to craft a plan of allocation that treats Plaintiffs and all other members of the proposed Settlement Class fairly;

- drafted the Preliminary Approval Motion and supporting papers;

- oversaw the implementation of the notice process; and

- drafted the Motion for Final Approval and supporting papers.

72.    Lead Counsel was assisted by BGG, GPM, and VLO in this action. As set forth in this declaration and the declaration of Garth Spencer of GPM ("GPM Decl."), attached hereto as

Exhibit 1, BGG, GPM, and VLO served as individual counsel to Plaintiffs.[4] In these roles, BGG, GPM and VLO undertook various responsibilities, for example, explaining the roles and duties of serving as lead plaintiff to Joseph Noto, Garden State Tire Corp., and Stephens Johnson, gathering trade records filed with the initial complaint in this action and with Noto, Garden State, and Johnson's motion to be lead plaintiff, presenting the lead plaintiff motion to Plaintiffs, explaining its contents, addressing questions and concerns, providing comments to Lead Counsel, and/or ensuring that those comments were addressed in the filed motion. *Id.*

73.     Attached hereto as Exhibit 2 is a schedule summarizing Lead Counsel's hours and lodestar.[5]

74.     The hourly rates for the attorneys and professional support staff are similar to the rates that have been accepted in other securities or shareholder litigation in this District in the context of a lodestar cross-check.  Additionally, the rates billed by Lead Counsel attorneys (ranging from $459-$550 per hour for non-partners and $875-$1,250 per hour for partners) are comparable to peer plaintiff and defense firms litigating matters of similar magnitude.  *See* Ex. 3 attached hereto (table of peer law firm billing rates).

75.     As set forth above and in detail in Exhibit 2, Lead Counsel expended a total of 1459.85 hours in the investigation and prosecution of the Action.  The resulting total lodestar is $1,210,810.00.  The requested fee amount of 33 1/3% of the Settlement Fund currently equals $1,000,000 (plus interest earned at the same rate as the Settlement Fund), and therefore represents a 0.826 "negative" multiplier of Lead Counsel's lodestar.

76.     Plaintiffs' Counsel will continue to work towards effectuating the Settlement in the

---

[4] The time expended by BGG and VLO in this Action was de minimus and thus not included in Lead Counsel's lodestar.

[5] Time expended in preparing the Fee and Expense Application has not been included.

event the Court grants final approval. Among other things, Lead Counsel will continue working with the Claims Administrator to resolve issues with Settlement Class Member's claims, will respond to shareholder inquiries, will draft and file a motion for distribution, and will oversee the distribution process. ***No additional compensation will be sought for this work, other than expenses incurred with respect to claims administration and any other necessary activities to conclude this matter.***

77. As detailed above, throughout this litigation, Lead Counsel devoted substantial time to the prosecution of the Action. Lead Counsel maintained control of, and monitored the work performed by, lawyers and other personnel on this case. I personally devoted substantial time to this litigation and was personally involved in, among other things: (a) the investigation of the facts and applicable law; (b) drafting, reviewing and editing all pleadings, court filings, the meditation statement, and other correspondence prepared on behalf of Plaintiffs; (c) engaging with damages and loss causation experts; (d) conducting discussions with counsel for Defendants on a variety of matters; and (f) participating in settlement negotiations.

78. Experienced attorneys at Lead Counsel, BGG, GPM, and VLO were involved with drafting, reviewing and/or editing pleadings, court filings, and the mediation submissions, communicating with Plaintiffs, serving, responding to, and negotiating discovery, the mediation process, negotiating the terms of the Settlement, Term Sheet and Stipulation, and/or other matters. More junior attorneys and paralegals also worked on matters appropriate to their skill and experience level. Throughout the litigation, Plaintiffs' Counsel maintained an appropriate level of staffing that avoided unnecessary duplication of effort and ensured the efficient prosecution of this litigation.

79. Plaintiffs' Counsel's extensive efforts in the face of substantial risks and

{00567731;1 }                                        23

uncertainties have resulted in a significant recovery for the benefit of the Settlement Class. In circumstances such as these, and in consideration of the hard work and the result achieved, I respectfully submit that the requested fee is reasonable and should be approved.

### 2. The Magnitude and Complexity of the Action

80. As detailed in the Fee and Expense Application, securities class action cases are known for their notorious complexity. This case was no different. As detailed above, this Action presented many novel and complex issues, including distinguishing the current circumstances from circumstances in prior decisions holding that an investigation need not be disclosed if it is unresolved or does not result in any penalties or findings of wrongdoing, identifying and investigating potential confidential witnesses who could testify about the use of promotional articles to boost 22nd Century's share price and the existence of the SEC investigation, drafting an amended complaint that would comply with the rigorous pleading standards of the PSLRA despite the PSLRA's automatic stay of discovery, and contesting motions to dismiss and an appeal opposition Defendants' sophisticated and well-resourced counsel at Foley & Lardner LLP and Duke, Holzman, Photiadis & Gresens LLP.

81. Additionally, the mediation and settlement process in this Action was hard-fought. The Parties zealously advocated their positions throughout the mediation process, including two days of mediation.

### 3. The Significant Risks Borne By Plaintiffs' Counsel

82. This prosecution was undertaken by Plaintiffs' Counsel on an entirely contingent-fee basis. From the outset, there was no guarantee that Plaintiffs' Counsel would ever be compensated for the substantial investment of time and money the case would require. In undertaking that responsibility, Plaintiffs' Counsel were obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, that funds were available to compensate

attorneys and staff, and that the considerable litigation costs required by a litigation like this one was covered. With an average lag time of many years for complex cases like this to conclude, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis. Indeed, Plaintiffs' Counsel received no compensation during the course of the Action and incurred $106,473.75 in out-of-pocket litigation-related expenses.

83.    Additionally, Plaintiffs alleged their claims without information gained through subpoena power, as Defendants would likely have argued that any attempt to do so would have been precluded by the PSLRA's automatic stay of discovery.

84.    Plaintiffs' Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset, this litigation presented multiple risks and uncertainties that could have prevented any recovery whatsoever.

85.    Moreover, despite the most vigorous and competent of efforts, success in contingent-fee litigation like this one is never assured. Plaintiffs' Counsel know from experience that the commencement of a class action does not guarantee a settlement. *See supra* ¶¶ 42-44. On the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

        **4.    The Quality of Representation, Including the Result Obtained, the Experience and Expertise of Lead Counsel, and the Standing and Caliber of Defendants' Counsel**

86.    As demonstrated by the firm resumes of Pomerantz and GPM, attached hereto as Exhibits 4 and 5, Lead Counsel are highly experienced and skilled laws firms that focus their practices on securities class action litigation. Indeed, Lead Counsel have substantial experience in litigating securities fraud class actions and have negotiated scores of other class settlements, which have been approved by courts throughout the country. Lead Counsel enjoys a well-deserved

reputation for skill and success in the prosecution and favorable resolution of securities class actions and other complex civil matters. Lead Counsel's experience added valuable leverage in the settlement negotiations.

87.    Additionally, the quality of the work performed by Plaintiffs' Counsel in obtaining the Settlement should also be evaluated in light of the quality of the opposition. Here, the Defendants were represented by Foley & Lardner LLP and Duke, Holzman, Photiadis & Gresens LLP, well-known law firms that vigorously represented the interests of their clients throughout the Action. In the face of this experienced and formidable opposition, Plaintiffs' Counsel were able to develop a case that was sufficiently strong to nonetheless persuade Defendants to settle the case on terms that we believe are highly favorable to the Settlement Class.

### 5.    The Requested Fee In Relation to the Settlement

88.    The amount of the fee requested (33 1/3%) in relation to the Settlement Amount ($1 million) is fair and reasonable. Courts routinely award fees of one-third in securities class action settlements. *See* Ex. 6.

### 6.    Interests of Public Policy, Including the Need to Ensure the Availability of Experienced Counsel in High-Risk Contingent Securities Cases

89.    Courts consistently recognize that it is in the public interest to have experienced and able counsel to enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors take an active role in protecting the interests of shareholders. If this important public policy is to be carried out, the courts should award fees that adequately compensate plaintiffs' counsel in consideration of the risks undertaken in prosecuting a particular securities class action. Relatedly, it is a long-recognized public policy that settlement is to be encouraged, including the resolution

of fee applications that fairly and adequately compensate the counsel who bear the risks and dedicate the time, financial investment, and expertise necessary to achieve those settlements.

### 7.    The Reaction of the Class Supports Class Counsel's Fee Request

90.    As noted above, as of August 29, 2023, 4,376 copies of the Postcard Notice and/or Notice have been disseminated advising Settlement Class Members that Lead Counsel would apply for an award of attorneys' fees in an amount not to exceed one-third of the Settlement Fund. Epiq Decl. ¶¶ 6-7, 16, Ex. A (Postcard Notice); ECF No. 81-1 at 61-82 (Notice). In addition, the Summary Notice has been published in *Investor's Business Daily* and transmitted over the *PR Newswire*. Epiq Decl. at ¶ 9; Ex. B (confirmation of Summary Notice publications). To date, no objections to the maximum potential attorneys' fees request set forth in the Postcard Notice and Notice have been received or entered on this Court's docket. Any objections received after the date of this filing will be addressed in Lead Counsel's reply papers, set to be filed by September 26, 2023.

### 8.    Plaintiffs Support Lead Counsel's Fee Request

91.    As set forth in their respective declarations submitted, Plaintiffs have concluded that Lead Counsel's requested fee is fair and reasonable based on the work performed, the recovery obtained for the Settlement Class, and the risks of the Action. *See* Ex. 8 ("Noto Decl.") ¶¶ 3-6; Ex. 9 ("Garden State Decl.") ¶¶ 3-5; Ex. 10 ("Johnson Decl.") ¶¶ 3-6. Plaintiffs have been involved in the litigation and settlement of the Action, and their endorsement of Lead Counsel's fee request supports the reasonableness of the request and should be given weight in the Court's consideration of the fee award.

92.    In sum, Plaintiffs' Counsel accepted the Action on a fully contingent basis, committed significant resources, and prosecuted the Action without any compensation or guarantee of success. Based on the result obtained, the quality of the work performed, the litigation

risks, and the contingent nature of the representation, Lead Counsel respectfully submit that a fee award of 33 1/3% of the Settlement Fund, resulting in a multiplier of 0.826, is fair and reasonable, and is supported by the fee awards courts have granted in other comparable cases.

**B.      Reimbursement of The Requested Litigation Expenses Is Fair And Reasonable**

93.      Lead Counsel seeks a total $106,473.75 in out-of-pocket expenses reasonably and necessarily incurred by in connection with commencing, litigating, and settling the claims asserted in the Action. The following is a combined breakdown by category of all expenses incurred by Lead Counsel[6]:

| CATEGORY OF EXPENSE | AMOUNT |
| --- | --- |
| CLERICAL OVERTIME | $839.58 |
| CLERK/COURT FILING FEES | $1,362.00 |
| COMPUTER RESEARCH | $11,227.86 |
| EXPERT FEES | $23,573.36 |
| INVESTIGATOR FEES | $30,504.68 |
| MEALS AND CONFERENCE | $1,187.43 |
| MEDIATOR FEES | $15,500.00 |
| PRINTING (APPEAL) | $8,264.17 |
| PHOTOCOPYING | $591.10 |
| POSTAGE AND OVERNIGHT MAIL | $154.70 |
| PRESS RELEASES & NEWSWIRES | $4,964.59 |
| PROCESS SERVER | $485.00 |
| TRAVEL | $2,483.57 |
| **GRAND TOTAL** | **$106,473.75** |

94.      To date, no objection has been raised as to expenses.  If any objection to the request for reimbursement of Litigation Expenses is made after the date of this filing, Lead Counsel will address it in their reply papers.

95.      From the commencement of this Action, Lead Counsel understood that they might

---

[6] The expenses reflected in the combined breakdown chart includes out-of-pocket litigation expenses incurred by Lead Counsel and GPM.

not recover their out-of-pocket expenses. Lead Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate them for the contemporaneous lost use of funds advanced to prosecute the Action. Accordingly, Lead Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

96.   The litigation expenses for which Lead Counsel seek reimbursement are types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour. These litigation expenses included, among other things: (a) the use of online research databases to research many of the factual allegations alleged in the Complaint and to research and support Plaintiffs' legal arguments; (b) court costs; (c) service of process costs; (d) photocopying; and (e) postage and delivery expenses.

### C.   Awards for Lead Plaintiff and Named Plaintiff

97.   Finally, as stated above, Plaintiffs respectfully request PSLRA awards in the amount of $5,000 for Noto, $5,000 for Garden State Tire Corp., and $5,000 for Stephens Johnson pursuant to 15 U.S.C. § 78u-4(a)(4) for the reasonable costs directly incurred, including the time and effort expended by Plaintiffs in connection with representing the Settlement Class. *See* Noto Decl., ¶ 6; Garden State Decl., ¶ 5; Johnson Decl. ¶ 6. Based on the work performed by Plaintiffs for the benefit of the Settlement Class, I believe the awards are justified and appropriate.

98.   As set forth in his declaration, Noto participated in discussions concerning the prosecution of the Action, the strengths of and risks of the asserted claims, and potential settlement. In particular, throughout the course of the Action, Noto (a) communicated with Plaintiffs' Counsel regarding the posture and progress of the case; (b) compiled his trading data and completed his certification in connection with his motion to be appointed Lead Plaintiff; (c) reviewed all of the

significant pleadings and pre-motion letters filed in the Action; (d) consulted with Plaintiffs' Counsel regarding the settlement negotiations and mediation; and (e) evaluated and approved the proposed Settlement.

99. As set forth in its declaration, Garden State participated in discussions concerning the prosecution of the Action, the strengths of and risks of the asserted claims, and potential settlement. In particular, throughout the course of the Action, Garden State (a) communicated with Plaintiffs' Counsel regarding the posture and progress of the case; (b) compiled trading data and completed its certification in connection with the motion to be appointed Lead Plaintiff; (c) reviewed all of the significant pleadings and pre-motion letters filed in the Action; (d) consulted with Plaintiffs' Counsel regarding the settlement negotiations and mediation; and (e) evaluated and approved the proposed Settlement.

100. As set forth in his declaration, Johnson participated in discussions concerning the prosecution of the Action, the strengths of and risks of the asserted claims, and potential settlement. In particular, throughout the course of the Action, Johnson (a) communicated with Plaintiffs' Counsel regarding the posture and progress of the case; (b) compiled his trading data and completed his certification in connection with his motion to be appointed Lead Plaintiff; (c) reviewed all of the significant pleadings and pre-motion letters filed in the Action; (d) consulted with Plaintiffs' Counsel regarding the settlement negotiations and mediation; and (e) evaluated and approved the proposed Settlement.

101. To date, no objections to the Litigation Expenses have been filed on the Court's docket. In Lead Counsel's opinion, the Litigation Expenses incurred by Lead Counsel and Plaintiffs were reasonable and necessary to represent the Settlement Class and achieve the Settlement. Accordingly, Lead Counsel respectfully submit that the Litigation Expenses should

be reimbursed in full from the Settlement Fund.

## VII.   CONCLUSION

102.   In view of the significant recovery for the Settlement Class and the substantial risks of this Action, as described herein and in the accompanying Final Approval Memorandum, Lead Counsel respectfully submit that the Settlement should be approved as fair, reasonable, and adequate and the proposed Plan of Allocation should be approved as fair and reasonable.  Lead Counsel further submit that the requested fee in the amount of 33 1/3% ($1,000,000) of the Settlement Fund should be approved as fair and reasonable, the request for reimbursement of $106,473.75 in Litigation Expenses, and Plaintiffs' request for $15,000 in PSLRA compensation in the amount of $5,000 for each of Plaintiffs should also be approved.

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct.

Executed this 29th day of August 2023, at New York, New York.

*/s/ Brian Calandra*
_____
BRIAN CALANDRA

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was electronically filed with the Clerk of

Court via the CM/ECF system, which will send Notice of such filing to all counsel of record.


Dated: August 29, 2023                         */s/ Brian Calandra*
                                                Brian Calandra

{00567731;1 }